Page 1

1               IN THE UNITED STATES DISTRICT COURT
2               FOR THE NORTHERN DISTRICT OF OHIO
3                        EASTERN DIVISION
4                            -  -  -
5    SHIRLEY BROWN,                    )
                                       )
6              Plaintiff,              )
                                       )
7        v.                           ) Case No. 1:11-CV-1370
                                       ) Judge Lesley Wells
8    MICHAEL CHAPMAN, et al.,          )
                                       )
9              Defendants.             )
                             -  -  -
10     THE VIDEOTAPED DEPOSITION OF OFFICER MICHAEL CHAPMAN
                  TUESDAY, JUNE 12, 2012
11                           -  -  -
12        The videotaped deposition of OFFICER MICHAEL
13   CHAPMAN, a Defendant herein, called for examination by
14   the Plaintiff, under the Federal Rules of Civil
15   Procedure, taken before me, Lori A. Morris, a Notary
16   Public within and for the State of Ohio, pursuant to
17   Notice, at Cleveland City Hall, 601 Lakeside Avenue,
18   Cleveland, Ohio commencing at 9:00 a.m., the day and
19   date above set forth.
20                           -  -  -
               HOFFMASTER & BARBERIC, INC.
21        THE LORENZO CARTER BUILDING, SUITE 440
                    1360 WEST NINTH STREET
22                 CLEVELAND, OHIO 44113
                       (216) 621-2550
23                 FAX (216) 621-3377
                       1-888-595-1970
24                           -  -  -

25

1   APPEARANCES:
2

On behalf of the Plaintiff:
3
         ALPHONSE A. GERHARDSTEIN, ESQ.
4        Gerhardstein & Branch, Co., LPA
         432 Walnut Street, Suite 400
5        Cincinnati, Ohio  45202
         (513) 621-9100
6
         DAVID B. MALIK, ESQ.
7        8437 Mayfield Road, Suite 103
         Chesterland, Ohio  44026
8        (440) 729-8260
9

On behalf of the Defendants:
10
         THOMAS KAISER, ESQ.
11       JOHN P. BACEVICE, JR., ESQ.
         Cleveland City Hall
12       Law Department
         601 Lakeside Avenue, Room 106
13       Cleveland, Ohio  44114
         (216) 664-2800
14
15
                              - - -
16
17   ALSO PRESENT:
         Videographer
18       Shirley Brown
         Maurice Brown
19       Leslie Hogan
         Belal Ilain
20
21                            - - -
22
23
24
25

```
 1                           INDEX

 2                                             PAGES

 3

 4    CROSS-EXAMINATION BY

 5        MR. GERHARDSTEIN                      4

 6

 7                       - - -

 8

 9    PLAINTIFF'S EXHIBITS MARKED

10

          1 and 2                              45

11        3                                    57

          4 and 5                              66

12        6                                    71

          7                                    73

13        8                                    93

          9                                    95

14        10                                   98

          11                                  100

15        12                                  105

          13                                  106

16        14                                  107

          15                                  109

17        16                                  116

18

                       - - -

19

20    OBJECTIONS BY

21        MR. KAISER     30, 34, 37(3), 38(2), 41, 44, 49,

          55, 56, 63(2), 65(3), 66, 72, 79, 87, 96(2),

22        97(2), 98, 121, 122, 123(2), 124(3), 128, 129

23                       - - -

24

25
```

1                    OFFICER MICHAEL CHAPMAN

2    a Defendant herein, called for examination by the

3    Plaintiff, under the Rules, having been first duly

4    sworn, as hereinafter certified, deposed and said as

5    follows:

6                    CROSS-EXAMINATION

7    BY MR. GERHARDSTEIN:

8    Q.    Good morning.

9    A.    Good morning.

10   Q.    State your name, please.

11   A.    Michael Chapman.

12   Q.    Where do you work?

13   A.    Cleveland Police, Fourth District.

14   Q.    My name's Al Gerhardstein.  With me is David

15         Malik and members of the family of Rodney Brown.

16              And we're here to take a deposition in a

17         lawsuit.  You're familiar with this case; right?

18   A.    Yes.

19   Q.    Have you been deposed before?

20   A.    No.

21   Q.    Have you been sued before?

22   A.    Yes.

23   Q.    What was the lawsuit?

24   A.    I got into an accident, probably around 2000, and

25         I didn't have insurance and the insurance company

```
 1          that the female had, they sued me.

 2   Q.     Okay.  Did you give a deposition in that case?

 3   A.     No.

 4   Q.     Have you ever discharged a firearm at a suspect?

 5   A.     No.

 6   Q.     Have you ever tased a suspect, other than Mr.

 7          Brown?

 8   A.     No.

 9   Q.     Have you ever been tased?

10   A.     Yes.

11   Q.     When were you tased?

12   A.     I'm not sure of the date and time, but it's been

13          on my -- since I've been on the police force.

14   Q.     And tell me about that.

15             What were the circumstances?

16   A.     Well, what do you mean as far as?

17   Q.     How you came to be tased?

18   A.     Oh, we had training.  We have training once a

19          year and part of the training was taser training.

20          During the taser training they asked if there are

21          any volunteers that want to get tased, and I

22          raised my hand.

23             And they -- me and my -- one of my classmates

24          they put a prong on me and prong on him and we

25          held our hands and they turned the taser on and
```

1         it pretty much shocked the heck out of us.

2   Q.   Did that hurt?

3   A.   Yes.

4   Q.   Were your muscles impacted by that?

5   A.   Yes.

6   Q.   What happened?

7   A.   I couldn't move.  My muscles were just really

8         tense, like, you know, all of my muscles felt

9         like they were balled up into a fist.

10  Q.   Did you fall down?

11  A.   I was already laying down.

12  Q.   And these prongs were actually alligator clips?

13  A.   Yes.

14  Q.   So they didn't actually stick it into your skin?

15  A.   No, they just clipped it on, like, you know,

16        clamped it on my skin.

17  Q.   And a single discharge was able to incapacitate

18        the muscles in both you and your partner?

19  A.   Yes.

20  Q.   How many times have you volunteered for that?

21  A.   Just once.

22  Q.   Would you do it again?

23  A.   No.

24  Q.   Why not?

25  A.   Because it was probably the most painful thing

1           I've ever felt in my life.

2    Q.    On December 31st, 2010 did you have an

3          identifying number or code that you went by?  A

4          badge number or cruiser number?

5    A.    Yes.

6    Q.    What was that?

7    A.    4 Barney 24.

8    Q.    4 Barney 24?

9    A.    Yes.

10   Q.    And is that an identifier you carry every day,

11         the same one?

12   A.    When I was with that number, yes.

13   Q.    Well, is that a geographical area, like a beat,

14         or was that your number that you carried every

15         day on the police department?

16   A.    No, it's actually a geographical area.

17   Q.    So if you're working as a detective, you wouldn't

18         carry that?

19   A.    No.

20   Q.    So one day you might be 4B24 and another day

21         someone else could be 4B24?

22   A.    Yes.

23   Q.    But on December 31st, 2010 you were 4B24?

24   A.    Yes.

25   Q.    And did you have a partner?

1   A.    Yes.

2   Q.    Who was that?

3   A.    Officer Belal Ilain.

4   Q.    What shift did you work?

5   A.    Second shift.

6   Q.    Were you in a zone car?

7   A.    Yes.

8   Q.    Were you the driver or the rider?

9   A.    I was the driver.

10  Q.    What equipment did you have on your person that
11        night?

12  A.    I remember I had my taser.  My OC spray.
13        Flashlight.  My duty weapon.  Handcuffs.  Two
14        pairs of handcuffs.  I think I had -- I'm not
15        sure if I had my ASP baton.

16            I think I had my ASP baton.

17  Q.    And all of those you carry on your duty belt?

18  A.    No.  My OC spray, my -- actually, my flashlight
19        and my taser all on my vest cover.  Everything
20        else was on my belt.

21  Q.    And the taser is an X26?

22  A.    Yes.

23  Q.    Your duty weapon is a Glock?

24  A.    Yes.

25  Q.    Tell me about the communications equipment that

1        was available to you on December 31st, 2010.

2   A.   Do you mean my radio?

3   Q.   Yes.

4   A.   Well, we had the car radio and also our hand-held

5        radios.

6   Q.   Now, with respect to the car radio, is that on a

7        taped line?

8   A.   Yes.

9   Q.   Is the hand-held radio over a different frequency

10       than the car radio?

11  A.   No, it's all the same frequency.

12  Q.   So it's all on a taped line?

13  A.   Yes.

14  Q.   What frequency?

15  A.   Well, I don't know the frequency.

16  Q.   When you use the hand-held or car radio, can you

17       speak to other zone cars directly?

18  A.   Yes.

19  Q.   And all of that is taped?

20  A.   Yes.

21  Q.   Did you also carry a cell phone?

22  A.   On that day, I'm not sure.

23  Q.   Do you normally have a personal cell phone?

24  A.   Yes.

25  Q.   Does the department ever issue cell phones?

1         Is there a Cleveland Police Department cell

2         phone?

3    A.   I don't know.

4    Q.   Have you ever had one?

5    A.   No.

6    Q.   Are there any rules about when you can make a

7         cell phone call?

8    A.   I'm not sure.

9    Q.   You're not aware of any?

10   A.   I'm not sure.

11   Q.   On December 31st, 2010 did you make any cell

12        phone calls while you were on your shift?

13   A.   I'm not sure.  I can't remember.

14   Q.   What was the service that you used for your cell

15        phone in December of 2010?

16   A.   Verizon.

17   Q.   Do you still have the same service?

18   A.   Yes.

19   Q.   What was your cell phone number?

20   A.   216-337-6486.

21   Q.   Do you still have the same number?

22   A.   Yes.

23   Q.   In the zone car was there a cruiser cam?

24   A.   No.

25   Q.   When you were working that night, did you carry a

Page 11

1          tape recorder?

2     A.    No.

3     Q.    Do you ever carry a tape recorder?

4     A.    No.

5     Q.    At anytime during your interaction with Rodney

6          Brown on 12-31-2010, did you make any cell phone

7          calls?

8               MR. KAISER:                Asked and

9               answered, but you can go ahead and answer

10              it again.

11    A.    No.

12    Q.    Your X26 taser, did it have a video feature?

13    A.    No.

14    Q.    When you came on shift on December 31, 2010, did

15         you do anything to investigate whether the taser

16         was in working order?

17    A.    I don't remember.

18    Q.    Is there a routine that you follow with respect

19         to the taser?

20    A.    Normally I might do a five-second check on the

21         taser when I come in, just to make sure it's in

22         working order.

23    Q.    Is it a five-second check or a one-second check?

24    A.    Normally a five-second check.  Sometimes a

25         one-second check.

1  Q.   Is it a spark test?

2  A.   Yes.

3  Q.   If you had done a spark test on December 31st,

4       2010, it would show up on the dataport; right?

5  A.   Yes, it would.

6  Q.   Have you ever looked at your taser download from

7       that night?

8  A.   I can't -- I think I glanced at it.  I'm not

9       sure, though.

10 Q.   Did you spark test your taser on December 31st,

11      2010 at the beginning of your shift?

12 A.   I can't remember.

13 Q.   Would it surprise you if you hadn't?

14 A.   No.

15 Q.   What's the purpose of a spark test?

16 A.   Just to make sure that the taser is working.

17 Q.   And do you know whether there were -- did you

18      carry the same taser every night?

19 A.   Yes.

20 Q.   So if you regularly spark tested your taser, the

21      spark test would show up on the download for each

22      night on the days when you worked previous

23      shifts; right?

24 A.   I'm really not sure how it all works, but I'm

25      pretty sure.

1   Q.   What was your first contact with Rodney Brown?

2   A.   Is when I approached him after -- during a

3        traffic stop and asked him for his driver's

4        license and insurance.

5   Q.   Well, back up and tell me why you stopped him.

6   A.   Well, we had an assignment in the area of Regalia

7        -- I can't remember the exact street.  After we

8        were done with the assignment as we were going

9        back to our vehicle, we heard gunshots in the

10       area, so we decided to wait on Regalia to see if

11       anything that might come in our direction.  And a

12       vehicle comes westbound towards us and doesn't

13       have his lights on -- from the area where the

14       gunshots were fired.

15           We figured we could check this vehicle out,

16       see what's going on with it, make sure the male

17       or female who was driving checked okay.

18  Q.   So what did you do?

19  A.   Well, the vehicle turned south on East 113th.  We

20       stopped -- we turned our lights and sirens,

21       initiated a traffic stop at East 113th and

22       Benham.  I got out the car -- my partner and I

23       exited the vehicle and I went to Mr. Brown and I

24       asked him for his license and insurance.

25  Q.   When you approached Mr. Brown, did you know who

1       he was?

2   A.   No, I didn't.

3   Q.   So what happened next?

4   A.   He stated to me, do you know who I am?  And I

5       said, no, I need to see your license and

6       insurance.  He stated, again, do you know who I

7       am?  And I said, no.  I said, you know, give me

8       your license.

9           And he reached towards the passenger side

10      area, I think, the glove compartment area and

11      started having words with my partner.  And my

12      partner told me, he said, Mike, he needs to come

13      out the car.

14  Q.   Then what happened?

15  A.   Well, I told Mr. Brown, I said, Mr. Brown -- I

16      said, sir, I need you to exit the vehicle.  He

17      exited the vehicle quite aggressively and I

18      stepped back towards the back of the vehicle and

19      I said, sir, you just come back here, place your

20      hands on the hood or on the trunk.

21          And, you know, me and my partner, we went to

22      him, I was on the left side, my partner was on

23      the right side.  I started to pat him down and we

24      let him know that -- as we were grabbing hold of

25      him, letting him know that, sir, you know, you

1          need to -- or, sir, you're under arrest.  You

2          haven't showed us any ID, you know, and you're

3          refusing to give us any ID, you're under arrest.

4             And he's tensing up and as soon as we start to

5          try to put his arms behind his back, he just

6          throws me and my partner off of him.  And -- keep

7          going?

8   Q.    Yes.

9   A.    All right.  Right as soon as he throws us both

10         off of him, you know, I take a step back and

11         pulled my taser and I pointed it at him and said,

12         sir, get on the ground and he takes a step

13         towards me.  I'm like, sir, get on the ground,

14         and he takes another step towards me and I taser

15         him right in the chest area.  Has absolutely no

16         affect on him.

17           He starts running eastbound on Benham.  My

18         partner -- as he's running, my partner tries to

19         tase him in the back.  And the taser hits, but

20         had absolutely no affect.

21           So we're chasing him and I could see that no

22         longer his arms aren't swinging anymore and I

23         said, Belal, he's reaching for something, he's

24         reaching for something.  So we're chasing him, we

25         get to East 114th and we're running south on East

1  114th, running about 10 houses -- about 10

2  houses, maybe 8 to 10 houses, my partner catches

3  him in the driveway and they go rolling from the

4  driveway into the grass.

5     As soon as we stop, I ended in the fray.  And

6  we're trying now to drive stun him.  To place

7  him, you know, get -- try to get some control of

8  him.  Well, he's smacking our tasers away with

9  his bare hands and it's doing absolutely nothing.

10  And my partner throws his taser out, I

11  reholstered my taser and we're wrestling with

12  him, he's punching and kicking at us.  Now it's

13  kind of -- it's almost like an all out brawl now.

14     He's punching and kicking, we're grabbing,

15  everybody is rolling around trying to get control

16  over him and he's a very powerful man.  You know,

17  it was most of the time we were just trying to

18  put all our weight on him just to keep him down.

19     During the fight I'm trying to radio our

20  location, what's going on, we need help.  We're

21  going back and forth with him.  He grabbed my

22  arm, he twisted my wrist back.  You know, he hit

23  my partner in the head with an object.  And

24  during the fight, I see him produce a black

25  object in his hand, wasn't sure what it was

1        because it was dark.

2             At this point, you know, we've been fighting

3        with him for some time.  I'm getting quite

4        exhausted.  I see a black object produced in his

5        hand and I grabbed my gun and I jammed it in his

6        back.  And I yell to clear my partner out, hey,

7        I'm gonna shoot him.  And it was more so, too, so

8        Mr. Brown could hear me because, hey, this is a

9        clear indicator, I have my gun out and he's still

10       fighting my partner.  Grabs his hand and yanks

11       the object out and throws it and says, don't

12       shoot and I reholster.  Now we're back again

13       fighting with him.  Everybody's fighting.

14       Everybody's fighting.  We're not getting anywhere

15       with him.

16            During the fight we kind of all three of us

17       come to a standstill or a -- you know, nobody's

18       moving, everybody's breathing hard.  We're just

19       keeping our weight on him just so he can't get

20       up.  Most we can get him is down to one knee.  We

21       never really got him down to his stomach or all

22       fours at anytime, but we keep him down on one

23       knee at least.

24            At one point he yells, hey, go get my people.

25       And we look and it's like a crowd of people

1      coming towards us.  And he's like just yelling,

2      hey, go get my people, go get my people.  And I'm

3      trying to broadcast to radio, you know, hey, we

4      think we got some people coming towards us.  Not

5      really sure, but it was really hard to broadcast.

6      I'm trying to breathe and talk at the same time.

7      I think that when the people came and they saw

8      that it was two cops fighting -- I think that he

9      may have knew them, but when they started seeing

10     maybe two cops fighting, they backed off.

11         And, you know, so we're kind of still holding,

12     everybody's holding each other.  He's holding us,

13     we're holding him.

14         And the first car arrives -- well, the first

15     car shows actually shows up and goes the wrong

16     way.  I'm screaming for him to turn around and

17     come back to us.

18         The first car comes and Officer Vargas shows

19     up.  He's pointing his taser and he's telling us

20     to leave and my partner's yelling, no, the

21     taser's not working, the taser's not working, so

22     he tries to grab him.  And the other officers all

23     show up, everybody else shows up and they piled

24     on him.

25         My partner and I, we fall back because we're

1    exhausted, you know.  There is no more fight left

2    in us.  I can barely crawl, you know.  And as I'm

3    laying on the ground, he's still fighting with

4    the other officers, you know.

5        I'm trying to -- as far as I can remember,

6    eventually they get him under control and I

7    remember broadcasting to radio to maybe get

8    another vehicle on East 113th where Mr. Brown --

9    you know, secure the vehicle, make sure nobody

10   takes off with it or just to secure the vehicle.

11       And I guess during this time they had placed

12   Mr. Brown in the back of one of the zone cars.

13   When I come back from making sure the vehicle was

14   secure, one officer comes to me and he says, hey

15   -- well, EMS shows up eventually -- let me

16   digress.

17       I see somebody -- one officer is talking to

18   Mr. Brown and they grab him out the vehicle and

19   EMS shows up.  They put him in the ambulance and

20   a short time later an officer -- one of the

21   officers comes to me and says, hey, he's in

22   cardiac arrest.

23       And after that, you know, they were in there

24   -- I went to the vehicle, I went to ambulance, I

25   could see them doing, you know, chest

Page 20

```
 1          compressions, you know, trying to resuscitate
 2          him.
 3    Q.    At anytime while you were rolling around with Mr.
 4          Brown, did he say he couldn't breathe?
 5    A.    No.
 6    Q.    At anytime when you were having contact with Mr.
 7          Brown, did he say he couldn't breathe?
 8    A.    No.
 9    Q.    When you were with Mr. Brown, was Officer
10          Melendez there?
11    A.    At what point when I was with Mr. Brown?
12    Q.    Were you still with Mr. Brown when Officer
13          Melendez showed up?
14    A.    When he first showed up on scene, when -- he was
15          the second assisting -- after -- he showed up
16          after Officer Vargas did, he was his partner.  So
17          they both showed up right on the scene.  They
18          were the first two officers to assist us.
19    Q.    So while you were still having contact with Mr.
20          Brown, Officer Melendez was having contact with
21          Mr. Brown?
22    A.    Yes.
23    Q.    And during that time, did Mr. Brown say, I can't
24          breathe?
25    A.    No.
```

1   Q.    Did Officer Melendez say, who gives a fuck?

2   A.    No.

3   Q.    Did you ever hear him say that?

4   A.    No.

5   Q.    Have you ever heard that he said that?

6   A.    No -- well --

7   Q.    Did you see that in the complaint?

8   A.    -- I'm sorry, I heard eventually on the tape he

9         did say it.

10  Q.    So you listened to the tape?

11  A.    Yes.

12  Q.    And you heard him say that?

13  A.    Yes.

14  Q.    And you heard Mr. Brown say, I can't breathe?

15  A.    Yes.

16              MR. KAISER:                    While

17              listening to the tape?

18  BY MR. GERHARDSTEIN:

19  Q.    While you were listening to the tape?

20  A.    Yes.

21  Q.    So when was that?

22  A.    I don't know when he actually said that.

23  Q.    Was it before you were lying on the ground

24        exhausted?

25  A.    No, it had to be after the fact, after -- he said

1       that it was after me and my partner had

2       disengaged from the fight.

3   Q.  And how do you know that?

4   A.  Because there was no talking when we actually

5       were fighting with him until, you know, only when

6       we told him that tasers weren't working.

7           I mean, as far as talking, nothing short of

8       put your hands behind your back, you know, but

9       nothing as far as I can't breathe.

10  Q.  Is there anything else that you recall about the

11      incident?

12  A.  No.

13  Q.  When you first contacted Mr. Brown while you were

14      at the side of his vehicle, did you tell him to

15      turn his headlights on?

16  A.  No, I didn't.

17  Q.  Why didn't you just tell him to turn his

18      headlights on and let him move on?

19  A.  Well, the reason when I stopped him -- when I do

20      a traffic stop, that's the first thing I ask is,

21      sir, do you have license and insurance.

22  Q.  You learned at some point that he had plenty of

23      ID; right?

24  A.  I can't remember.

25  Q.  He had a birth certificate, he had other ID on

1       him; right?

2   A.   I can't remember.

3   Q.   When you brought Mr. Brown back to the back of

4       the vehicle, did there come a time when you used

5       force to direct Mr. Brown to put his hands on the

6       vehicle?

7   A.   No.

8   Q.   Did you ever elbow him in the neck?

9   A.   No.

10   Q.   Did you ever push him onto the vehicle?

11   A.   No.

12   Q.   Would it be appropriate to elbow a person in Mr.

13       Brown's situation in the neck in order to get him

14       to place his hands on the vehicle?

15   A.   No.

16   Q.   In a situation where all you've got is a person

17       who hasn't produced his ID and you're still

18       investigating, would it be appropriate to push

19       him onto the vehicle in order to get him lined up

20       so you can pat him?

21   A.   No.

22   Q.   He stopped when you put your lights and siren on;

23       right?

24   A.   Yes.

25   Q.   Did anyone ask him to place his car into park?

1    A.    Yes, I think my partner told him place the car

2          into park.

3    Q.    And he complied with that; right?

4    A.    Yes.

5    Q.    And when he was asked to exit his vehicle, he

6          complied with that; right?

7    A.    Yes.

8    Q.    At some point while you were -- by the way, why

9          did you decide to start cuffing him?

10   A.    Well, he was -- he was being very evasive, we

11         felt, with not giving us any identification.  His

12         speech was quite slurred and he kept saying, do

13         you know who I am?  Instead of giving us

14         identification he just -- it's not normal when an

15         officer asks you for identification and the

16         person keeps answers, do you know who I am?  You

17         know, it seemed like he was being pretty evasive.

18             So, okay, it was the whole situation, the

19         totality of the situation.  I mean, he came from

20         an area with gunshots, refused to show us any ID,

21         had slurred speech, so it was the totality of

22         everything.

23   Q.    What was the crime you were arresting him for?

24   A.    Well, at the time he wasn't producing any

25         identification, which is an unwaivable offense,

1      which is also an arrestable offense.  So that

2      alone, we had probable cause to arrest him, just

3      for refusing to show us any type of

4      identification.  Or at the time, we couldn't find

5      any identification on him.  So that alone, and

6      him being very -- like I said, being very

7      evasive, seems like he was under the influence of

8      something, having slurred speech.

9    Q.  While you were interacting with Mr. Brown, was

10      that contact with Mr. Brown being broadcast?

11   A.  I'm not understanding.

12   Q.  Would that be on your radio?

13   A.  No.

14   Q.  You could put it on the radio, though; right?

15      All you'd have to do is click you mic?

16   A.  You'd have to hold it, which isn't practical.

17      You'd have to hold your mic, you can't just --

18   Q.  You can't set it?

19   A.  Yeah, you just can't click it and leave it on.

20   Q.  Is that the only way to have an interaction with

21      a citizen recorded, you have to hold the mic

22      down?

23   A.  Unless you were to buy your own instrument.

24   Q.  You said that you didn't find any ID on Mr.

25      Brown, did you pat him down?

Page 26

1    A.    Yes, we patted him down just for -- at the time

2          for weapons.

3    Q.    And did you reach into his pockets to find wallet

4          or ID?

5    A.    No.

6    Q.    So when you say you didn't find any ID on him,

7          what did you do to look for ID?

8    A.    Well, we didn't really have the chance, because

9          we didn't -- we didn't have a chance to search

10         him.  We wanted to place him under arrest and

11         that's when we could search him.  We could only

12         pat him down for weapons at the time.

13   Q.    How much time did you give him in the vehicle to

14         come up with his ID before you directed him to

15         leave the car?

16   A.    I can't give you the amount of minutes, but it

17         was plenty of time.  I asked him three times for

18         his ID.  My partner asked for his ID.  He was

19         going back and forth with his partner and refused

20         to give any identification to either one of us.

21   Q.    More than a minute?

22   A.    Yes.

23   Q.    More than five minutes?

24   A.    I probably say about five minutes.

25   Q.    Prior to initiating the traffic stop, did you

Page 27

1       observe his license plates?

2   A.  No.

3   Q.  Did you -- you have a system where you can type

4       in a license plate and get an owner and all that

5       kind of stuff, right, all that information?

6   A.  Yes.

7   Q.  Did anybody do that?

8   A.  I think my partner may have, but I can't

9       remember.

10  Q.  So prior to stopping him, did you get a report

11      back with respect to the owner of the car or

12      anything about the car?

13  A.  I can't remember.  Sometimes we're able to type

14      in the plate and call it out.  Sometimes we can

15      just -- sometimes we'll type in a plate and then

16      call out a traffic stop.  Sometimes we can just

17      call out the plate over the radio and just exit

18      the vehicle before we get a report on the

19      vehicle.

20  Q.  Before the events of that evening had concluded,

21      had you ever received a report back as to the

22      owner of the car?

23  A.  I can't remember.

24  Q.  Did you learn, before the events of the evening

25      are concluded, that the owner of the car lived

1       within a couple blocks of the location you were

2       at at the time?

3   A.    Yes.

4   Q.    Tell me about that.  When did you learn that?

5   A.    I can't remember when I learned it, but I do

6       remember learning it.  I don't know if I checked

7       the -- went back and checked the plate or check

8       his ID, but I remember seeing it, that the

9       vehicle came, like, down the street from where it

10      was supposed to be.

11  Q.    You learned it that night?

12  A.    I would -- I don't remember.

13  Q.    Well, if you learned it that night, did you take

14      any steps to contact the owner of the car who was

15      just a few blocks away?

16  A.    No.

17  Q.    Why not?

18  A.    Well, if I learned it, it was after everything

19      had concluded.  And at this point, homicide takes

20      the investigation.  I have absolutely nothing

21      else to do with anything.  My partner and I have

22      absolutely nothing else to do with anything.

23  Q.    So is it your testimony now that you did not

24      learn that the owner of the car lived a few

25      blocks away prior to having the events with Mr.

1          Brown?

2    A.    I can't remember.

3    Q.    Okay.  Well, let me just understand your normal

4          practice; okay?

5    A.    M-hm.

6    Q.    So you don't really remember when you learned

7          that the owner of the car was nearby.  If you had

8          learned that the owner of the car was nearby and

9          you had just had this altercation with the driver

10         of the car, would you have taken steps to contact

11         the owner just to advise her as to the status of

12         the car and what had happened?

13   A.    I never had a homicide situation, so I couldn't

14         really tell you.  This is the only one I've ever

15         had is this.

16   Q.    And if he had not died, would you have contacted

17         the owner of the car?

18   A.    Yes, we would have tried to contact the owner.

19   Q.    So you would expect a homicide situation is even

20         more serious than the ones you've had; right?

21   A.    Yes.

22   Q.    So you would expect that someone involved in the

23         homicide investigation that night would have

24         contacted the owner of the car; right?

25   A.    Well, I don't know the procedures of homicide.  I

1          don't know their procedures.

2    Q.   I understand that you don't know them, but as a

3         law enforcement professional you would expect

4         someone to contact her; right?

5               MR. KAISER:                    Objection.

6    A.   I don't know.

7    Q.   You're at the back of the car and you said that

8         you told him he was under arrest; is that

9         correct?

10   A.   Yes.

11   Q.   And you're on Mr. Brown's left side?

12   A.   Yes.

13   Q.   And your partner is on Mr. Brown's right side?

14   A.   Yes.

15   Q.   And at that point, are you situated squarely in

16        the back of Mr. Brown's vehicle?

17   A.   No, we're on the -- we're -- I think we're kind

18        of like on the corner.  Like he's near the corner

19        of the car.  I'm on the left side of the car,

20        he's pretty much on the corner near the rear left

21        side of the car.

22   Q.   I'm going to give you a piece of paper and I'd

23        like you to just draw a box for the car and put a

24        C for your initial where you are and B for Mr.

25        Brown's initial for where he is and an I for an

1         initial showing where your partner is.

2             And the driver's side of the car would be --

3         so you're on the driver's side of the car?

4   A.    Yes.

5   Q.    And what kind of car is that?

6   A.    I can't remember what type of car it is.

7   Q.    Is it a sedan or a station wagon?

8   A.    It was a four door smaller vehicle.

9   Q.    So you're all lined up at the driver's rear of

10        the car --

11  A.    Yes.

12  Q.    -- right?

13            And then you said that Mr. Brown -- well,

14        prior to Mr. Brown taking any action, did his

15        hands ever get placed on the car?

16  A.    Yes.

17  Q.    And did you ever get a cuff on one of the arms?

18  A.    No.

19  Q.    And did your partner ever get a cuff on one of

20        the arms?

21  A.    No.

22  Q.    Did you ever have your hands on Mr. Brown's left

23        arm?

24  A.    Yes.

25  Q.    And did you bring his left arm around to his

1       back?

2   A.  I wasn't able to.

3   Q.  Was that your intention?

4   A.  Yes.

5   Q.  And as you had your hands on his left arm, what

6       happened?

7   A.  Well, as we were letting him know he's under

8       arrest, I tried grabbing his hands to place it

9       around him, but he tensed up very strong.  My

10      partner tried to grab his arm, you know, now

11      we're trying to put his arms behind his back but

12      he's, you know -- and he just kind of swung us

13      off of him.  You know, kind of yanked away from

14      me, pushed me away and pushed my partner away.

15  Q.  Okay.  And then did Mr. Brown move at that point?

16  A.  Yes.

17  Q.  Where did he go?

18  A.  Well, I took a step back and he took a step

19      towards me and he had his fist in the air.  Like

20      I said I took a step back and he took another

21      step towards me.

22  Q.  When you say you took a step back, did you take a

23      step into the street or behind the vehicle?

24  A.  No, we were already in the street so I was taking

25      a step back maybe towards the front of the

1        vehicle because we were at the back of the

2        vehicle.

3    Q.  Were you facing Mr. Brown?

4    A.  Yes.

5    Q.  And Where was your partner?

6    A.  He was -- I can't remember where my partner was

7        at the time.  I remember where I was.

8    Q.  So how far away from Mr. Brown were you when you

9        took your step back?

10   A.  I would say if he was at the rear of the vehicle,

11       I was maybe at the middle of the vehicle, not --

12       I mean, maybe --

13   Q.  Six feet?

14   A.  Around that.

15   Q.  And then at that point you carry your taser in

16       some sort of shoulder holster?

17   A.  No, a chest holster.  A body holster.

18   Q.  And does your taser have a yellow handle or a

19       yellow edge of the handle?

20   A.  No.

21   Q.  Is it all black?

22   A.  Yes, yes, it is.  It's all black.

23   Q.  You've stepped now toward the driver's seat;

24       right?

25   A.  Yes.

1   Q.    And Mr. Brown has stepped towards you, you say?

2   A.    M-hm.

3   Q.    Then what happened?

4   A.    Well, I pull my taser and I aim it at him.  I

5         said, get on the ground, sir.  Sir, get on the

6         ground.

7   Q.    And when you said that, did you have any light

8         beam or any other indication that the taser was

9         activated?

10  A.    Yes.

11  Q.    Tell me about that.

12  A.    It was a red light beam that was directly on his

13        chest.

14  Q.    And when you acted in this manner, were you

15        acting consistent with the general orders on use

16        of force from the City of Cleveland?

17  A.    Yes.

18              MR. KAISER:                  Objection

19              to the general orders.

20  BY MR. GERHARDSTEIN:

21  Q.    When you acted in this manner, did you act

22        consistently with how you had been trained?

23  A.    Yes.

24  Q.    All right.  So you've got a beam of light on his

25        chest and where on his chest?  Just show me with

1           your finger.

2    A.    Around the area right here in the middle

3           (indicating).

4    Q.    So you call that center mass?

5    A.    About center mass, yes.

6    Q.    The sternum?

7    A.    I would say so, yes.

8    Q.    So you've got your light beam there, did you say

9           to him anything with respect to what you were

10          going to do?

11   A.    No.  I just -- sir, get on the ground.

12   Q.    Did you say taser, taser?

13   A.    No.

14   Q.    Did you say, sir, I'm going to tase you?

15   A.    No.

16   Q.    How long did you point your taser with the light

17          at his chest?

18   A.    It wasn't long.  I can't remember how long.

19          Everything happened very fast.

20   Q.    And what did he do when you had your taser out?

21   A.    Took another step towards me.

22   Q.    And you told him to do what?

23   A.    Get on the ground.

24   Q.    And then what happened?

25   A.    He took another step towards me.  As he took

```
 1          another step towards me, I pulled the trigger,

 2          tried to hit him with the taser.

 3    Q.    So at that point was he, like, five feet away?

 4    A.    He was about -- because every time he took a

 5          closer to me, I took a step back.  He seemed --

 6          the guy was -- he was well within distance where

 7          he could probably get to me very quick.  So every

 8          time he took a step towards me, I took a step

 9          back.

10    Q.    So how many feet away do you think he was at the

11          time you tased him?

12    A.    Same amount of feet.  Five, six feet.  You know,

13          every time he took a step towards me, I took a

14          step back.

15    Q.    When you shot the taser at him, did both prongs

16          strike him in the chest?

17    A.    No.  The way the prongs shoot, they both wouldn't

18          have striked him in the chest.

19    Q.    Where did they strike him?

20    A.    Well, I don't remember where the first -- where

21          the actual second one hit him.  The first one hit

22          where the taser hit, but they go in a way where

23          they kind a spread apart when they hit it.  If

24          the second one hit him, maybe it could have hit

25          him in the leg, the stomach, or it probably
```

Page 37

```
 1              couldn't have made contact at all.  I'm not sure.
 2    Q.    Would you agree that the closer you are to a
 3          subject, the shorter the prong spread?
 4    A.    Yes.
 5    Q.    And would you agree that if you don't have a very
 6          broad prong spread, okay, and both prongs hit the
 7          chest, that type of shot does not incapacitate a
 8          person so that they would fall down?
 9              MR. KAISER:                    Objection.
10    BY MR. GERHARDSTEIN:
11    Q.    Do you understand the question?
12    A.    The closer they are, yeah, it would probably be
13          that way.
14    Q.    Because if you don't have one prong above the
15          waist and one prong below, it may not be a big
16          enough prong spread to accomplish knocking the
17          guy over; right?
18              MR. KAISER:                    Objection.
19    A.    I don't know.  Some people react differently.
20    Q.    Well, you understand that the purpose -- the goal
21          is to have one prong above the chest and one
22          prong below the waist; right?
23              MR. KAISER:                    Objection.
24    A.    No.
25    Q.    You don't understand that?
```

1  A.   No.  You're saying that's the purpose, I don't

2       understand that's the purpose.

3  Q.   Well, isn't the goal to use the taser to

4       incapacitate the muscles?

5  A.   Yes.

6  Q.   And isn't the goal to use the taser so that the

7       muscles are incapacitated and the person falls

8       over?

9  A.   Yes.  And then when the person falls over and

10      while they're under power, your partner is

11      supposed to cuff him; right?

12  A.   Yes.

13  Q.   So if he doesn't fall over, something goes wrong;

14      right?

15          MR. KAISER:                    Objection.

16  A.   I'm not sure what you're saying.

17  Q.   Well, the goal was to have him fall over?

18  A.   You're saying that the taser didn't work?

19  Q.   The taser was ineffective; right?

20  A.   Yes, the taser was ineffective.

21  Q.   And one reason a taser can be ineffective is if

22      both prongs hit the chest; right?

23          MR. KAISER:                    Objection.

24  A.   It would be less, I would guess.  I would

25      probably say it would probably be less effective.

Page 39

1         MR. KAISER:                    Al, when

2         you reach a convenient point would you

3         mind giving me a short break?

4         MR. GERHARDSTEIN:              Okay, just

5         hold on.

6    BY MR. GERHARDSTEIN:

7    Q.   You shot your taser and Mr. Brown -- and you saw

8         at least one prong hit his chest; right?

9    A.   Yes.

10   Q.   And you're just not sure where the other prong

11        went?

12   A.   No.

13   Q.   And then what happened?

14   A.   It had no affect.  He took another step towards

15        me, then he took off -- he started running

16        eastbound on Benham.

17   Q.   And during this whole episode when he was

18        running, you were chasing him; right?

19   A.   My partner, we were both chasing him.

20   Q.   And did you ever determine whether the wire

21        connected to the prong severed or were you able

22        to stay within 25 or 21 feet?

23   A.   I do remember for a moment I was able to stay

24        with him, but -- so one wire was connected.

25        Whether both wires were connected, I'm not sure.

Page 40

1    Q.    So at least as of the time you started wrestling,

2          one wire was still connected?

3    A.    I don't know if it was mine, because my partner

4          also tried tasing him, but one wire, you know,

5          was still on him.

6    Q.    And you say that because you saw it on him?

7    A.    Yes.  After the fight I remember seeing -- like

8          the guys there were getting evidence up and I

9          remember seeing the taser wire on him -- on the

10         ground.

11                 MR. GERHARDSTEIN:              Well,

12                 we'll pick it up after we accommodate a

13                 break.

14                 MR. KAISER:                Thank you.

15                 THE VIDEOGRAPHER:          Off the

16                 record.

17                 (Thereupon, there was a brief recess.)

18                 THE VIDEOGRAPHER:              On the

19                 record.

20   BY MR. GERHARDSTEIN:

21   Q.    Resuming.

22            Mr. Chapman, when did you join the Cleveland

23         Police Department?

24   A.    October 15th, 2007.

25   Q.    How old are you?

Page 41

```
 1   A.   I am 33.

 2   Q.   On December 31st, 2010 did your zone car have a

 3        GPS locator?

 4   A.   Yes.

 5   Q.   And just tell me what that means.

 6   A.   Well, it's called an AVL.  It's more so that it

 7        can -- just like a GPS, tells us where -- tells

 8        whoever needs to know where our vehicle is at all

 9        times.

10   Q.   Is that all stored in a database somewhere?

11   A.   I'm not sure.  I think so, though.

12   Q.   So is it your understanding that there's some

13        server somewhere that has a computerized record

14        of all the places your car went when you were out

15        on patrol?

16             MR. KAISER:                    Objection.

17   A.   I think so.

18   Q.   When you were engaged in the use of force with

19        Mr. Brown prior to the point when he ran, why did

20        you use your taser as opposed to OC spray?

21   A.   Well, I felt that that would probably -- the

22        taser was probably my best option.  Mr. Brown

23        seemed pretty aggressive.  He was a pretty big

24        guy, seemed very strong, and I didn't think the

25        OC spray would work.
```

1   Q.   The cartridge that you had when you deployed the

2        taser against Mr. Brown, do you know how many

3        feet the wire was or what color the door was?

4   A.   Green doors.

5   Q.   Green doors, and how many feet is that?

6   A.   I'm not sure.

7   Q.   Is that all you're issued is green cartridges?

8   A.   Green door cartridge, yes.

9   Q.   Is that still the case?

10  A.   Yes.

11  Q.   By the way, when you went on duty that night, how

12       many green door cartridges did you have?

13  A.   I had three.

14  Q.   Is that standard that you would have three

15       cartridges?

16  A.   I'm not sure if it's standard.

17  Q.   Is that what you carry every night?

18  A.   Yes.

19  Q.   How many total cartridges did you discharge that

20       night?

21  A.   One.

22  Q.   And where did you have the other two cartridges?

23  A.   They were in my bag, actually.  They were in my

24       bag.

25  Q.   In your bag, what's that mean?

1  A.    In my zone car bag.  My duty bag, that's where

2        they were.

3  Q.    So when you're issued these three cartridges, you

4        have one in the taser that's in the holster;

5        right?

6  A.    Yes.

7  Q.    And that's already loaded into the taser; is that

8        correct?

9  A.    Yes.

10 Q.    And then the other two cartridges are not on your

11       person?

12 A.    No.  Most of time they're in the bag -- I'm

13       pretty sure they were in my bag.  Sometimes --

14       most times -- sometimes I just keep them in my

15       pocket.

16 Q.    What about that night, did you have the other two

17       cartridges in your pocket?

18 A.    In my bag.

19 Q.    Are you sure?

20 A.    I'm pretty sure.

21 Q.    After all the events were concluded, there was an

22       investigation; right?

23 A.    Yes.

24 Q.    At any point did anyone investigating this use of

25       force ask you to account for the other two

Page 44

1         cartridges?

2    A.    No.

3    Q.    So if we wanted to be sure that you hadn't

4         deployed the other cartridges, we wouldn't have

5         any way of knowing that; would we?

6    A.    Yes.

7              MR. KAISER:                    Objection.

8    BY MR. GERHARDSTEIN:

9    Q.    How would we know that?

10   A.    Well, they have an -- on the blast doors they

11        have like these sprinkle things that come out and

12        that's where you can locate it.  They would have

13        seen those.  If these are the blast doors, where

14        are the other taser cartridge they came from.

15   Q.    Do you know if the small pieces of paper that

16        accompany the blast doors were collected that

17        night from your taser?

18   A.    I don't know.

19   Q.    Have you ever discharged your firearm while on

20        duty?

21   A.    No.

22             MR. KAISER:                    You mean

23        the firearm?

24             MR. GERHARDSTEIN:             Yeah, the

25        firearm.

Page 45

```
 1              MR. KAISER:                     Okay.

 2   A.    No.

 3   Q.    Have you ever been involved in an investigation

 4         where somebody has discharged their firearm?

 5   A.    No.

 6   Q.    Are you aware that when you're involved in such

 7         an investigation, they count all the bullets?

 8   A.    Yes.

 9   Q.    But in this instance they didn't count your other

10         two tasers; right?

11   A.    Taser cartridges?

12   Q.    Right.

13   A.    No.

14   Q.    Is that correct?

15   A.    Yes, they didn't count them.

16              (Thereupon, Plaintiff's Exhibits 1 and 2

17              to the videotaped deposition of Officer

18              Michael Chapman were marked for purposes

19              of identification).

20              (Thereupon, there was a discussion off the

21              record.)

22   BY MR. GERHARDSTEIN:

23   Q.    I'm going to show you what's been marked as

24         Exhibit 2.  This is a map of the area.

25              Can you indicate on this map the direction
```

Page 46

1        that Mr. Brown traveled?  And use an X for where

2        you interacted with him and then a Y for where

3        you ended up in your wrestling match with him.

4            Start with an X and end with a Y, if you

5        would, please.

6   A.   You want me to write it down?

7   Q.   Yes.

8            So you started at the corner of 113th and

9        Benham?

10  A.   Yes.

11  Q.   And his vehicle was on which street?

12  A.   East 113th.

13  Q.   Okay.  And go ahead and show me the path that he

14       traveled.

15  Q.   So he started at the X and he ended at the Y; is

16       that correct?

17  A.   Yes.

18  Q.   Did he travel on the roadway?

19  A.   In between grass, into the road, going up Benham.

20  Q.   When you say in between the grass and the road --

21  A.   He ran on the grass, onto the road, onto the

22       road, onto the grass.

23  Q.   Are there trees along the roadway?

24  A.   I can't remember.

25  Q.   Did he go behind any houses?

1   A.   No.

2   Q.   So he was basically on the tree lawn or on the

3        road?

4   A.   Yes.

5   Q.   And then where you finally had your interaction

6        with him, was that a driveway?

7   A.   It was on a front lawn.

8   Q.   And how long did you spend wrestling with him?

9   A.   As far as minutes go, I don't know, but it felt

10        like a long time.

11   Q.   Did somebody tackle him?

12   A.   Yes.

13   Q.   Who did?

14   A.   My partner, Belal Ilain.

15   Q.   And you mentioned that while you were chasing

16        him, your partner also tried to tase him; is that

17        correct?

18   A.   Yes.

19   Q.   Did you see that taser get discharged?

20   A.   Yes.

21   Q.   And where did that taser strike Mr. Brown?

22   A.   It appeared to hit him in the back.

23   Q.   And then when you actually arrived at the spot

24        where you were wrestling with Mr. Brown, I think

25        you mentioned that you tried to drive stun him;

1       is that correct?

2   A.    Yes.

3   Q.    When you tried to drive stun him were some of

4       those efforts -- by the way, just explain to me

5       the difference between discharging the taser in

6       prong mode and discharging it as a drive stun.

7   A.    Well, in drive stun -- of course, when the prongs

8       shoot out and hit you.  In drive stun there are

9       no prongs, it's just the electrical shock that,

10      you know, you hit a person with it and try, you

11      know, incapacitate them right there with the

12      taser directly on the skin or the clothing.

13  Q.    A drive stun can be initiated with the cartridge,

14      the discharged cartridge, still loaded onto the

15      weapon; right?

16  A.    Yes.

17  Q.    Is that what you did?

18  A.    I can't remember.

19  Q.    Did you take the cartridge off before you applied

20      the weapon to his skin?

21  A.    I can't remember.

22  Q.    If the cartridge is still in the weapon and the

23      prong is still in the skin and the wire is still

24      connected, then you accomplish a larger area of

25      incapacitation; right?

Page 49

1   A.      Yes.

2   Q.      And if the cartridge is not in the weapon and

3           you're simply applying the end of the weapon to

4           the skin, you're inducing pain; right?

5   A.      Yes.

6   Q.      But you're not really incapacitating muscles;

7           right?

8                   MR. KAISER:                    Objection.

9   A.      I'm not sure how that would be.  I'm not sure how

10          the muscles would work as far as that, you know.

11  Q.      So you just don't know whether you're

12          incapacitating muscles when you do a drive stun

13          without the cartridge attached?

14  A.      I mean, you're asking me how -- I'm sure -- I

15          mean, it does incapacitate the muscles in some

16          way, but, I mean, of course, it wouldn't have the

17          broad effectiveness of two wires and a drive

18          stun.

19  Q.      So it's your belief that a drive stun

20          incapacitates muscles?

21  A.      Not as effective as a prong -- effective prong

22          shot.

23  Q.      Have you heard of the drive stun being described

24          as a pain compliance tool?

25  A.      I can't remember.

Page 50

1  Q.    It does induce pain; right?

2  A.    Yes.

3  Q.    Your use of your taser weapon against Mr. Brown,

4        you applied the end of the taser weapon to his

5        back?

6  A.    We were rolling and fighting, I can't remember

7        where it actually hit him.

8  Q.    So it could have been applied to his front or his

9        back or his side ==

10 A.    Yes.

11 Q.    -- you don't know; is that correct?

12 A.    Yes.

13 Q.    Do you know how many times?

14 A.    No, I don't know how many times.

15 Q.    And is it your understanding that your partner

16        was doing the same thing?

17 A.    Yes.

18 Q.    Why were you using that technique?

19 A.    Because we still had our tasers out and we

20        figured that's been -- we've seen it effective

21        before and we figured it probably would be more

22        effective if we tried it again.

23 Q.    Tell me about that.

24            When have you seen it effective before?

25 A.    Throughout the course of duties on a daily --

Page 51

```
 1        when we see -- assist other officers and they're

 2        fighting with individuals and they'll use the

 3        drive stun on them and that they comply once that

 4        happens.

 5   Q.   So you've witnessed that?

 6   A.   Yes.

 7   Q.   Have you ever administered the drive stun before

 8        yourself?

 9   A.   I think I have.  I can't really remember.  Before

10        that, I can't remember.

11   Q.   Can you describe for me any specific incident

12        when you administered the drive stun to a suspect

13        prior to Mr. Brown?

14   A.   No, I can't remember.

15   Q.   How about since Mr. Brown?

16   A.   I can't remember.

17   Q.   Can you describe for me any specific incident

18        where you observed a colleague administer the

19        drive stun to a suspect effectively?

20   A.   Yes.

21   Q.   Tell me about that.

22   A.   Well, there was a vehicle pursuit that we had

23        assisted on and he ended up getting out of the

24        car, running.  It ended up being a foot pursuit.

25        They ended up catching him and he was fighting
```

Page 52

1          with them, fighting and fighting and refused to

2          obey commands.  One of the officers, you know,

3          drive stunned him in the back.  At that point he

4          gave up.

5    Q.    Was that before or after Mr. Brown?

6    A.    I can't remember.

7    Q.    When the taser is deployed either in prong mode

8          or drive stun, are you supposed to complete any

9          paperwork?

10   A.    A report and -- I think most of the paperwork

11         goes to my supervisors.

12   Q.    What is the paperwork that you have to fill out?

13   A.    Use of non-deadly force.

14   Q.    Is there a form number for that or a specific --

15   A.    As far as the form number, I don't know the

16         actual form number, but it's just a use of

17         non-deadly force sheet.  My supervisors fill it

18         out.

19   Q.    The supervisor fills it out?

20   A.    Yes.

21   Q.    You don't fill it out?

22   A.    I've seen officers fill it out.  I've seen

23         supervisors fill it out.  I've never filled it

24         out myself.

25   Q.    Well, in connection with your use of force on Mr.

1         Brown, did you complete any paperwork yourself?

2    A.   No.

3    Q.   Is that your understanding of a normal way to

4         proceed after using the prongs?

5    A.   After it becomes a homicide, homicide takes

6         everything.  I have absolutely -- we do not put

7         our fingers -- we don't touch any paperwork.

8         Homicide takes everything.

9    Q.   So you didn't fill out an incident report?

10   A.   No.

11   Q.   You didn't fill out a Form 1?

12   A.   A Form 1, I'm not sure.  I think I did, but I'm

13        not sure.  I don't think -- I can't really

14        remember.

15   Q.   If you had filled out an incident report in

16        December of 2010, was it the practice of the

17        Cleveland Police Department to have the officer

18        hand write it and then have typists type it into

19        the system?

20   A.   Do you mean on that night?

21   Q.   During that period of time.

22   A.   Well, you're talking about just any night, is

23        that what you mean?

24   Q.   Yes.

25   A.   Incident report, yes, we can either hand write it

1          or type it out ourselves.

2     Q.   When you have filled out incident reports, do you

3          tend to type them directly into the system?

4     A.   Sometimes I write it, sometimes -- it all depends

5          just how I'm feeling that day.

6     Q.   And when you hand write it --

7     A.   Yes.

8     Q.   -- what happens to the handwritten copy?

9     A.   Well, we have a bin where we put the original

10         copies.  We make another copy.  It depends on the

11         type of report.  We just make the original copy

12         and a copy and then make a copy for the detective

13         bureau.

14    Q.   In connection with Mr. Brown, did you hand write

15         any reports, at all?

16    A.   No.

17    Q.   Did you type write any reports, at all?

18    A.   No incident reports.

19    Q.   Any other reports?

20    A.   Maybe the Form 1.  I don't know if -- that could

21         be the only one I can think of if I did do one,

22         but I can't remember.

23    Q.   On December 31, 2010, as of that date, had you

24         been advised that Taser International had

25         recommended that the preferred target zone be

Page 55

```
 1          moved from the upper chest to the lower chest and
 2          the abdomen?
 3                  MR. KAISER:                    Objection.
 4    A.    I can't remember.
 5    Q.    As of December 31, 2010 was it your understanding
 6          that the upper chest was an appropriate target
 7          area?
 8    A.    I can't remember.
 9    Q.    Well, you've already testified that you were
10          following your training at the time --
11    A.    M-hm.
12    Q.    -- you shot Mr. Brown, is that still your
13          testimony?
14    A.    Yes.
15    Q.    So is it your belief that you were acting
16          consistent with your training when you shot him
17          in the chest?
18    A.    Yes.
19    Q.    And if that were all to have happened today,
20          would that still be consistent with your training
21          to shoot him in the chest?
22    A.    If it would be practical.  I'm not really sure
23          what you're asking me.
24    Q.    I'm asking you if your understanding today is
25          that the preferred target zone remains the upper
```

Page 56

1           chest?

2   A.      I would have to -- if the preferred target zone,

3           I'm not sure.  If it's changed, I'm not sure.

4   Q.      So as we sit here today, do you have any

5           awareness one way or the other as to whether the

6           upper chest remains an acceptable target area for

7           a taser in prong mode?

8   A.      If it's changed, I guess it wouldn't be the upper

9           chest area.

10  Q.      But my question to you is has it changed or not?

11  A.      I'm not sure.  I'd have to look it up.

12  Q.      Well, you carry a taser every day; right?

13  A.      Yes.

14  Q.      So you might be interacting with a citizen today?

15  A.      Yes.

16  Q.      And when you interact with that citizen today,

17          will it be your belief, as it was on December 31,

18          2010, that it's appropriate to tase a citizen at

19          center mass?

20  A.      Yes.

21  Q.      Are you aware that in September -- in October of

22          2009 Taser International issued a change -- a new

23          preferred target area where they lowered the

24          target from the upper chest?

25               MR. KAISER:                    Show an

1               objection.

2    A.    Is that what you're asking me, if I was aware of

3          it?

4    Q.    Yes.

5    A.    I'm not sure from 2009.  I'm not sure.

6               (Thereupon, Plaintiff's Exhibit 3 to the

7               videotaped deposition of Officer Michael

8               Chapman was marked for purposes of

9               identification).

10   BY MR. GERHARDSTEIN:

11   Q.    I'm going to show you what has been marked as

12         Exhibit 3.  Have you ever seen this before?

13   A.    I can't remember.

14   Q.    When you get -- have you ever received a product

15         warning label on a taser?

16   A.    A product warning label?

17   Q.    Yes.

18   A.    I'm not sure what that is.

19   Q.    Take a look at Page -- it starts over again, it's

20         1 of 6 towards the back of the packet.

21           You got it?

22   A.    Yes.

23   Q.    Have you ever seen this document before?

24   A.    Just this little box right here (indicating), or

25         the whole thing?

1  Q.   The whole thing.

2  A.   Well, I haven't read through this.  I'm not sure

3       if I've read it or not.

4  Q.   Can you take a look at it and see if you have,

5       see if that refreshes your memory?

6  A.   You want me to read the whole thing?

7  Q.   I want you to read the six pages.  I think you'll

8       be able to figure out pretty soon whether you've

9       ever seen these six pages before, if you start

10      looking at it.

11 A.   I've seen things of the like.  Whether this was

12      the exact one I've seen, I can't say.  I've seen

13      many -- we get lots of training on taser.  As far

14      as this being the exact ones, I'm not sure.

15 Q.   Do you save the training you get on tasers?

16 A.   Yes.

17 Q.   So do you have a copy in your personal possession

18      somewhere of the various product warning and

19      product information pieces of information?

20 A.   I have my general orders of taser training.

21 Q.   I understand that Cleveland Police has a general

22      order related to tasers?

23 A.   M-hm.

24 Q.   In addition to that, do you have other taser

25      materials that you've saved from your training?

1   A.    I may, I'm not sure.

2   Q.    Where do you keep that?

3   A.    I have a lot of my papers in my locker.

4         MR. GERHARDSTEIN:                I'm going

5         to ask your attorney to help you locate

6         that, if you can.

7         THE WITNESS:                M-hm.

8   BY MR. GERHARDSTEIN:

9   Q.    When an update comes up about tasers, how does

10        the city communicate that to you?

11  A.    Some by divisional notices or by training we

12        receive.

13  Q.    What's a division notice?

14  A.    It's some information, new information that they

15        give out to the districts to police officers.

16  Q.    And just tell me how you actually get that.

17  A.    Our supervisors post them for us and let us know

18        they're out.  They'll make copies of them so

19        everybody can see them if they need to be put in

20        our general orders.

21  Q.    So if you take a look at the second page of this

22        exhibit, this is a black and white copy, and

23        obviously the original document was colored.  Do

24        you see the silhouette of the human being and it

25        says, preferred target areas in blue?

```
 1   A.    Yes.

 2   Q.    And I'm going to ask you to assume that the blue

 3         is the shaded area; okay?

 4   A.    Okay.

 5              MR. KAISER:                    Al, are

 6              you on 2 of 6?

 7              MR. GERHARDSTEIN:No, on the second page of

 8              the exhibit.

 9              MR. KAISER:                    Oh, back

10              to the original.

11   BY MR. GERHARDSTEIN:

12   Q.    Have you ever seen, while you've worked in the

13         Cleveland Police Department, a document related

14         to tasers where you're advised that the preferred

15         target area is this shaded area below the upper

16         chest?

17   A.    I think I have.

18   Q.    And when did you receive that?

19   A.    I can't remember when I received it.  But, you

20         know, we receive the training when we first get

21         our tasers and also subsequent training, too.

22   Q.    How long have you had tasers?

23   A.    I've had it?  How long I've had it?

24   Q.    Yes, the whole time you've been on the police

25         department?
```

1  A.  No, I haven't had it the whole time I was on the

2  police department.

3  Q.  How long have you had it?

4  A.  I can't remember the exact months or years.

5  Q.  Did you have a taser prior to September of 2009?

6  A.  I can't remember.

7  Q.  Well, I want to get something straight here,

8  because you've just told me that you now think

9  that you have seen a taser-related document

10  indicating that the preferred target area is

11  below the chest?

12  A.  I said I may have, I'm not sure.

13  Q.  And earlier you said that when you go out to work

14  tonight, you will think it's okay to shoot in the

15  chest, so which is it?

16  A.  I see the preferred target areas.

17  Q.  Right.

18  A.  So, I mean, if it's practical, things happen like

19  that.  If the target shot is to the chest, then

20  it's going to be the chest.  But like I said, if

21  I have this, you know, the preferred target

22  areas, you know,m are the shaded areas, if it's

23  practical I'll try to do that.  But like I said,

24  things happen like that and if the best shot I

25  have is at the chest, then I'll take the shot at

```
 1           the chest.
 2    Q.     On December 31, 2010 did you know that the
 3           preferred target area was below the chest?
 4    A.     I wasn't thinking about that.
 5    Q.     No, that's not my question.
 6              Did you know that the preferred target area
 7           was below the chest?
 8    A.     I'm not sure.
 9    Q.     In the subsequent investigation of the use of
10           force did anyone ask you about whether you
11           attempted to shoot Mr. Brown below the upper
12           chest?
13    A.     No.
14    Q.     Is it your understanding, based on the results of
15           that whole investigation of the use of force
16           against Mr. Brown, that it was okay to shoot him
17           in the chest?
18    A.     Can you ask me that again, please?
19    Q.     Is it your understanding that it was acceptable
20           to shoot him in the chest?
21    A.     Yes.
22    Q.     So no supervisor, no trainer, no boss in the
23           Cleveland Police Department has told you that it
24           would have been preferred to shoot him below the
25           chest; is that correct?
```

Page 63

1    A.    This is in concerning with this case?

2    Q.    Correct.

3    A.    No one has said that to me.

4    Q.    Why did the preferred target area move below the

5          upper chest?

6                MR. KAISER:                    Objection.

7                Foundation.

8    A.    Can you ask me again?  I'm not sure what you're

9          asking me.

10   Q.    Tell me why the preferred target area is no

11         longer in the upper chest.

12   A.    I would have to look that up.

13            Are you asking why I didn't shoot him or why

14         Taser did it?

15   Q.    Why, in your understanding -- you use this

16         weapon; right?

17   A.    M-hm.

18   Q.    As you understand the use of this weapon, explain

19         to me why you believe the preferred target area

20         was moved down away from the chest.

21                MR. KAISER:                    Objection.

22                Foundation.

23   A.    I wasn't sure that -- until you mentioned it to

24         me I wasn't sure -- you told me that Taser

25         changed it, so I don't know what I can base that

Page 64

```
 1           answer to.  I didn't prefer anything.  You said
 2           Taser changed it, and I wasn't sure -- or I was
 3           aware of that.
 4      Q.   So you really don't know whether on December
 5           31st, 2010 you were aware that the target area
 6           had been moved to the lower chest or not; right?
 7      A.   Well, I can't -- it's hard to recollect from two
 8           years ago.
 9      Q.   And you really don't know today --
10      A.   No.
11      Q.   -- whether the preferred target area is below the
12           chest --
13      A.   I would probably have to refresh --
14      Q.   -- is that correct?
15      A.   I would probably have to refresh my memory.
16      Q.   Right, because you really don't know that prior
17           to me bringing it up; right?
18      A.   I would have to refresh it.  Probably we received
19           so much training on so much material that a lot
20           of it you would have to constantly keep reading
21           up, keep reading up, and you may just -- you
22           know, you may not remember some things, that's
23           all.
24      Q.   It's important to know how a weapon you use
25           operates; isn't it?
```

1  A.    Yes.

2  Q.    Would you agree that the taser can capture the

3        hearth rhythm?

4              MR. KAISER:                    Objection.

5              Foundation.

6  A.    I'm not aware about heart rhythms.

7  Q.    Would you agree that the taser, in prong mode,

8        penetrating the chest can interfere with the

9        heart?

10             MR. KAISER:                    Same

11             objection.

12 A.    I'm not sure how the heart works as far as

13       interfering with the heart.

14 Q.    Prior to December 31, 2010, have you ever been

15       advised that there is some risk that the taser

16       can interfere with the hearth rhythm?

17 A.    I would have to -- I don't remember as far as

18       prior to 2010.

19 Q.    As we sit here today, have you ever been advised

20       that there is some risk that a taser can

21       interfere with the hearth rhythm?

22             MR. KAISER:                    Objection.

23 A.    I probably have been advised, but I'm not sure.

24 Q.    As of December 31, 2010, were you ever advised

25       that the taser can interfere with breathing?

1  A.    I'm not sure as far as prior to 2010.  I'm not

2        sure.

3  Q.    As we sit here today in 2012, have you ever been

4        advised that a taser in prong mode, discharged to

5        the chest can interfere with breathing?

6            MR. KAISER:                    Objection.

7  A.    I'm not sure.

8            (Thereupon, Plaintiff's Exhibit 4 to the

9            videotaped deposition of Officer Michael

10           Chapman was marked for purposes of

11           identification).

12 BY MR. GERHARDSTEIN:

13 Q.    I'm going to show you what's been marked as

14       Exhibit 4, have you ever received training

15       regarding the taser in 2009?

16 A.    Excuse me?

17 Q.    Did you receive any training regarding the taser

18       in 2009?

19 A.    I'm not sure.  I can't remember when I actually

20       received the taser.

21 Q.    Do you have a yearly update when you qualify for

22       taser?

23 A.    We don't get taser training every year as far as

24       our in-service goes.

25           (Thereupon, Plaintiff's Exhibit 5 to the

Page 67

```
 1                  videotaped deposition of Officer Michael
 2                  Chapman was marked for purposes of
 3                  identification).
 4    BY MR. GERHARDSTEIN:
 5    Q.   I'm going to show you what has been marked as
 6         Exhibit 5, this is selected portions of your
 7         training file.
 8              Have you ever seen your training file?
 9    A.   No, I haven't seen my training file.
10    Q.   This top document is dated September 16th, 2010.
11              By the way, do you have a relative also, a
12         woman working for the police department?
13    A.   A woman relative?
14    Q.   Yes.
15    A.   No, I don't have a woman relative.
16    Q.   Because there was a female Chapman stuff mixed in
17         with yours.
18    A.   Okay.  No.
19    Q.   At any rate, September 16th, 2010 is the date of
20         this top page and it indicates that you received
21         taser/ASP recertification four hours.  Does that
22         refresh your recollection as to whether you
23         received taser training in 2010?
24    A.   Yes.
25    Q.   And do you know what that consisted of?
```

1    A.    I have to go over it.  As far as 2010 I'm sure

2          changes have been made, but as far as tell you

3          what actually happened, outside of this I can't

4          remember.  I can't tell you what happened on

5          2010.

6    Q.    The second page of the exhibit is dated September

7          14th, 2010 and it looks to be a certification

8          test on the X26 based on Version 15 of the taser

9          materials.  Would you agree with that?

10   A.    Yes.

11   Q.    And, of course, all we have are the answers so

12         that doesn't tell us much; right?

13   A.    Yes.

14   Q.    But this reference to Version 15, in other

15         circumstances what I've typically seen is that

16         officers view a PowerPoint that has a whole bunch

17         of information and then they take a test on it.

18         Is that what you go through?

19   A.    As far as 2010 that day or --

20   Q.    As far as -- yeah, in order to take this test you

21         have must be given some materials?

22   A.    It's like a mix of PowerPoint, practical

23         application, looking through -- they have books,

24         small books that we go through, so it's a number

25         of things.

1    Q.    And it's some of those materials that you might

2          have in your locker?

3    A.    Maybe, I'm not sure.  I can look through it.

4    Q.    All right.  Now, seeing that you actually had

5          taser training on Version 15 as of September

6          14th, 2010, does that refresh your recollection

7          as to whether you were advised about the change

8          in the target zone?

9    A.    Yeah, I would have -- if that's in here, I would

10         have to look it up.  But I couldn't tell you

11         exactly, you know, as far as target zone goes.

12   Q.    The next page is a test from 2009 based on

13         materials Version 14.2 from Taser.

14         Unfortunately, we only got two pages and I think

15         it must have been a two-sided document.

16             I'm going to ask your attorney to see if they

17         can come up with the rest of the documents.  I

18         think we probably just didn't get the back side.

19             As you look at these two pages of the test,

20         actually it's the three pages because you have

21         the labeling of the taser at the back, does that

22         refresh your recollection as to the type of

23         training you go through every year?

24   A.    I would have to -- it's about, I would guess,

25         about the same.

1              MR. KAISER:                  Al, we'll

2              look into whether there is a back side.  I

3              doubt it.

4              MR. BACEVICE:                Those are

5              Bates stamped.

6              MR. GERHARDSTEIN:            That's

7              why.

8              MR. KAISER:                  They are

9              sequential.

10             MR. BACEVICE:        Yes.

11             MR. KAISER:                  We'll have

12             to look into it.

13             MR. GERHARDSTEIN:            Thank you.

14   BY MR. GERHARDSTEIN:

15   Q.   Now, I want to return to Exhibit 4.

16        The page we have from these taser materials

17        has instructor notes; do you see that?

18   A.   Yes.

19   Q.   And I take it that when you look at a PowerPoint,

20        there's often an instructor who gives you

21        additional information and additional to what's

22        on the screen; right?

23   A.   Yes.

24   Q.   And these instructor notes that have a second

25        paragraph that begins, the contraction of the

Page 71

1         thorax that may be induced by some taser

2         applications, but not all applications, may

3         impede breathing; did I read that correctly?

4    A.   Yes.

5    Q.   Does that refresh your recollection as to whether

6         you've ever been advised, in any of your taser

7         training, that the application of the taser can

8         impede breathing?

9    A.   If it's been advised to me, I can't remember the

10        exact date or the exact training date.

11              (Thereupon, Plaintiff's Exhibit 6 to the

12              videotaped deposition of Officer Michael

13              Chapman was marked for purposes of

14              identification).

15   BY MR. GERHARDSTEIN:

16   Q.   I'm going to show you what's been marked as

17        Exhibit 6.  Can you tell me what this is?

18   A.   It says -- it looks like a GPO from October 2005.

19   Q.   And then revised date is May 7th, 2007?

20   A.   Yes.

21   Q.   Now, of course, we asked for the general order in

22        effect at the time of the use of force and this

23        is what was produced to us.

24            Do you know whether the general order on

25        tasers that was in effect on December 31, 2010

Page 72

1        was last revised on May 7th, 2007?

2            MR. KAISER:                  Show an

3            objection to the GPOs.

4  A.    I don't know the revised date.

5  Q.    Okay.  Well, if you should learn that what's been

6       produced to us is not the general order that was

7       in effect in 2010, please advise us; okay?

8  A.    Okay.

9  Q.    On Page 3 of this exhibit, IV A, it indicates

10      that officers shall have EMS respond to the scene

11      to evaluate a subject who has been exposed to a

12      taser shock; did I read that correctly?

13  A.    Yes.

14  Q.    So is it your understanding that anytime you

15      deploy a taser into a suspect that EMS should be

16      called?

17  A.    Yes.

18  Q.    Did you call EMS after deploying the taser into

19      Mr. Brown?

20  A.    No.

21  Q.    And why not?

22  A.    Well, I was aware that another officer did it.

23  Q.    Who did it?

24  A.    I'm not sure which officer.

25  Q.    How did you become aware of that?

1   A.   I was just told -- I can't remember which officer

2        told me.  I remember somebody mentioning that EMS

3        was already called.

4             (Thereupon, Plaintiff's Exhibit 7 to the

5             videotaped deposition of Officer Michael

6             Chapman was marked for purposes of

7             identification).

8   BY MR. GERHARDSTEIN:

9   Q.   I'm going to show you what's been marked as

10       Exhibit 7.  Have you ever seen a document like

11       this before?

12  A.   No.

13  Q.   This is called an event chronology.  Apparently

14       it's a sort on by an incident number of radio

15       traffic with respect to a specific incident.

16       Does that make sense?

17  A.   Can you repeat that last part?  I'm sorry.

18  Q.   It appears to be a sort of radio traffic by an

19       incident so that you're only getting the radio

20       traffic with respect to a specific incident?

21  A.   Yes.

22  Q.   Now, is it your testimony that you've never seen

23       a document like this which records the radio

24       traffic about a specific incident?

25  A.   I can't remember ever seeing anything like that.

1    Q.    In your training have you ever been trained with

2          respect to how to read documents like this?

3    A.    Not specifically like this.  I can't remember

4          anything like that this.

5    Q.    Have you ever seen any of the printout of radio

6          traffic with respect to the incident involving

7          Mr. Brown?

8    A.    No.

9    Q.    Did you use your radio, at anytime after Mr.

10         Brown started running, up until the time he was

11         secured?

12   A.    Yeah, yes.

13   Q.    Now, in this particular event chronology it

14         suggests that the traffic stop started at

15         8:45:05; does that sound right?

16   A.    Yes.

17   Q.    All right.  About the middle of the page at

18         8:48:20 there is a request for another car; do

19         you see that?  8:48:20 is on the left-hand

20         column.

21   A.    Yes, I see.

22   Q.    Reading across it says, request another car, do

23         you know if you were the one who requested

24         another car?

25   A.    I don't know who requested for another car.

1  Q.   Now, at 8:48:58 it says, ML still resisting,

2       multiple taser not working.  Is that a radio

3       broadcast that you made?

4  A.   Yes.

5  Q.   And what's ML refer to?

6  A.   Male, I would guess.  Male still resisting.

7  Q.   And at 8:49:06 it says SB multiple taser not

8       working.  ML still resisting.  If you know, what

9       does SB stand for?

10 A.   I don't know what SB stands for.

11 Q.   Are these radio broadcasts that you made, if you

12      you know?

13 A.   The male still resisting, the first one.  I don't

14      remember if I made the second one.

15 Q.   But you know that you did one something like

16      that?

17 A.   Yes.

18 Q.   What does -- at 8:49:35 it says ML pos. high on

19      wet?

20 A.   Possibly high on wet.

21 Q.   And what is wet?

22 A.   It's a drug, a PCP.

23 Q.   And is that -- what's your experience with it and

24      tell me what that means to you, the type of

25      statement.

Page 76

1  A.   Males -- a lot of males that we dealt with who

2       have been high on wet, they're very aggressive.

3       They're impervious to pain.  They -- a lot of

4       them don't listen to your commands.  Some do.

5       Some are docile.  Some are very aggressive.

6       Super human strength.  I've seen a male high on

7       wet get hit with a taser shot and actually had no

8       affect on him.

9  Q.   Now, did you ever become aware of the toxicology

10      report on Mr. Brown?

11 A.   Yes.

12 Q.   And what did you learn about it?

13 A.   That he didn't have any wet in his system.

14 Q.   Right.

15      Further on at 8:50:42 there is a broadcast,

16      crowd gathering?

17 A.   Yes.

18 Q.   Is that a broadcast you would have made?

19 A.   I think I did make that one.

20 Q.   Now, as of 8:50:42 was Mr. Brown subdued?

21 A.   No, as far as -- I mean, according to this, I

22      think that this is when -- this is when he was

23      saying, go get my people, go get my people.

24      That's when I think the crowd gathering started

25      to come in.

1    Q.    And, frankly, what I'm trying to do is between

2          your recollection and looking at this, maybe we

3          can pinpoint some of the times that things

4          happened.

5              Further on at 8:50:47 it says, has crowd, INC

6          on East 113th.  Do you have any clue as to what

7          INC means?

8    A.    I'm not sure.  I would probably -- maybe

9          incoming.  I'm not sure.

10   Q.    Oh, all right.  Were they coming from that

11         direction?

12   A.    They were coming from Benham towards us.

13   Q.    But you were on 114th; right?

14   A.    Yes.

15   Q.    Now, 8:52:08, which is on Page 2 of 5 of this

16         event chronology, it says, slow it down, DN, I

17         assume it's down, male in custody; did I read

18         that correctly?

19   A.    Yes, that's the right one.

20   Q.    Did you make that broadcast?

21   A.    No.

22   Q.    Who did?

23   A.    I don't know.

24   Q.    And I don't know if you can tell, do you see any

25         indication on this printout as to who the person

1          making the broadcast is?

2             Like I see back on the first page it says unit

3          4 B 24.

4     A.   M-hm.

5     Q.   Like in that very first entry.

6     A.   M-hm.

7     Q.   That's your unit; right?

8     A.   Yes, yes.

9     Q.   But on all of these various entries, we don't

10         always see a unit.  This operator number, that is

11         not any number that you went by; right?

12    A.   No.

13    Q.   So do you know who would have said, slow it down,

14         male in custody?

15    A.   No, I don't know.

16    Q.   At that point when Mr. Brown was in custody,

17         where were you?

18    A.   I don't know.  I was like -- I was still probably

19         on the ground, because for a long time I was on

20         the ground just spitting and trying to catch my

21         breath.  Getting up, walking around, still trying

22         to catch my breath.  For a long time I was trying

23         to catch my breath.

24    Q.   After you disengaged -- by the way, did you

25         disengage at the point Mr. Brown was secured?

Page 79

1          MR. KAISER:                    Objection.

2               Asked and answered.

3    A.   No.  I disengaged when the other officers came on

4         scene.

5    Q.   He was not yet cuffed?

6    A.   Yes.

7    Q.   At any point after you disengaged and before the

8         end of the event, did you have any contact with

9         Mr. Brown?

10   A.   No.

11   Q.   At any point after you disengaged and before the

12        end of the event, did you say anything to Mr.

13        Brown?

14   A.   No.

15   Q.   At any point after you disengaged and before the

16        end of the event, did Mr. Brown say anything to

17        you?

18   A.   No.

19   Q.   At any point after you disengaged and before the

20        end of the event, did you say anything to any of

21        your brother or sister officers about what had

22        happened up to that point?

23   A.   I can't remember.  I can't remember.

24   Q.   Do you recall any conversation with the officers

25        as they arrived to join in the efforts to

Page 80

1           restrain Mr. Brown that you engaged in?

2     A.    Yes.  I remember with my partner and I went --

3           when Vargas, Officer Vargas, first showed up and

4           he had his taser pointed and my partner yelled,

5           the tasers aren't working, you know the tasers

6           aren't working, don't use it.  That's the only

7           thing I can think of.  The only thing I remember.

8     Q.    Would that have occurred before 8:52:08 when

9           apparently Mr. Brown was in custody?

10    A.    Well, I don't know the time.  I don't remember

11          the time.

12    Q.    Well, in terms of the sequence, though, that

13          would have occurred before he was in custody;

14          right?

15    A.    Well, I would have to read the whole thing to

16          know when he was actually in custody, because

17          someone can call in custody and the male may not

18          be in custody.

19    Q.    Oh.  So tell me how you use that term.

20              If somebody said, slow it down, male in

21          custody, what's your understanding of what

22          message that is intended to send out?

23    A.    That the male is in custody.

24    Q.    So actually, physically restrained?

25    A.    Yeah.  Sometimes they -- someone can give it out

1    too early because they see the officers there and

2    they think the male is custody, when the male is,

3    in fact, not in custody.  They're still holding

4    him or fighting with him.

5        Like my custody is the male is in cuffs and

6    that's it.

7  Q.  Now, this notion slow it down, is this an effort

8    to indicate that officers that are not at the

9    scene don't have to come rushing?

10  A.  No, that's -- yeah, just don't go lights and

11    sirens.  If you're still going to come, don't go

12    lights and sirens trying to break your neck

13    getting there.

14  Q.  At 8:55:31 there's a broadcast that says, needs

15    EMS.  Did you make that broadcast?

16  A.  I don't remember.

17  Q.  Have you ever been questioned, during the course

18    of any investigation into this incident, about

19    any communications with EMS?

20  A.  No.

21  Q.  Did you have any conversation with anyone from

22    EMS when they arrived at the scene?

23  A.  No.

24  Q.  Did you see Mr. Brown getting placed into the

25    zone car?

1    A.    Yes.

2    Q.    Whose zone car was he placed into?

3    A.    It was Officer Rusnak and Officer Merritt's zone

4          car.

5    Q.    Was he bleeding?

6    A.    I don't know.

7    Q.    He had a long crease on his chest at autopsy, do

8          you know how he got that?

9    A.    I don't know how he got that.

10   Q.    Tell me which officers moved Mr. Brown into the

11         zone car.

12   A.    I don't remember which officers moved him to the

13         zone car.

14   Q.    Describe how Mr. Brown acted as he was moved into

15         the zone car.

16   A.    I can't remember how he acted.  I wasn't, like,

17         right there, you know, because I was still

18         huffing and puffing.  For the longest time I was

19         huffing and puffing, just trying to catch my

20         breath.

21   Q.    So as we sit here today, do you have any

22         recollection as to whether Mr. Brown was

23         cooperating, whether he was dragging himself,

24         whether he was limp, anything at all?

25   A.    No, not from -- after I disengaged, no.

Page 83

1    Q.    As we sit here today, do you have any

2          recollection of seeing him being placed in the

3          zone car?

4    A.    Yeah, I saw him get placed in the zone car.

5    Q.    Did he voluntarily sit down in the zone car or

6          was he thrust into the zone car by the officers?

7    A.    I don't think he was thrust in there.  I don't

8          remember seeing him get thrown or forcibly -- I

9          mean, it was just, you know, putting him in the

10         zone car.  I don't know if he voluntarily went on

11         his own.  I mean, I don't know if he was still

12         fighting with them after he was handcuffed, I

13         don't know.

14   Q.    Give me your best recollection of whether he was

15         placed in the zone car so that he was lying on

16         the seat or whether he was placed in the zone car

17         whether he was sitting.  What's your best

18         recollection?

19   A.    I really don't know.  I can't remember.  Like I

20         say, I wasn't the one that put him in the zone

21         car.  There was a lot of officers on scene at

22         that time.

23   Q.    So as we sit here today, you just don't have a

24         visual image of him being placed in the zone car?

25   A.    I remember him getting put in the zone car.  As

```
 1            far as who or how, you know, but it didn't seem

 2            like -- I don't recollect that he was thrust or

 3            thrown into the zone car at that time.

 4    Q.      When he went into the zone car was he facing the

 5            back seat or the front seat?

 6    A.      You can't face the back seat.

 7    Q.      I'm sorry, was he lying down so his face was

 8            towards the back of the bench seat?

 9    A.      I can't remember.

10    Q.      Was he seated or lying?

11    A.      I can't remember.

12    Q.      Were the windows up or down in the zone car that

13            he was placed into?

14    A.      I can't remember.

15    Q.      Prior to EMS arriving, did you ever hear any

16            sounds coming from Mr. Brown after he was placed

17            in the zone car?

18    A.      No.

19    Q.      Prior to EMS arriving, did you observe any of

20            your brother or sister officers apparently

21            engaged in conversation with Mr. Brown at the

22            zone car?

23    A.      Yeah, I do remember an officer saying something

24            to him.  Which officer it was, I can't remember

25            which officer, but I do remember an officer
```

 1           saying something to him.

 2     Q.    When that officer -- was that a male or a female?

 3     A.    It was only males that assisted.

 4     Q.    When that officer spoke to Mr. Brown, did that

 5           officer open the door?

 6     A.    Yes, he did open the door.

 7     Q.    And how long was that door open?

 8     A.    I don't know.

 9     Q.    Was Mr. Brown, when that door was open, was he

10           seated or lying down?

11     A.    I don't know.

12     Q.    Did you hear any screaming or kicking or any

13           other loud sounds coming from the zone car?

14     A.    No.

15     Q.    Were you close enough to hear those, had they

16           been made?

17     A.    If the door was open, I probably would have been

18           close enough to hear.

19     Q.    How far were you from the zone car that Mr. Brown

20           was placed into?

21     A.    I can't remember.  I did a lot of walking around

22           and it was a long time before I caught my breath.

23                 THE VIDEOGRAPHER:              Off the

24           record.

25                 (Thereupon, there was a brief recess.)

1          THE VIDEOGRAPHER:              On the

2          record.

3   BY MR. GERHARDSTEIN:

4   Q.   Were you more than 10 feet away from the zone car

5        as you were trying to catch your breath?

6   A.   I can't remember.

7   Q.   Before you testified that you believe you would

8        have heard any loud noises coming from the zone

9        car, so can you give me some clue?  Less than 20

10       feet?

11  A.   I couldn't really give you an exact.  I mean, but

12       I've heard people screaming with the door open

13       from houses away.

14  Q.   Okay.  And, again, which zone car was it?  I know

15       you said this one, I just need to --

16  A.   Whose zone car was it?

17  Q.   Yes.

18  A.   It was Officer Merritt and Officer Rusnak's zone

19       car.

20  Q.   Now, returning to Exhibit 7, at 8:54 unit 4 D 27,

21       do you know who that would be?

22  A.   No, not on that date.  I didn't know who that

23       was.

24  Q.   But that would be another zone car?

25  A.   Yes.

Page 87

1   Q.    Then it says, status DP, location East 113th and

2         Benham, is that departing?

3   A.    I don't know what DP stands for.

4   Q.    When you arrive at a location where there's

5         activity, do you naturally radio your unit and

6         give a location?

7   A.    Yes.

8   Q.    And so do you use those terms, departing or

9         arriving?

10        What's your lingo?

11  A.    It's about the same.  4 28 show us on scene.  4

12        24 arriving.  That's about that.  I mean, you can

13        use other arriving terms, other synonyms.

14  Q.    So 4 D 27, 28 -- oh, I see.  So 4 D 27 departing

15        at 54:16 for that location, then 4 D 27 arriving

16        at 54:21 at that location; do you see that, too?

17              MR. KAISER:                    Objection.

18  BY MR. GERHARDSTEIN:

19  Q.    Does that make sense to you?

20              MR. KAISER:                    Al, he

21              testified earlier he doesn't know what DP

22              stands for.

23              MR. GERHARDSTEIN:              I

24              understand, but --

25              MR. KAISER:                    You're

1            assuming it means departing.

2   BY MR. GERHARDSTEIN:

3   Q.   I'm having you work with me, okay?

4        Normally you would say that you're going

5        somewhere and then you would say when you arrive;

6        right?

7   A.   Yes.  Like as far as -- you pretty much know --

8        if you're heading somewhere, you let them know

9        that's where you're going.  When you arrive, you

10       let them know when you get there.

11  Q.   So at 8:54:21 4 D 27 arrives at 113th and Benham;

12       do you see that?

13  A.   Yes.

14  Q.   Then at 8:54:23 4 D 28 arrives at 113th and

15       Benham; right?

16  A.   Yeah, if that's what AR means.

17  Q.   Now, at 8:55:15 it says, request boss.  What does

18       that mean?

19  A.   Request supervisor on scene.

20  Q.   And have you ever made a request like that?

21  A.   Yes.

22  Q.   So under what circumstances would you request a

23       supervisor on scene?

24  A.   Well, for a situation as this.  Use of any type

25       of force, maybe a bad accident or a domestic

1           violence.  The list is very long, but those --
2           but maybe a shooting, stabbing, I mean.
3    Q.     And a supervisor is -- I forget your ranks here.
4           What rank is -- do you have sergeants?
5    A.     Yes, we have sergeants.
6    Q.     Is that what a supervisor would be?
7    A.     Yeah, but also it could be a lieutenant.  But
8           normally when you say request a boss, I mean,
9           immediate supervisor would be a sergeant.
10   Q.     And was there a time when a supervisor arrived on
11          the scene on December 31st, 2010?
12   A.     Yes.
13   Q.     Who was that supervisor?
14   A.     Sergeant Sudy.  I remember seeing her.
15   Q.     How do you spell that?
16   A.     S-U-D-Y.
17   Q.     On December 31st, 2010 did you say anything to
18          Sergeant Sudy and did she say anything to you?
19   A.     I remember her telling me about -- to securing
20          the area that the incident happened in as far as,
21          you know, getting some warning tape up and to go
22          to some of the houses around the area and see if
23          they had saw anything to get some witness
24          statements.
25   Q.     Was this after EMS had left the scene?

1    A.    Yes.

2    Q.    Did you have any contact with Sergeant Sudy

3          before EMS left the scene?

4    A.    I can't remember.

5    Q.    Did she arrive on scene before EMS left the

6          scene?

7    A.    I can't remember.

8    Q.    This was New Year's Eve?

9    A.    M-hm.

10   Q.    And you, in the City of Cleveland, have people

11         who celebrate New Year's Eve; right?

12   A.    Yes.

13   Q.    And in the urban core it's not unusual to have

14         people shoot off guns on New Year's Eve; right?

15   A.    Yes.

16   Q.    Compared to other New Year's Eves, were the

17         gunshots that you had heard prior to this

18         incident starting any more worse than normal?

19   A.    I would say New Years Eves probably some more

20         than normal.

21   Q.    More than non-New Year's Eve nights?

22   A.    Yes.

23   Q.    Now, when you hear gunshots on New Year's Eve are

24         you assuming somebody is shooting somebody or is

25         it your experience that there are a number of

```
 1          people that shoot into the air?

 2   A.     Well, I'm not sure if they're shooting somebody

 3          or shooting in the air.  I would say more often

 4          on New Year's a lot of people are shooting into

 5          the air, but I don't know if they're shooting at

 6          somebody or in the air.  I couldn't tell you.

 7   Q.     On that evening prior to the initiation of the

 8          stop of Mr. Brown, you had no specific report of

 9          an aggression by use of guns; right?

10   A.     No.  As far as for me and my partner?

11   Q.     Yes.

12   A.     No.

13   Q.     So you were just in the neighborhood and you

14          heard gunshots like other neighbors would?

15   A.     Yeah, we were in the area for an assignment.

16          After the assignment, we heard gunshots.

17   Q.     By the way, what was that assignment?

18   A.     I can't remember what the exact assignment was

19          for.

20   Q.     After you talked to Sergeant Sudy and she

21          instructed you to secure the area, did you deploy

22          crime scene tape?

23   A.     Yes.

24   Q.     That's something you kept in your zone car?

25   A.     I can't remember if it was in my zone car.  It's
```

1          in some zone cars, not all zone cars.  A lot of

2          supervisors have them.  But some people take them

3          and put them in whatever zone car they going to

4          be working in.  I can't remember if it was in my

5          zone car or somebody else's.

6    Q.    Did you comply with her other request that you

7          secure any witnesses that may have identified any

8          of the events of that evening?

9    A.    Yes.

10   Q.    Tell me about that.

11   A.    Went from door to door on that street, eastbound

12         and westbound on the street.

13   Q.    On Benham?

14   A.    East 114th.  And around where the incident ended,

15         people who did come out said they didn't hear

16         anything.  Nobody answered the other doors.

17   Q.    So did you secure any witnesses who could report

18         on what they had seen?

19   A.    No.

20   Q.    Did you take any other steps to identify

21         witnesses?

22   A.    No.

23   Q.    At anytime have you ever had any conversation

24         with any individual who claims to have witnessed

25         the events of that evening?

```
 1   A.    No.
 2               MR. KAISER:                Al, I
 3               assume on your last question you were
 4               referring to civilian witnesses?
 5               MR. GERHARDSTEIN:               Yes.
 6               Thank you.
 7               (Thereupon, Plaintiff's Exhibit 8 to the
 8               videotaped deposition of Officer Michael
 9               Chapman was marked for purposes of
10               identification).
11   BY MR. GERHARDSTEIN:
12   Q.    In the zone car when a prisoner is placed in the
13         back, I assume there's a screen between the back
14         and the front of the zone car?
15   A.    Yes.
16   Q.    When the prisoner is placed in the back and the
17         officer isn't located in the zone car, is there
18         an audio system that kicks on so that anybody is
19         listening to what the prisoner is saying or
20         doing?
21   A.    In our zone car we don't have that.  At the time
22         we didn't have it.
23   Q.    What about the zone car that Mr. Brown was in?
24   A.    I don't know if they had it or not.
25   Q.    Have you ever heard of a system like that?
```

1   A.      Not in the City of Cleveland I haven't.

2   Q.      So in your experience in the City of Cleveland

3           using different zone cars, has anybody ever had a

4           system like that?

5   A.      No.  Maybe if they had it it was supplied -- like

6           they bought it themselves, but not as far as it

7           being issued to us or made part of the zone car.

8           I don't have any knowledge of that.

9                   MR. GERHARDSTEIN:              Who is

10                  that, Simone?

11                      Is there anybody other than Officer

12                  Simone who adds his own equipment to the

13                  cars?

14                  MR. KAISER:                 I've heard

15                  of at least one other, maybe there's a

16                  handful of others, but I don't

17                  specifically know, and I don't like being

18                  deposed.

19  BY MR. GERHARDSTEIN:

20  Q.      All right.  Take a look at Exhibit 8.  This, I

21          believe, is the event chronology from the EMS

22          system.  Do you know whether EMS talks to

23          dispatchers on a different system than you do?

24  A.      I don't know.

25  Q.      Have you ever seen this chronology from the EMS

1          event code before?

2     A.     No.

3                    (Thereupon, Plaintiff's Exhibit 9 to the

4                    videotaped deposition of Officer Michael

5                    Chapman was marked for purposes of

6                    identification).

7     BY MR. GERHARDSTEIN:

8     Q.     I'm going to show you what's been marked as

9            Exhibit 9.  This is the coroner's verdict and

10           autopsy report and toxicology report related to

11           Mr. Brown.  Have you ever seen this before?

12    A.     Yes.

13    Q.     When did you have occasion to see this?

14    A.     I can't remember the exact time, but I think it

15           was sometime last year when I first saw this.

16    Q.     On Page 2 or Bates No. Page 203 in the lower

17           right-hand corner, there is a paragraph that's

18           numbered 4 that describes circular puncture

19           wounds on the left lower back; do you see that at

20           the top of the page?

21    A.     Yes.

22    Q.     Then it goes on to describe other puncture

23           wounds, do you have any reason to disagree with

24           the coroner's finding as to the location of these

25           various puncture wounds?

1   A.    No.

2              MR. KAISER:                    Objection.

3                    Foundation.

4   BY MR. GERHARDSTEIN:

5   Q.    In the next paragraph there are other

6         descriptions of puncture wounds, do you have any

7         reason to disagree with the coroner's findings

8         with respect to those puncture wounds?

9              MR. KAISER:                    Same

10             objection.

11  A.    No.

12  Q.    Have you been asked about these puncture wounds

13        in the body of Mr. Brown in any investigation

14        that has included you?

15  A.    No.

16  Q.    Up to this point?

17  A.    No.

18  Q.    No one has ever reviewed the location of puncture

19        wounds on Mr. Brown in conversation with you?

20  A.    No.

21  Q.    As you administered the taser in prong mode, you

22        would expect a puncture wound; right?

23  A.    Yes.

24  Q.    As you administer a taser in drive stun mode,

25        would you expect a puncture wound?

1        MR. KAISER:                    Objection.

2        Foundation.

3   A.   I don't -- no, not a puncture wound, no.

4   Q.   Right.  Because a drive stun tends to leave a

5        little burn mark; right?

6   A.   I don't recall, but I would probably say so.

7   Q.   When you apply the drive stun even -- well, when

8        you apply the drive stun with the cartridge in

9        it, is there any piece of hardware sticking out

10       of the cartridge?

11  A.   No, it's just a cartridge itself.

12  Q.   Just the wire; right?

13  A.   Well, I mean, after the -- are you talking about

14       after the wire is disengaged?

15  Q.   Let's say the wire is still connected to the

16       prong, and still connected to the cartridge, my

17       question is based on your experience with just

18       seeing the deployed cartridge, would you expect

19       to see any puncture wound on the skin after you

20       had applied that cartridge to the body of the

21       suspect?

22       MR. KAISER:                    Objection.

23       Foundation.

24  A.   No.

25  Q.   And when the cartridge is not in it, then you've

1          got the hardware that the cartridge attaches to

2          at the end of the weapon; right?

3    A.    Yes.

4    Q.    But when you apply that into the skin, that's not

5          a really sharp item that would puncture the skin;

6          is it?

7                MR. KAISER:                    Objection.

8    A.    No.

9                (Thereupon, Plaintiff's Exhibit 10 to the

10               videotaped deposition of Officer Michael

11               Chapman was marked for purposes of

12               identification).

13   BY MR. GERHARDSTEIN:

14   Q.    I'm going to show you what's been marked as

15         Exhibit 10.  Have you seen that before?

16   A.    I think I have, or this actual sheet or just --

17   Q.    Yes.

18   A.    I think I have.

19   Q.    And this is the printout of the download that is

20         done from the handle where the dataport is on

21         your taser indicating the deployments of your

22         taser; right?

23   A.    Yes.

24   Q.    And this indicates that local time was December

25         31, 20:47 through 20:48; right?

1   A.    Yes.

2   Q.    Now, this indicates three taser deployments.  The

3         first being 7 seconds and the other two being 5

4         seconds each; right?

5   A.    Yes.

6   Q.    That's a total deployment of 17 seconds; is that

7         correct?

8   A.    Yes.

9   Q.    It does not appear, based on this record, that

10        you spark tested your taser at the beginning of

11        your shift; right?

12  A.    Yes.

13  Q.    You're agreeing that --

14  A.    Yeah, I did not do it.

15  Q.    Have you ever been advised of any tests that have

16        been done on tasers indicating that they vary in

17        the amount of electrical output they produce,

18        beyond what the manufacturer specifications are?

19  A.    I'm not sure.

20  Q.    Was your taser taken from you that night?

21  A.    Yes.

22  Q.    And how long were you without it?

23  A.    Well, I can't remember.  I think they actually,

24        like, took it, period, like for the

25        investigation.  Like I don't think I got it back.

1   Q.    So did you get a different taser then?

2   A.    Yes.

3   Q.    At any point do you know whether your taser was

4         ever tested for how much electrical output it was

5         producing?

6   A.    I don't know.

7   Q.    In your use of the taser, either in training or

8         in testing or in field operations, have you ever

9         experienced any reaction when you used the taser

10        that made you believe that it was producing more

11        electricity than the manufacturer's

12        specification?

13  A.    No, I never thought to think about that.

14              (Thereupon, Plaintiff's Exhibit 11 to the

15              videotaped deposition of Officer Michael

16              Chapman was marked for purposes of

17              identification).

18  BY MR. GERHARDSTEIN:

19  Q.    Do you know whether your taser download was

20        synchronized with the times that are used by the

21        dispatcher?

22  A.    I don't know.

23  Q.    Has anybody ever questioned you about whether

24        your taser download times were consistent with

25        what is on the event chronology, which we've

1       marked as Exhibit 7?

2   A.    No.

3   Q.    Given your experience with Mr. Brown that night,

4       do you have any reason to disagree with the

5       duration of the trigger pulls that are indicated

6       on Exhibit 10?

7   A.    I don't have any reason to disagree.

8   Q.    So that would indicate the first trigger pull was

9       7 seconds and that would have been the one to the

10      chest; right?

11  A.    Yes.

12  Q.    And this indicates that within a minute you had

13      already applied two more trigger pulls, which

14      you're saying were drive stuns; right?

15  A.    Yes.

16  Q.    And so that is it your understanding that you

17      chased Mr. Brown and were wrestling with him and

18      applying the drive stun in less than a minute

19      from the time you had tased him by the car?

20  A.    Trying to apply -- yes, I was trying to apply the

21      drive stun, but he kept smacking them away.

22  Q.    I understand, but I'm just trying to use this to

23      give us a sense -- the whole chase was very

24      short, then?

25  A.    Yeah.  According to the time, yes.

1   Q.   Have you ever had occasion to look at the
2        downloads from your partner?
3   A.   No.
4   Q.   And did you ever have occasion to learn whether
5        his taser was synchronized by time with your
6        taser?
7   A.   No.
8   Q.   Take a look at Exhibit 11.  I think we've marked
9        it.  This is labeled incident report, have you
10       ever seen this before?
11  A.   No.
12  Q.   Have you ever seen any incident report before --
13  A.   Not --
14  Q.   -- for any event in your history as a Cleveland
15       Police Department law enforcement officer?
16  A.   Not in this manner.  Not in this manner, no.
17  Q.   How did you see them?
18  A.   Well, the reports that I produce or may see
19       someone else make as far as RMS reports, but not
20       in this manner, how it's typed out and
21       everything, no.
22  Q.   What do you mean RMS reports?
23  A.   Well, it's the same as an incident report, but
24       the way we type them out we have a different type
25       of form, the way we fill them out and everything

1       else.

2    Q.   So do you usually fill them out at a computer

3         terminal?

4    A.   Either at a computer table or we have papers that

5         are just blank and you have to fill in the boxes.

6    Q.   Are these drop-down menus on a computer form?

7    A.   No, it's just -- it looks just like a regular

8         form.  Not a drop-down menu, but you pull it up

9         and it just looks like a piece of paper and you

10        have to fill in the boxes.

11   Q.   And then when you're done, does it save it to the

12        computer system or is it --

13   A.   No, you have it either on a flash drive of your

14        own or on your desktop, however you decide to

15        save that.

16   Q.   And how did you deliver that to your superior

17        officers?

18   A.   You print it out and you hand it to them so they

19        can review it and make sure everything is okay

20        and they sign it.  You make a copy and you put it

21        in the box it goes in.

22   Q.   So this looks like it was printed out from some

23        database, do you know how this gets stored?

24   A.   No.  No, sir.

25   Q.   Who would know that?

```
1              Who should I invite to a deposition?
2     A.    I have absolutely no idea.
3     Q.    As you look at this document, is this -- do you
4           fill out all this information when you do your
5           own incident report?
6              Even if it doesn't look like this, is this
7           capturing the same things you fill out when you
8           fill out one of these forms?
9     A.    A lot of it is on here, but a lot of it's not.
10    Q.    Well, I'm most interested in Page 3 or Bates
11          numbered Page 123, and there's this dispatch
12          narrative; do you see that?
13    A.    Yes, I see it.
14    Q.    Do you fill that out when you create an incident
15          report?
16    A.    Dispatch narrative, no.
17    Q.    Do you fill out a summary of the facts when you
18          fill out an incident report?
19    A.    Yes.
20    Q.    So did you ever create an incident report
21          regarding Mr. Brown?
22    A.    No.
23    Q.    Now, this has primary Michael Chapman at the top
24          of Page 123?
25    A.    M-hm.
```

1    Q.    Do you know what that means?

2    A.    I'm the primary officer on scene.

3    Q.    So would you normally be the one to create the

4          incident report, then?

5    A.    Not for a homicide.

6    Q.    So who wrote this?

7    A.    I don't know who wrote this.  I have to look at

8          -- this is a -- it seems this -- it says

9          reporting officer, it looks like Timothy En -- it

10         says homicide.

11   Q.    Okay.  So at the bottom of the first page this

12         narrative came from Detective Tim Entenok?

13   A.    It looks that way.

14   Q.    All right.  That's helpful.

15             So would it be your understanding that the

16         dispatch narrative -- that all of the information

17         on this would have come from that detective?

18   A.    I would think so.

19                   (Thereupon, Plaintiff's Exhibit 12 to the

20                   videotaped deposition of Officer Michael

21                   Chapman was marked for purposes of

22                   identification).

23   BY MR. GERHARDSTEIN:

24   Q.    I'm going to show you Exhibit 12.  Do you

25         recognize this?

1    A.    I've never seen it.

2    Q.    It appears to be an attempt to draw a diagram of

3          Mr. Brown's car at the corner of East 113th and

4          Benham; do you agree?

5    A.    Yes.

6    Q.    Is that the address that you were in front of on

7          East 113th, 3570?

8    A.    I don't remember the address.

9    Q.    Any clue as to why those particular measurements

10         are indicated on this form?

11   A.    No, I don't know.

12   Q.    Did anything, in particular, happen at Benham

13         where those arrows are indicated?

14   A.    I don't know.  I mean, that whole incident

15         happened on East 113th and Benham so what the

16         actual arrows were for, I'm not sure.

17   Q.    Well, we have to visit with Detective Ronald Timm

18         for that, I guess.

19             (Thereupon, Plaintiff's Exhibit 13 to the

20             videotaped deposition of Officer Michael

21             Chapman was marked for purposes of

22             identification).

23   BY MR. GERHARDSTEIN:

24   Q.    I'm showing you what's been marked Exhibit 13.

25         Do you recognize that?

1    A.    I've never seen this.

2    Q.    It appears to be an attempt to draw a diagram of

3          a location at East 114th near a building that had

4          a wheelchair ramp.  Does that refresh your

5          recollection, at all, about how this might relate

6          to the use of force with respect to Mr. Brown?

7    A.    I think this is where the incident ended, where

8          the fight between myself, my partner and Mr.

9          Brown.

10   Q.    So did you have any contact with Mr. Brown at a

11         wheelchair ramp?

12   A.    I don't remember a wheelchair ramp.

13   Q.    Okay.

14              (Thereupon, Plaintiff's Exhibit 14 to the

15              videotaped deposition of Officer Michael

16              Chapman was marked for purposes of

17              identification).

18   BY MR. GERHARDSTEIN:

19   Q.    I'm showing you what's been marked as Exhibit 14.

20         This is the EMS report with respect to the

21         dispatch of EMS and their treatment of Mr. Brown

22         on December 31st, 2010.  Have you ever seen this

23         before?

24   A.    No.

25   Q.    Do you have any reason to disagree with the times

1      that are indicated on the first page on the

2      right-hand column?

3   A.   No.

4   Q.   Now, this particular report shows that EMS was at

5      the patient at 21:10, which is 9:10; right?

6   A.   Yes.

7   Q.   And at least as we look at the assessment area,

8      see 21:10 down there, assessments?

9   A.   Yes.

10  Q.   When EMS arrived, they found in assessing Mr.

11     Brown, no spontaneous respirations, no pulse and

12     a fixed gaze; did I read that correctly?

13  A.   Yes.

14  Q.   So he was not breathing and his heart wasn't

15     beating when EMS arrived; right?

16  A.   According to this.

17  Q.   And in any conversations that you've had with

18     your brother officers or the supervisor at the

19     scene, did anyone indicate to you that Mr. Brown

20     had stopped breathing and that his heart had

21     stopped beating prior to EMS arriving?

22  A.   No.

23  Q.   Did you talk about whether Mr. Brown was

24     breathing or whether his heart was beating, at

25     all, with any of the other officers prior to the

1         time EMS arrived?

2    A.   No.

3    Q.   So do you have any personal knowledge, directly

4         or indirectly, about whether Mr. Brown stopped

5         breathing before EMS arrived?

6    A.   No.

7              (Thereupon, Plaintiff's Exhibit 15 to the

8              videotaped deposition of Officer Michael

9              Chapman was marked for purposes of

10             identification).

11   BY MR. GERHARDSTEIN:

12   Q.   I'm going to show you what's been marked as

13        Exhibit 15.  It's called a synopsis.  It was part

14        of the homicide investigation file.  Have you

15        ever seen this before?

16   A.   No, I haven't seen it -- printed out, no, I don't

17        think I've seen this.

18   Q.   Have you ever seen a version of this on the

19        computer or otherwise?

20   A.   I think maybe when I was giving my statement,

21        that's the only time I've seen something like

22        that.

23   Q.   So tell me about that.

24            How did it come to be that you gave a

25        statement?

1    A.    Well, we were called in to talk to homicide and,

2          you know, pretty much give our statements about

3          the events that happened that night.

4    Q.    How did that work?

5    A.    What do you mean, how did it work in?

6    Q.    How long after the event did you give the

7          statement?

8    A.    I can't remember.  It wasn't immediate, though,

9          because I guess they had us on administrative

10         time off.  I can't remember how long it was.

11   Q.    Prior to giving your statement, did you discuss

12         the events of that night with any of your brother

13         officers?

14   A.    Yes.

15   Q.    Tell me about that.

16   A.    I spoke to Officer Jenae Wilson-Brown and told

17         her what happened.

18   Q.    Any other officers?

19   A.    Not that I can recollect.

20   Q.    Who's Jenae Wilson-Brown?

21   A.    I think she was the ex-wife -- or mother of

22         Rodney Brown's children.  She's an officer.

23   Q.    Did you know her?

24   A.    I knew her professionally.

25   Q.    When did you talk to her?

1   A.   I think maybe two days -- around two days, maybe,

2        after it happened.  A day or two.

3   Q.   And what were the circumstances that caused you

4        to be talking to her?

5   A.   Well, after I found out who -- that she was

6        related to him in some way, I figured to get in

7        contact with her and let her know, you know,

8        exactly what happened, instead of hearing it from

9        10 other people, I'd tell her exactly what

10       happened.

11  Q.   That night were you involved, at all, in

12       identifying Mr. Brown?

13  A.   I'm not sure what you're asking.

14  Q.   He was listed as John Doe at the morgue.

15  A.   Okay.

16  Q.   Were you contacted, were you involved in --

17  A.   No.

18  Q.   -- identifying him?

19  A.   No.

20  Q.   How did you learn that this was Rodney Brown,

21       relative of Jenae Brown?

22  A.   I can't -- it was an officer that told me.  I

23       can't remember which officer or how, I know an

24       officer told me.

25  Q.   And when did you learn that?

Page 112

1    A.    I think it was -- it -- possibly maybe a day

2          after, or I really can't recall when did I learn

3          of it.

4    Q.    So tell me the circumstances, then.  Just

5          describe what happened in terms of how you

6          contacted Jenae Brown.

7    A.    Well, I called her over her cell phone and I told

8          her everything that -- you know, I can't remember

9          the exact, like, the small talk before, but I

10         told her exactly what happened.  And, you know,

11         she told me that, you know, she understood.  And,

12         you know, her relationship with him was

13         tumultuous.  You know, he was a big, strong guy.

14   Q.    So tell me -- so, first of all, you didn't meet

15         with her; right?

16   A.    No.

17   Q.    You just talked to her on the phone?

18   A.    Yes.

19   Q.    And what did you say to her?

20   A.    I told her -- you want me to repeat the --

21   Q.    Yeah, tell me what you told her.

22   A.    The exact -- I can't remember the exact -- my

23         exact words, but I went throughout the whole

24         scenario from the traffic stop to when he was

25         being put in the ambulance.

1   Q.    How long did you speak to her?

2   A.    I don't know how long.  I'm guessing maybe 10, 15

3         minutes.

4   Q.    What did she say to you?

5   A.    You know, she understood, you know.  She felt

6         sorry for me and she said that she understand

7         that we had to do what we had to do because he

8         was a strong man and he was a fighter and her

9         relationship with him was quite tumultuous.

10  Q.    Did she say anything else?

11  A.    Not that I can recall.

12  Q.    Did you speak to anyone else?

13  A.    No.

14  Q.    Prior to giving your statement, did you talk to

15        your partner from the zone car?

16  A.    As far as -- I mean, we talked, but --

17  Q.    So did you tell him what you thought happened and

18        he told you what he thought happened?

19  A.    No, we didn't go over everything.  I mean, I

20        can't remember -- it was almost two years ago, I

21        can't really recall what we exactly said to each

22        other.  I mean, we talked.

23  Q.    Prior to giving the statement, did you review

24        with any of the other officers who were with you

25        that night what you were going to say in your

1       statement?

2  A.    No.

3  Q.    Were you given any instructions about whether to

4       speak with your brother officers or not?

5  A.    No.

6  Q.    So it was okay to speak with other officers about

7       the events of that night?

8  A.    I don't know if it's okay, but I didn't speak

9       with any of the officers as far as --

10  Q.    You were not instructed to stay away from

11       conversations about the events of that night

12       prior to giving your statement; right?

13  A.    I really can't remember if I was instructed or

14       not.  I just kind of assumed that this isn't

15       something I was going to go talking about to

16       everybody.  I can't remember if I was instructed

17       or not.  I really wasn't talkative anyway.

18  Q.    Are you a member of a union?

19  A.    Yes.

20  Q.    And prior to giving your statement, did you

21       discuss the contents of your statement with any

22       union official?

23  A.    I'm not sure.

24  Q.    Did you receive advice, other than from an

25       attorney, about the contents of your statement

1       prior to giving your statement?

2   A.  I don't remember.  I don't think I did.

3           As far as advice, I'm not understanding what

4       you're asking me as far as advice.

5   Q.  Did you speak with any union official about the

6       contents of your statement?

7   A.  No.

8   Q.  Did you talk to any union official, at all,

9       before you gave your statement?

10  A.  Yes.

11  Q.  Who was that?

12  A.  I think Officer Kindness.  He pretty much told me

13      what's going to happen.  You know, they're going

14      to ask you to give a statement and you're going

15      to go give your statement.  Just make sure it's

16      truth and facts.  Stick to the facts.

17  Q.  Did you review with Officer Kindness the details

18      of the events of that night?

19  A.  No.

20  Q.  Did you review with him any of the facts of the

21      events of that night?

22  A.  No.

23  Q.  Did you speak with any attorney, prior to giving

24      your statement?

25          I don't want to know the content of what you

1           said, I just want to know if you spoke with

2           anyone.

3     A.    Before giving my statement?

4     Q.    Yes.

5     A.    No.

6                 (Thereupon, Plaintiff's Exhibit 16 to the

7                 videotaped deposition of Officer Michael

8                 Chapman was marked for purposes of

9                 identification).

10    BY MR. GERHARDSTEIN:

11    Q.    I'm going to show you what's been marked as

12          Exhibit 16, do you recognize this?

13    A.    Yes.

14    Q.    This is dated January 17th, 2011 and it appears

15          to be a three-page document signed by you; right?

16    A.    Yes.

17    Q.    And there is a narrative here and then some

18          questions and answers typed at the back; do you

19          see that?

20    A.    Yes.

21    Q.    Did you type this statement?

22    A.    No.

23    Q.    So describe for me how this statement came to be.

24    A.    The detective or the officer I was -- they were

25          talking -- you know, giving them my statement.

1     He would type out everything that I told him.

2  Q.  Okay.

3  A.  And that would be it.  I mean, I remember the

4     attorney being there, or I can't remember his

5     name, but an attorney was there.  He'd just ask

6     me a question and I'd tell him what happened and

7     he would type it out.

8  Q.  So where did this occur?

9  A.  In the homicide department.

10 Q.  And you were in a room with the officer who did

11    the typing?

12 A.  Yes.

13 Q.  And do you remember the name of that person?

14 A.  No.

15 Q.  And you were also present with an attorney;

16    right?

17 A.  Yes.

18 Q.  Was anybody else in the room?

19 A.  Yeah.  It was a big room so my partner was there

20    making his statement.  He was with an officer or

21    a union rep, I think.

22 Q.  So did your partner witness you making your

23    statement was he there when you were making your

24    statement?

25 A.  We were in the same room, but like I was on one

1           side of the room, he was on the other side of the

2           room.

3    Q.    Did you hear what your partner said when he gave

4           his statement?

5    A.    No.

6    Q.    How many feet away from him were you?

7    A.    I don't know how many feet.  I mean, it's a

8           pretty big office.

9    Q.    About the size of this room we're in today?

10   A.    No.  Like where the hallway is, it's how big the

11          room was.  And I was like at one end and he was

12          at the other end.

13   Q.    So as the officer was listening to you speak and

14          typing, did you make corrections and did he alter

15          the statement, at all?

16   A.    I don't think he altered the statement, but if he

17          asked me to be clearer, I would try to be as

18          clear as I could.

19   Q.    Did the attorney offer any edits or suggestions

20          about the content of this statement as you

21          proceeded through this process?

22   A.    No.

23   Q.    Did the attorney say anything?

24   A.    Not that I can remember.

25   Q.    Were there any drafts of this statement printed

Page 119

1          out that differed, in any respect, from the one

2          we see as Plaintiff's Exhibit 16?

3     A.   I haven't seen any.

4     Q.   Was this printed out while you were there?

5     A.   No, I can't remember if it was printed out or not

6          while I was there.  I haven't seen it.

7     Q.   Is that your signature on the third page?

8     A.   Of course it is then.  Yes, this was printed out

9          when I was there.

10    Q.   Well, are you assuming that because you see your

11         signature or do you now recall that?

12    A.   Yeah, this was printed out then while I was

13         there.

14    Q.   This statement says that you do not consent to

15         audio or videotaping.  Was it, nonetheless,

16         videotaped or audiotaped?

17    A.   No, it wasn't.

18    Q.   Are you sure?

19    A.   Yes.

20    Q.   Did you videotape or audiotape it?

21    A.   No.

22    Q.   When was the last time you saw this statement?

23    A.   It was the day we made the statement.

24    Q.   Prior to your deposition today did you review any

25         documents?

1    A.    Documents?

2    Q.    Yes.

3    A.    I went over some.  I think I went over my

4          statement with my attorney right here.

5    Q.    And by statement, you mean Exhibit 16?

6    A.    Not -- maybe the exhibit, I don't know.  We went

7          over my statement.  I don't know if this was the

8          exact statement.

9    Q.    Is there a written statement that you're

10         referring to, other than what I see as Exhibit

11         16?

12   A.    I don't know.  I didn't look at the statement we

13         were going over.

14   Q.    I don't really want to know what you said to your

15         attorney and what he said to you, but I do want

16         to know if there's a document out there that has

17         your statement, other than what we've seen so far

18         today.

19   A.    I don't think there's another statement out

20         there.  I haven't made any other statements.

21   Q.    There is no other document summarizing your

22         statement?

23   A.    Besides the synopsis and this, I haven't seen

24         anything else.

25   Q.    When you volunteered to be tased back when you

1       were in class, did you sign a release?

2   A.  I don't remember signing a release.

3   Q.  Did you sign any document waiving a right to sue

4       anybody if you were injured by being tased?

5   A.  I don't remember signing a statement like that.

6   Q.  Is there a particular person in the Cleveland

7       Police Department who is the taser trainer?

8           MR. KAISER:                    Time

9           frame, please.

10          MR. GERHARDSTEIN:              Back in

11          2008 to 2010.

12  A.  There's two officers that train us in the taser.

13      I can't think of their names off the top of my

14      head, though.  If I have to see them I could tell

15      you, yeah, those are the guys.

16  Q.  Is Seroka one of them?

17  A.  I don't remember Seroka.

18        One of them is Officer Bachman.

19  Q.  B-A-C-H-M-A-N?

20  A.  I think it's -- I guess that would be the

21      spelling.  I don't know how to spell it, but the

22      other guy, I can't remember his name.

23  Q.  Have you been disciplined, at all, while you've

24      worked for the Cleveland Police Department?

25          MR. KAISER:                    Objection.

1   A.   Yes.

2   Q.   Tell me about that.

3             MR. KAISER:                Same

4             objection.

5             Go ahead.

6   A.   I worked part time without filling out the proper

7        paperwork, completing the proper paperwork.

8   Q.   You have to apply to be approved for secondary

9        employment?

10  A.   Yes.

11  Q.   If you don't apply, that's a violation of the

12       rules?

13  A.   Yes.

14  Q.   And when was that discipline?

15  A.   The exact date I can't -- I don't remember.

16  Q.   What year?

17  A.   I don't remember the year.

18  Q.   Was it before your use of force with Mr. Brown?

19  A.   Yes, I think so.  I'm pretty sure it was.

20  Q.   And what was the -- were you suspended or what

21       was the discipline?

22  A.   No, I think it was just a warning.

23  Q.   Any other discipline?

24  A.   No.

25  Q.   In your experience in the Cleveland Police

Page 123

1            Department, have you ever witnessed a suspect

2            incur injury as a result of the deployment of a

3            taser?

4   A.    No, I never witnessed it.

5   Q.    In your experience in the Cleveland Police

6            Department, have you ever had specific

7            discussions with your supervisor or trainers

8            about the affects of a taser on breathing and/or

9            cardiac function?

10  A.    During training.

11  Q.    And to the best of your recollection, tell me

12          what you learned in training about the affects of

13          a taser on breathing.

14          MR. KAISER:              Objection.

15  A.    I really can't recall the exact training, you

16          know, what came out of it.

17  Q.    And to the best of your recollection, tell me

18          what you have learned about the affects of taser

19          on cardiac function in your training at the

20          Cleveland Police Department?

21          MR. KAISER:              Objection.

22          Calls for hearsay.

23  A.    I can't recall.

24  Q.    In your experience and training as a Cleveland

25          Police Officer, have you ever been warned about

1       the affects of multiple deployments of the taser

2       on a single subject?

3  A.    Not that I can recall.

4  Q.    So in your experience have you ever been warned

5       that tasing a person four times may put the

6       person at more risk than tasing them once?

7  A.    I can't recall.

8        MR. KAISER:           Objection.

9  BY MR. GERHARDSTEIN:

10  Q.    As we sit here today, do you have an opinion as a

11       police officer certified to use a taser as to

12       whether tasing a person four times puts them at

13       greater risk for their health than tasing them

14       once?

15        MR. KAISER:           Objection.

16        Foundation.

17  A.    I don't have an opinion.

18  Q.    So is it that you just don't know if tasing a

19       person four times puts them at greater risk than

20       once?

21        MR. KAISER:           Same

22        objection.

23  A.    No, I don't know.

24  Q.    You mentioned that during the wrestling match

25       with Mr. Brown there came a time when he had a

1    dark object?

2  A.    Yes.

3  Q.    And you actually stood up and pulled your Glock?

4  A.    I didn't stand up.

5  Q.    Or so you were still on the ground?

6  A.    Yes.

7  Q.    And you unholstered your Glock?

8  A.    Yes.

9  Q.    And did you say out loud to Mr. Brown that you
10       were going to shoot him?

11  A.    I yelled, Belal, I'm going to shoot him, but I
12        yelled so both of them could hear it.

13  Q.    And was it your intent to discharge your firearm
14        at that point?

15  A.    Yes.

16  Q.    And why was that?

17  A.    Well, at this point of the fight I didn't feel
18        that we were winning and I was extremely
19        exhausted and I felt that he was just getting
20        stronger and stronger.  It was harder and harder
21        to keep him down.  And he produced an object, a
22        black object, I had absolutely no idea what it
23        was.  I didn't know if it was a gun, if it was a
24        knife, but I was like, we're losing this fight
25        and he's producing weapons, what I thought was a

1        weapon.  So that's where I felt like this is now

2        -- we're coming to the end of this and I don't

3        want be at the losing end.

4    Q.  At the time you made that announcement and

5        unholstered your Glock, where were the three of

6        you in relation to each other, and explain to me

7        where this object was?

8    A.  Well, we were all on the ground.  Everybody was

9        still on the ground.

10   Q.  All right.

11   A.  You know, we were still holding each other.  I

12       mean, I can't tell you exactly what part was

13       holding who.  And I said during the fight, yeah,

14       you know, he produced a black object in his hand.

15   Q.  Did you see it?

16   A.  Yeah, I saw it.  That's what caused me to, you

17       know, like I don't know what that is.  I didn't

18       know if that was a knife or a gun.  I didn't know

19       what it was.

20   Q.  Where did it come from?

21   A.  Where did it come from?

22   Q.  Yes.

23   A.  I don't know where it came from.

24   Q.  And did Mr. Brown use that object against you, in

25       any way?

Page 127

1    A.    Not against me.

2    Q.    Did you see him use it against anyone else?

3    A.    I didn't see him use it.

4    Q.    And then after you said -- I'm sorry, what was it

5          you said?

6    A.    Belal, I'm going to shoot him.

7    Q.    After you said, Belal, I'm going to shoot him,

8          what happened with respect to this object?

9    A.    My partner grabbed his wrist and wrestled it out

10         of his hand and threw it and he yells, don't

11         shoot him, and I reholstered it.  I reholstered

12         my weapon.

13   Q.    How far away from you, at that point, was this

14         black object?

15   A.    After my partner threw it?

16   Q.    Yes.

17   A.    I don't know how far it was.

18   Q.    Were you satisfied that it was out of your reach

19         at that point?

20   A.    Yeah, as long as my partner threw it, I was

21         comfortable with it, no matter where it landed.

22   Q.    So at that point were you satisfied that Mr.

23         Brown no longer had a weapon?

24   A.    Yeah, at that point.

25   Q.    Then you reholstered your Glock and as of that

Page 128

1        moment was it still just you and your partner or
2        were there other officers?
3    A.   It was still me and my partner.
4    Q.   How long after that did the other officers
5        arrive?
6    A.   I couldn't tell you.  I mean, like I say -- I
7        don't know, it seemed like a long time for me and
8        my partner, we were fighting.
9    Q.   When the other officers arrived, you then
10       disengaged?
11   A.   Yes.
12   Q.   Did you advise any of them that he was no longer
13       armed or he was armed one way or the other?
14   A.   No.
15   Q.   Prior to the discharge of your taser with respect
16       to Mr. Brown, were you aware of any reports from
17       Amnesty International of the taser causing
18       hundreds of deaths?
19           MR. KAISER:                    Objection.
20   A.   No, I wasn't aware of that.
21   Q.   Have you followed any of the national news about
22       the controversy surrounding the use of tasers?
23   A.   I haven't followed any of it.
24   Q.   Are you aware that the United Nations has
25       declared that tasers can be instruments of

1            torture when misused?

2                    MR. KAISER:                    Objection.

3    A.    No, I wasn't aware of that.

4    Q.    Do you subscribe to any law enforcement

5          publications?

6    A.    Yes.

7    Q.    What law enforcement publications do you

8          subscribe to?

9    A.    It's a website.  I think it's called Officer 1.

10   Q.    Is it Force 1?

11   A.    I haven't looked at the website in a while.  It

12         may be Force 1.

13                   MR. MALIK:                     Police 1.

14   BY MR. GERHARDSTEIN:

15   Q.    Or Police 1?

16   A.    It may be Police 1.

17   Q.    Tell me about that website.

18   A.    Like I said, I haven't looked at it in a long

19         time.  It has a lot of police-related things.

20         Could be new training, police incidents, police

21         videos, new police cars coming out.

22   Q.    How often in 2010 were you looking at that

23         website?

24   A.    I didn't look at that website in 2010.

25   Q.    Oh, you started looking at it since then?

1    A.    I remember looking at it last year is when I

2          first became aware of it.

3    Q.    In 2010 did you subscribe to any law

4          enforcement-related publications?

5    A.    I can't -- I don't -- I can't recall.

6    Q.    During the entire incident, did Mr. Brown say

7          anything to you after he said, do you know who I

8          am?

9    A.    No.

10   Q.    So even though you were trying to get him to

11         follow your directions at the back of the car and

12         then by the side of the car and then during the

13         chase, he didn't say anything to you?

14   A.    I mean, during the fight I think he was saying

15         something during the fight, but I can't recall

16         what he was saying.

17                   THE VIDEOGRAPHER:              Excuse me,

18                   off the record.

19                   (Thereupon, there was a brief recess.)

20                   THE VIDEOGRAPHER:              On the

21                   record.

22   BY MR. GERHARDSTEIN:

23   Q.    To your knowledge, with respect to the radio

24         equipment you had on December 31st, 2010, was

25         there a way to just push the mic down and then

1        leave it in that state permanently?

2    A.   No.

3    Q.   During your altercation with Mr. Brown, did you

4         press the mic from time to time?

5    A.   Yes.

6    Q.   Do you know how many times?

7    A.   I don't know how many times.

8    Q.   Do you know what your goal was in pressing the

9         mic?

10   A.   Yes.

11   Q.   And what was it?

12   A.   To locate -- to give everybody our location, let

13        everybody know what was happening, to call for

14        backup.  You know, let everybody aware of what's

15        going on.

16   Q.   Did you witness your partner also using his

17        radio?

18   A.   I don't remember.

19   Q.   The black object that was thrown, did you ever

20        look at it after the incident?

21   A.   I can't recall.

22   Q.   Did you ever see what it was during the

23        investigation, at anytime?

24   A.   No.  Once homicide takes the scene, I didn't get

25        involved in any of it.

1   Q.    So as we sit here today, do you know what it was?

2   A.    I was told it was a knife.

3   Q.    Who told you that?

4   A.    I can't remember which officer told me that.

5   Q.    Did you ever see the knife?

6   A.    No.

7   Q.    With respect to --

8         MR. KAISER:                    He saw the

9         black object.

10  BY MR. GERHARDSTEIN:

11  Q.    On the night you saw a black object, but you

12        never afterwards looked at it and determined that

13        it was a knife?

14  A.    No, I never saw it with my own eyes.

15  Q.    And he held it in which arm?

16  A.    I can't recall which arm it was in right now.

17        Like I said we were all fighting, I can't

18        remember which one it was in.

19  Q.    And how big was it?

20  A.    I can't remember how big it was.

21  Q.    What shape was it?

22  A.    It was dark.  I don't remember what shape it was

23        in.

24  Q.    Going back to your first encounter with Mr. Brown

25        with the headlights that you say were off, as he

Page 133

1        got out of the car did you instruct him to turn

2        the car off?

3    A.  No, I didn't.

4    Q.  Was the car still running?

5    A.  I believe so.  I can't remember, though.  I

6        didn't tell him to turn it off.

7    Q.  So your only instruction was to put it in park

8        and he did comply with that?

9    A.  Yes.

10   Q.  And it may well be that the engine was still

11       running?

12   A.  It could be.  It's possible.

13   Q.  In your training with the Cleveland Police

14       Department, you have received some medical

15       training; right?

16   A.  Some.

17   Q.  You have some kind of certificate for heart, what

18       is that?

19   A.  I don't remember having a certificate for heart.

20       Maybe CPR.

21   Q.  Yeah, did you get trained in CPR?

22   A.  Some years ago.

23   Q.  How many years ago?

24   A.  I think possibly two or three.

25   Q.  And is that something you maintain, your CPRs

1       training?

2   A.  No.  When they give it to us, that's what we

3       receive our CPR training.

4   Q.  Have you received any other medical training?

5   A.  No.

6   Q.  At anytime while you were on the scene and before

7       EMS arrived, did you observe anyone take Mr.

8       Brown's vitals?

9   A.  No.

10  Q.  At anytime while you were on the scene and before

11      EMS arrived, did you hear anyone say whether or

12      not Mr. Brown was experiencing any medical

13      distress?

14  A.  No.

15  Q.  Are you married?

16  A.  Yes.

17  Q.  Do you have any kids?

18  A.  Yes.

19  Q.  Have you filed bankruptcy?

20  A.  No.

21  Q.  When you identify yourself in electronic

22      communications, like a LEADS check, what number

23      do you put in?

24  A.  I'm not -- I'm not sure.  What do you mean?

25  Q.  You have a badge number; right?

Page 135

1    A.    Yes.

2    Q.    It's 170, I think?

3    A.    175.

4    Q.    175.  Are there any other numbers that you use as

5          a self identifier in your work in the Cleveland

6          Police Department?

7    A.    The car number I'm using, maybe.

8    Q.    That car number changes with whatever beat you're

9          on; right?

10   A.    Yes -- depend -- yes, or what --

11   Q.    Does the car number change?

12   A.    Yes, the car number does change.  You may not

13         work the same geographical location.  You may be

14         in another unit.

15   Q.    Does the car stay with the beat?

16   A.    The car normally stays with the beat.

17   Q.    So the only personal number you have is 175?

18   A.    Yes.

19   Q.    And do you put that on all of your correspondence

20         and all of your electronic communications?

21   A.    What do you mean, like when I talk to radio?

22   Q.    Yeah, when you talk to radio or when you use the

23         CAD?

24   A.    No, the only time I use my badge number is when

25         I'm doing a tow.

Page 136

1   Q.    You have a CAD system in the car?

2   A.    Yes.

3   Q.    And that's a computerized terminal that allows

4         you to type requests for information to check

5         LEADS; right?

6   A.    Yes.

7   Q.    Have you seen a printout from CAD communications

8         from December 31st, 2010?

9   A.    No.

10  Q.    Did you use the CAD that night?

11  A.    I can't remember.  My partner and I probably did.

12        I don't know who logged on, whether it was me or

13        my partner that night.

14  Q.    Well, if you were the driver would you have

15        logged on?

16  A.    It didn't matter.  We were partners and it didn't

17        matter who logged on.

18              MR. GERHARDSTEIN:              All right.

19              Well, I have asked your attorney to

20              see if you can go to your locker and find

21              your taser materials.  We're probably

22              going to want some cooperation on getting

23              your cell phone record from that day.

24              And other than that, I think we're

25              done.  So thank you for your cooperation.

1          THE WITNESS:                You're

2          welcome, sir.

3          THE VIDEOGRAPHER:                End of

4          record.

5          MR. GERHARDSTEIN:                Hold you,

6          are you going to give him instructions?

7          THE VIDEOGRAPHER:                Mr.

8          Chapman has the right to review a

9          transcript when it's typed or he can waive

10         that right, Counsel.  Also, he can watch

11         the videotape if he'd like.

12         MR. KAISER:                He'll

13         review them both.

14         THE VIDEOGRAPHER:                Thank you.

15                        – – –

16              (DEPOSITION CONCLUDED.)

17                        – – –

18

19

20

21         _____

22         OFFICER MICHAEL CHAPMAN  (Date)

23                        – – –

24

25

Page 138

1    I have read the foregoing transcript from Page 1

2    through 137 and note the following corrections:

3    PAGE      LINE                REQUESTED CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

      _____

20                                 Officer Michael Chapman

21        Subscribed and sworn to before me this _____ day

22    of _____, 2012.

23                                 _____

                                   Notary Public

24

         My commission expires: _____.

25

1           C E R T I F I C A T E

2

3  STATE OF OHIO,                    )

4                                    )  SS:

5  COUNTY OF CUYAHOGA.               )

6

7

        I, Lori A. Morris, a Notary Public within and for
8  the State of Ohio, authorized to administer oaths and
   to take and certify depositions, do hereby certify that
9  the within-named witness, OFFICER MICHAEL CHAPMAN, was
   by me, before the giving of his/her deposition, first
10 duly sworn to testify the truth, the whole truth and
   nothing but the truth, that the deposition as above-set
11 forth was reduced to writing by me by means of
   stenotypy, and was later transcribed into typewriting
12 under my direction; that this is a true record of the
   testimony given by the witness; that said deposition
13 was taken at the aforementioned time, date and place,
   pursuant to notice or stipulations of counsel, that I
14 am not a relative or employee or attorney of any of the
   parties, or a relative or employee of such attorney or
15 financially interested in this action.  I am not, nor
   is the court reporting firm with which I am affiliated,
16 under a contract as defined in Civil Rule 28(D).

17

18      IN WITNESS WHEREOF, I have hereunto set my hand
   and seal of office, at Cleveland, Ohio, this 26th day
19 of June, 2012.

20

21 _____
   Lori A. Morris, Notary Public, State of Ohio.
22 1360 West Ninth Street, Cleveland, Ohio 44113
   My Commission expires April 21, 2017.

23

24

25