```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                        - - -
 5   SHIRLEY BROWN,                )
                                   )
 6             Plaintiff,          )
                                   )
 7       v.                        ) Case No. 1:11-CV-1370
                                   ) Judge Lesley Wells
 8   MICHAEL CHAPMAN, et al.,      )
                                   )
 9             Defendants.         )
                          - - -
10     THE VIDEOTAPED DEPOSITION OF OFFICER BELAL ILAIN
                  TUESDAY, JUNE 12, 2012
11                        - - -
12        The videotaped deposition of OFFICER BELAL ILAIN,
13   a Defendant herein, called for examination by the
14   Plaintiff, under the Federal Rules of Civil Procedure,
15   taken before me, Lori A. Morris, a Notary Public within
16   and for the State of Ohio, pursuant to Notice, at
17   Cleveland City Hall, 601 Lakeside Avenue, Cleveland,
18   Ohio commencing at 1:10 p.m., the day and date above
19   set forth.
20                        - - -
             HOFFMASTER & BARBERIC, INC.
21        THE LORENZO CARTER BUILDING, SUITE 440
                 1360 WEST NINTH STREET
22               CLEVELAND, OHIO 44113
                    (216) 621-2550
23               FAX (216) 621-3377
                   1-888-595-1970
24                        - - -
25
```

```
 1    APPEARANCES:
 2
      On behalf of the Plaintiff:
 3
           ALPHONSE A. GERHARDSTEIN, ESQ.
 4         Gerhardstein & Branch, Co., LPA
           432 Walnut Street, Suite 400
 5         Cincinnati, Ohio  45202
           (513) 621-9100
 6
           DAVID B. MALIK, ESQ.
 7         8437 Mayfield Road, Suite 103
           Chesterland, Ohio  44026
 8         (440) 729-8260
 9
      On behalf of the Defendants:
10
           THOMAS KAISER, ESQ.
11         JOHN P. BACEVICE, JR., ESQ.
           Cleveland City Hall
12         Law Department
           601 Lakeside Avenue, Room 106
13         Cleveland, Ohio  44114
           (216) 664-2800
14
15
                              - - -
16
17    ALSO PRESENT:
           Videographer
18         Shirley Brown
           Maurice Brown
19         Leslie Hogan
           Michael Chapman
20
21
                              - - -
22
23
24
25
```

```
 1                           INDEX

 2                                              PAGES

 3

 4   CROSS-EXAMINATION BY

 5       MR. GERHARDSTEIN                         4

 6

 7                      - - -

 8

 9   PLAINTIFF'S EXHIBITS MARKED

10       17                                      22

11       18                                      36

12       19                                      46

13       20                                      47

14       21                                      61

15

16                      - - -

17

18   OBJECTIONS BY

19       MR. KAISER          6, 17, 24(2), 25(2), 26,

20       27(2), 28, 47, 74, 76, 79, 87

21

22

23                      - - -

24

25
```

1              OFFICER BELAL ILAIN

2   a Defendant herein, called for examination by the

3   Plaintiff, under the Rules, having been first duly

4   sworn, as hereinafter certified, deposed and said as

5   follows:

6                 CROSS-EXAMINATION

7   BY MR. GERHARDSTEIN:

8   Q.    Good afternoon.  My name's Al Gerhardstein.  With

9         me is David Malik and members of the family of

10        Rodney Brown.

11           Have you ever been deposed before?

12  A.    No, sir.

13  Q.    You understand that I'll be asking questions,

14        you're giving your answers under oath.  You give

15        a verbal answer.  If you need to take a break,

16        just let me know; okay?

17  A.    Okay.

18  Q.    State your full name, please.

19  A.    Belal Ilain.

20  Q.    Where do you work?

21  A.    City of Cleveland Police Safety Department,

22        Fourth District.

23  Q.    When did you start?

24  A.    February 25th, 2008.

25  Q.    What rank do you have?

1   A.   Just patrol officer.

2   Q.   Are you married?

3   A.   Yes.

4   Q.   Kids?

5   A.   No.

6   Q.   You on any medications today?

7   A.   No.

8   Q.   Have you ever been sued before?

9   A.   No.

10  Q.   Have you ever discharged your firearm at a

11       suspect?

12  A.   No.

13  Q.   Prior to the tasing of Mr. Brown, did you ever

14       tase a suspect?

15  A.   I attempted to, but it didn't hit properly.

16  Q.   How long before the Brown use of force was that?

17  A.   About two weeks.

18  Q.   And what was the name of that suspect?

19  A.   I don't recall.

20  Q.   Did you fill out a use of force report?

21  A.   Yes, we did.

22  Q.   And what's that called in Cleveland?

23  A.   The use of non-deadly force report.  You want,

24       just go by UNDF.

25  Q.   Did that suspect get injured?

1   A.   Not from that, no.  He was -- we were in a car

2        chase.  He ended up crashing so --

3   Q.   What happened?

4   A.   He was in a stolen car and he backed into our car

5        and he nearly hit my partner and a few other

6        officers and he hit a building, took off in a car

7        and smashed into a pole and took off running.

8        And I tackled him that day and we just ended up

9        cuffing him.  I didn't taser him at that point.

10       I tried to taser him to keep him backing into my

11       partner who was standing behind the vehicle.

12            MR. KAISER:                Show an

13            objection to this other incident.

14   BY MR. GERHARDSTEIN:

15   Q.   Have you filed for bankruptcy?

16   A.   No.

17   Q.   On December 31, 2010 what was your beat?

18   A.   It was 4 zone.  I was on zone car 4 Barney 24.

19   Q.   Did there come a time when you had occasion to

20        have any contact with Mr. Rodney Brown?

21   A.   Yes.

22   Q.   Tell me about it.  Start from the beginning.

23   A.   As previously stated, we were finishing up a

24        radio assignment in the area of 112th and Kinsman

25        and Regalia, that area.  I remember it was

```
 1          something to do with a fight, but we couldn't
 2          locate the actual victim.  We checked a few
 3          houses.
 4              My partner and I heard gunshots very nearby.
 5          And it's normal on New Year's, but we just wanted
 6          to make sure nobody was injured, so we heard it
 7          coming from the Regalia area, we drive our car
 8          towards that area.  We were facing -- we're now
 9          on Regalia facing East 116th at about 113th, so
10          we were facing, which would be eastbound we're
11          facing.
12              And Mr. Brown is in his vehicle approaching us
13          from 116th and he's traveling westbound and he
14          has no headlights on.  We just begin to follow
15          him.  I run the plate on the MDT, wait a few
16          seconds, see the information come up and we
17          finally decide to make the traffic stop at 113th
18          and Benham.
19   Q.     Let's stop there for a second.
20              Were you like facing him and he went by you?
21   A.     No, he never went by.  We were just kind of
22          coming together, driving towards each other.
23   Q.     There came a time when you were behind him?
24   A.     Yeah, once he turned southbound on East 113th
25          then we turned behind him.
```

1    Q.    So if he was looking through his windshield he

2          should have observed that this was a police car?

3             You were pretty close; right?

4    A.    Yeah, yeah.

5    Q.    I mean, how close did you pass?

6    A.    We never passed.  He just --

7    Q.    Turned in front of you?

8    A.    Yeah, we're going the same way he turned, we just

9          turned behind him.

10   Q.    So you were within 20 feet of him?

11   A.    Oh, I couldn't tell you that.  I mean, with that

12         kind of distance we were -- I mean, we were -- I

13         mean, a normal following position.  I mean,

14         it's --

15   Q.    So you said you ran the plate, what does that

16         mean?

17   A.    I ran the -- I typed in his license plate on the

18         computer that we had in our vehicle.

19   Q.    Now, when you did that, is there a document that

20         I could get that would reflect what you typed in

21         and what came back to you?

22   A.    I don't know, personally.  You could maybe ask

23         the state or LEADS, whoever does that.  I really

24         don't know.

25   Q.    Was there any other information that you typed in

1          or that you received regarding Mr. Brown or any

2          of the events of that evening on the MDT?

3    A.    Yes.  Afterwards, yes.

4    Q.    What did you type in afterwards?

5    A.    Well, I didn't really -- on the old system,

6          because we still didn't know who he was at the

7          time, we still didn't have his ID.  On the old

8          system if you clicked on the address, it's like

9          highlighted.  On the MDT it would come up with a

10         few other names and one of them was Rodney Brown,

11         and then it took that, I believe it shows Social,

12         I typed that in just to see if that face would

13         pop up and that's the person that we have here.

14         That's how I discovered it was him.

15   Q.    That was all that night, then?

16   A.    Yes, that was after the whole incident when the

17         EMS was out there and all that.

18   Q.    So prior to even stopping him, you got the

19         information back that the car was owned by

20         Shirley Brown?

21   A.    I just remember it was a female.  I do remember

22         that.

23   Q.    And you saw that the address was nearby?

24   A.    Honestly, I don't remember paying attention to

25         the actual address on there, before the traffic

| | | |
|---|---|---|
| 1 | | stop.  Afterwards I did. |
| 2 | Q. | At least, if I understand this correctly, one of |
| 3 | | the things you're looking for is to see if it's a |
| 4 | | stolen car? |
| 5 | A. | Yes. |
| 6 | Q. | And it wasn't? |
| 7 | A. | No. |
| 8 | Q. | All right.  But you say that he didn't have his |
| 9 | | lights on; right? |
| 10 | A. | That's correct. |
| 11 | Q. | And then what happened? |
| 12 | A. | Well, we initiate our traffic stop, activate our |
| 13 | | overheads and siren briefly, and he stops.  Now |
| 14 | | we're at 113th and Benham just a little bit north |
| 15 | | of Benham on 113th.  And my partner approaches |
| 16 | | from the driver side, I approach from the |
| 17 | | passenger side. |
| 18 | | And my partner asked for the license, his |
| 19 | | license and insurance.  And I remember him, |
| 20 | | specifically, saying in a very slow and hesitant |
| 21 | | voice, do you know who I am?  It was not like the |
| 22 | | way we would have a conversation, it was a very |
| 23 | | bizarre way he said it. |
| 24 | Q. | As best you can, say it like he said it. |
| 25 | A. | Do you know who I am? |

1    Q.    So he wasn't slurring?

2    A.    Not necessarily slurring, just really slow for

3          some reason.

4    Q.    Okay.  Go ahead.

5    A.    I think my partner -- I can't recall exactly if

6          my partner asked him again for the license.  He

7          said that again.  But, regardless, he eventually

8          starts looking for his license in the glove box.

9          And, you know, he's making weird noises.  He's

10         very noisy (indicating).  I said, sir, I

11         understand you're frustrated, but you don't have

12         -- your headlights are not on.  He says, my

13         headlights are on.  And his headlights are not

14         still on.

15             So at this point I know something's going on.

16         Again, the way he's speaking, he's speaking like

17         very slow, almost just not in the way a person --

18         almost like a person maybe under the influence

19         would speak.

20             And we're talking, he's still digging around

21         for the license and digging around in the glove

22         box, and eventually he's not finding anything.

23         And I'm already suspicious he's under the

24         influence of something.  We've given him ample

25         time to find a license.

1          And I tell Mike, Mike, we've got to get him

2          out of the car.  We're not going to sit here and

3          let him produce something I don't know.  You

4          know, I don't know what he's up to.

5  Q.    So at that point, what was your intent in getting

6          him out of the car?

7  A.    At that point, in my mind he was going have to be

8          under arrest, either for not having a license or

9          possibly OVI, if it came to that.

10  Q.    And what was your plan?

11  A.    We were going -- usually, you know, when we take

12          somebody out of the car we put them on the car,

13          we search them, handcuff them, let them know,

14          listen, you're under arrest for this reason.

15          And in that situation, you know, we took him

16          to the back of the car, he put his hands on the

17          trunk --

18  Q.    Hold on.

19          Prior to getting to that, so your intent was

20          to search him, cuff him, would you have intended

21          to do a physical arrest?

22  A.    In that situation?

23  Q.    Yes.

24  A.    Yes, we're going to have to, my opinion, because

25          I knew, probably more so than my partner, that I

1          really believed he was under the influence.

2    Q.    And had you concluded that he wasn't under the

3          influence after bringing him out of the car

4          and --

5    A.    Had I concluded that?

6    Q.    If you had concluded that, would you have then

7          sent him on his way, if you had concluded that he

8          wasn't under the influence?

9    A.    If he wasn't under the influence?

10   Q.    Right.

11   A.    Probably not because he has -- he had -- we

12         didn't know at the time -- first of all, we would

13         have had to figure out if he had a license, which

14         at that time we didn't know who he was.  And

15         afterwards he had a suspended license anyways, so

16         probably considering he had a suspended license,

17         we would have arrested him either way.  We didn't

18         know that.  At that point we knew he didn't have

19         a license with him, but we later found out he had

20         a suspended license anyways.

21   Q.    So you tell your partner -- who's your partner,

22         by the way?

23   A.    Michael Chapman.

24   Q.    You tell him you want to get him out of the car?

25   A.    Yes.

1    Q.    So tell me what happens.

2    A.    He comes out of the car and the way he steps out

3          of the car, very aggressive manner, just angry,

4          almost like he's ready to fight for some reason.

5          Most people get of the car, all right, but he's

6          like this (indicating).  Again, there's something

7          off and I don't feel comfortable with his whole

8          behavior.

9             He puts his hand on the -- we bring him to the

10         back, puts his hand on the trunk lightly, and

11         it's not comfortable.  It's like he wants to

12         reach off anyways, you know.

13            So at that point, I don't know if I told Mike,

14         yeah, we got to place him under arrest or I told

15         him, listen, we're going to place you under

16         arrest, you don't have a license.  As soon as

17         pretty much we put some tension on his arm to

18         bring it back, he just seems to go like this

19         (indicating) immediately, and he starts walking

20         backwards behind us, almost straight back,

21         something like -- I don't know, anywhere from 10,

22         15 feet, something like that.

23   Q.    So while he was still in the car, did he comply

24         with your instructions, to the extent that you

25         asked him to find a license and it looked like he

1           was looking for a license?

2     A.    It looked like it, yeah.

3     Q.    Was there anything else about his conduct inside

4           the car that made you want to extract him from

5           the car?

6     A.    Just the way his speech was, the way his eyes

7           were looking, his eyes were just wide open.

8           They're not -- I mean, if I look at you,

9           everybody here, I can tell nobody is under the

10          influence here, but if you're out there, you can

11          just tell, he's not acting like a normal -- 99

12          percent of the people we run into.  He was not

13          behaving in that way.

14    Q.    So what was it about his eyes?

15    A.    His eyes were just wide open like they had --

16          almost as if you were on PCP at the time, it was

17          just kind of this blank kind of stare.

18    Q.    So he's looking for his license or rumbling

19          around or messing around in the glove box, he's

20          got that stare, he spoke slowly, anything else

21          about his conduct in the car that caused you to

22          want to extract him?

23    A.    In the car, no, I don't think so.

24    Q.    Okay.  And he gets out, you say, in an aggressive

25          manner, but he's complying; right?  I mean, he

```
 1            got out of the car?

 2    A.      Yeah.

 3    Q.      But you sense he's got an attitude?

 4    A.      Yeah.

 5    Q.      Now, when you say he came around back, as you

 6            instructed --

 7    A.      M-hm.

 8    Q.      -- did you have to place your hands on him, at

 9            all, in order to adjust his position on the car?

10    A.      No.

11    Q.      Would it have been appropriate to elbow him in

12            the neck in order to get his compliance in terms

13            of placing him in the position you wanted him on

14            the car?

15    A.      No.

16    Q.      Would it have been appropriate to push him

17            vigorously in order to get him to adjust to the

18            position you wanted him to be at the car?

19    A.      No, not in that situation.

20    Q.      Can you stand up and show us what you mean by his

21            hands being slightly off, just so that I get a

22            sense of what it is?

23    A.      They're like this (indicating).  They're not --

24    Q.      Why don't you move that so that -- we're filming

25            it, so we might as well get a picture of it.
```

 1   A.     It's like this (indicating) --

 2                MR. KAISER:                    Show an

 3                objection.

 4                   It's my belief a deposition is for the

 5                purpose of spoken questions and answers.

 6                Not for recreations.

 7                MR. GERHARDSTEIN:                   Actually,

 8                we've just done this with the court, but

 9                that's all right  --

10                MR. KAISER:                    I've just

11                done it, too, maybe with different

12                results.

13   BY MR. GERHARDSTEIN:

14   Q.     Can you move your water bottle for a second?

15                Show me, again, what it is about his hands

16          that caused you to be concerned.

17   A.     You want him flat down like this.  His were just

18          more like this (indicating).  Just kind of like

19          he doesn't really want to put his hands down.

20   Q.     And did you instruct him, I want your hands flat

21          on the car?

22   A.     No.

23   Q.     But you observed that?

24   A.     Yes, because I didn't feel comfortable at this

25          time.  With his behavior, it was too aggressive.

1          I didn't want to fight with this guy.

2     Q.   So you observed that his hands were sort of

3          elevated on the fingertips, but you didn't talk

4          to him about that?

5     A.   No.

6     Q.   So he's got his hands up on the fingertips,

7          anything else about the way he positioned himself

8          on the car that you were not comfortable with?

9     A.   Not that I recall.

10    Q.   Did he say anything to you up to this point?

11    A.   I mean, other than I told him his lights were off

12         and he said that they're on, that was the --

13         that's all I can remember at this point.

14    Q.   Okay.  So he's at the back of the car, you're on

15         the right?

16    A.   Yes.

17    Q.   Mr. Chapman's on the left, then what happens?

18    A.   Like I said, we're trying to bring him back to

19         put him in the handcuffs.  As soon as we put a

20         little tension on his arms to bring his arms

21         back, he just immediately brings his arms up in

22         the arm and starts walking backwards.  I don't

23         know if he said something then, but he didn't

24         want to go in handcuffs.

25    Q.   Walking backwards away from the rear of his

1        vehicle?

2   A.   Yeah, he's walking backwards at that point.

3            My partner, he pulls out his taser, he's

4        telling him -- I can't recall exactly what my

5        partner was saying.  I immediately -- as soon as

6        he lifted up, I broadcast, male resisting

7        immediately on the -- over the radio.

8            And he continues backing up, my partner is --

9        I mean, I really don't know what my partner was

10       telling him, I just remember my partner had a

11       taser on him.  I'm telling him, listen, we're

12       going to taser you, we're going to taser you, get

13       down.  That's what I'm telling him.  I'm just

14       telling him because I don't really want to taser

15       this guy, we're just going to try to do what we

16       can here.

17  Q.   So you're giving the warning, but Mr. Chapman had

18       the weapon out?

19  A.   Yeah, he might have been giving the warning, too.

20       I just -- I'm paying attention to my words

21       exactly.

22  Q.   Was your taser also drawn?

23  A.   I don't think I immediately drew it.  I drew it

24       at some point, but I don't know -- I think my

25       partner drew it fast -- I might have actually had

1    my hand on my gun, but I couldn't even tell you

2    because sometimes when one person has a taser

3    out, you might want to have a gun out, just in

4    case, because you might need to use deadly force,

5    you don't know.

6  Q.  Can you look at Exhibit 7, please?

7        This is the event chronology that was produced

8    in discovery in this case, and you just mentioned

9    that you broadcast male resisting?

10 A.  That's correct.

11 Q.  Do you see a reflection of that broadcast on

12    this?

13        I'm wondering about the entry at 8:48:20,

14    would you have also requested another car or --

15 A.  I could tell you for a fact when I was trying to

16    broadcast, I couldn't get in.

17 Q.  What do you mean you couldn't get in?

18 A.  I couldn't -- the radio -- there was people

19    talking on the radio so when I tried to squeeze

20    the radio, you can't override them.

21 Q.  Okay.  So help me understand this.

22        You're on a certain frequency?

23 A.  M-hm.

24 Q.  Can only one person talk at a time?

25 A.  Unless you hit your emergency button.

1    Q.    Okay.  I grew up on a farm.  We actually had a
2          party line, we could all talk at once.
3    A.    No, you'll just hear a big boom, boom when you're
4          trying to talk over somebody.
5    Q.    When you tried to broadcast that initial time,
6          did you accomplish the broadcast?
7    A.    What do you mean the initial time?
8    Q.    When you said male resisting?
9    A.    I got that broadcasted.  I mean, this is just
10         what she types.  She -- on the radio broadcast
11         you can hear me say that, but what she -- this is
12         just what they type.  I mean, there's more stuff
13         that we say.  This is just what they --
14   Q.    Oh, so you've actually listened to the tape?
15   A.    I listened to it, yes.  You can hear me saying
16         male resisting.
17   Q.    And is that tape, does it have -- some of the
18         taped lines have the time broadcast over it?
19   A.    As I recall, there's like a computer voice saying
20         a time, as I recall.  I haven't probably listened
21         to it in a year, but --
22   Q.    So you broadcast male resisting and you did hear
23         that on one of the tapes that were produced?
24   A.    That's correct.
25   Q.    Then what happened?

```
1   A.      Again, we're telling him, get down, I'm going to
2           taser you.  I don't know if Mike said that or
3           not, we're going to taser you.  And, boom, Mike
4           shoots him with the taser.  I don't know if it
5           even hit him.  I really thought it didn't hit
6           him.  But as soon as he deployed the taser, in my
7           mind, he just immediately took off running.
8           Rodney -- Mr. Brown, immediately took off
9           running.
10                  (Thereupon, Plaintiff's Exhibit 17 to the
11                  videotaped deposition of Officer Belal
12                  Ilain was marked for purposes of
13                  identification).
14  BY MR. GERHARDSTEIN:
15  Q.      Using a rectangle as the car, indicate the front
16          of the car and indicate the position of you and
17          Mr. Brown and Mr. Chapman at the time when
18          Officer Chapman faced Mr. Brown.
19  A.      You want me to write the front of the car?
20  Q.      Write front so we know which way we're oriented.
21              Using B for Brown and I for you and C for
22          Chapman, put their location on the --
23  A.      Kind of like at an angle there.  He walked
24          straight back this way and then began walking
25          towards Mike that way (indicating).
```

1   Q.   So all of this occurred behind the car?

2   A.   Yeah, because we were at the corner here and kind

3        of walked straight back like that (indicating).

4   Q.   Do you have a sense how far behind the car Mr.

5        Brown was at the time he was tased?

6   A.   I mean, behind the actual vehicle?

7   Q.   Yes.

8   A.   I mean, I can't really -- I'm not that good at

9        estimating at this point.  I don't think I should

10       -- I mean -- at this point, I mean, it wasn't

11       like 200 feet or anything like that, but I

12       couldn't exactly tell you.

13  Q.   How many feet from Officer Chapman was Mr. Brown?

14  A.   I just remember, I could tell you he was at a

15       good distance where I thought Mike would be able

16       to hit him with the taser and drop on him.  It's

17       going to be less than 25 feet and it's going to

18       be, you know, maybe around 10 feet, something

19       like it.  It looked like a good distance where I

20       thought he was going to get a good shot.

21  Q.   And at the time Officer Chapman tased Mr. Brown

22       December 31st, 2010, was it your understanding

23       that a shot to the chest was consistent with

24       taser policy in Cleveland?

25  A.   To my knowledge at that time, yes.

1   Q.   Did there come a time as a police officer in
2        Cleveland that you learned that tasing a person
3        in the chest was not a preferred target zone?
4             MR. KAISER:                    Show an
5             objection.
6   A.   I just this past year learned it was not a
7        preferred target area, that's correct.
8   Q.   So you didn't learn that until 2011 or 2012?
9   A.   Yeah, it was after -- 2011 or 2012, something
10       like that, yeah.
11  Q.   Did that surprise you when you learned it?
12  A.   Did it surprise me?  I wouldn't -- no, I can't
13       say it surprised me.  I mean, I'm not an
14       electronic engineer.  I'm not a medical doctor or
15       anything like that.  I mean, there's always weird
16       stuff going on that they're talking about with
17       that so --
18  Q.   What's your understanding of the reason that you,
19       as an officer, are now instructed to try and stay
20       away from the upper chest?
21            MR. KAISER:                    Objection.
22            You can answer.
23  A.   I thought it was just to get a wider area because
24       to actually end up for it to work better, you
25       need, you know, a wider hit area.  That's the

1          only reason I know of.  I don't remember reading

2          anything much more than that.

3     Q.   Were you advised at the time you learned that the

4          preferred target zone had been moved, were you

5          advised that tasing someone in the chest posed a

6          medical risk to the suspect?

7     A.   No.

8               MR. KAISER:                    Same

9               objection.

10    A.   No.

11    Q.   As you sit here today, do you have any knowledge,

12         one way or the other, as to whether tasing

13         someone in the chest poses a medical risk?

14    A.   Do I have actual --

15    Q.   Yes.

16    A.   I don't know anything that's 100 percent factual

17         that says it is harmful.  I don't know anything.

18    Q.   In your training on tasers, as we sit here today,

19         have you learned from your superiors and your

20         training officers in the City of Cleveland that

21         there is a medical risk associated with tasing

22         somebody in the chest?

23              MR. KAISER:                    Objection.

24    A.   I hear there's medical risks.  I hear there's not

25         medical risks.  That's all I can say.  I don't --

1    I don't know for a fact either one.  I just do

2    what my officers in the training academy tell me

3    to do.  If they say I can use it, I'm going to

4    use it.

5  Q.  So if you can use it in the chest, you're going

6    to use it?

7  A.  Yes.

8  Q.  As of December 31, 2010 had you become aware of

9    any medical risks associated with tasing a person

10   with respect to the suspect's breathing?

11  A.  No.

12  Q.  As we sit here today, have you ever heard that

13   tasing a person could interfere with their

14   breathing?

15  A.  I specifically, no.

16  Q.  As of December 31st, 2010 had you ever been

17   instructed that there's a medical risk -- that

18   the medical risk to the suspect is increased if

19   you do repeated or multiple tasings?

20     MR. KAISER:      Objection.

21  A.  Repeated, I don't -- I don't recall that.

22  Q.  As of December 31st, 2010 were you ever

23   instructed that tasing a person four times would

24   pose a greater medical risk than tasing them

25   once?

1          MR. KAISER:                    Objection.

2    A.    No.  Nobody's really discussed that.

3    Q.    So a typical taser exposure would be five

4          seconds; correct?

5    A.    That's correct.

6    Q.    And if you tased the person four times, that

7          would be a 20 second exposure?

8    A.    If you do it continuously.

9    Q.    Or if you -- even if you stop and then start

10         again --

11   A.    Yeah.

12   Q.    -- they get 20 seconds of tasing; right?

13   A.    That's correct.

14   Q.    And as we sit here today, have you ever been

15         instructed in your training in the City of

16         Cleveland that exposing a suspect to 20 seconds

17         of electrical impulses from a taser increases the

18         risk to them medically versus a single exposure?

19         MR. KAISER:                    Objection.

20   A.    I don't recall that.  I don't know for sure.

21   Q.    Have you ever been instructed, as of December

22         31st, 2010, that there's any increased risk to a

23         suspect when that suspect is exposed to tasers

24         from different officers, like two officers

25         shooting their tasers separately at him?

1   A.   I don't know for sure what would happen.  From

2        what I remember, it doesn't make a difference if

3        there's two people shooting, it's still the same

4        voltage.  It just won't matter.

5   Q.   As we sit here today, have you ever been

6        instructed that there's any increased medical

7        risk to a suspect when the suspect is exposed to

8        taser applications from multiple officers?

9             MR. KAISER:                Objection.

10            I thought that was asked and

11            answered.

12            THE WITNESS:               It seems

13            like it.

14            MR. GERHARDSTEIN:          As of

15            today.

16            MR. KAISER:                Oh.

17  A.   I don't recall that.  No, I can't remember.

18  Q.   So Mr. Brown is located, as you've indicated in

19       Exhibit 17, and then does he actually run past

20       Officer Chapman?

21  A.   Well, I just remember him running this way

22       (indicating).

23  Q.   So he runs off to Officer Chapman's right?

24  A.   Yes, through the yards over here and onto Benham.

25  Q.   Did he stay on the roadway or does he go off

1          behind houses and --

2    A.    He doesn't go behind houses.  He cuts over the

3          lawn, back onto Benham, maybe over another lawn,

4          onto 114th until I'm finally able to tackle him

5          at East 114th.

6    Q.    At any point prior to tackling him, did you apply

7          your taser?

8    A.    Yes, almost immediately after he turned and

9          started to run, that's when I deployed your

10         taser.

11   Q.    What happened when you deployed your taser?

12   A.    It went off, but it didn't slow down Mr. Brown at

13         all.

14   Q.    Do you know if you actually struck him?

15   A.    I can't say for sure.  I believe it was still

16         stuck in his jacket, at least.  I don't know if

17         it struck his actual body.

18   Q.    Did you see it sticking in his jacket that night?

19   A.    I don't remember.  Definitely not when I'm

20         running, I mean, no.

21   Q.    So you and Officer Chapman are running behind Mr.

22         Brown; right?

23   A.    That's correct.

24   Q.    Did the wires that connect the prong to the

25         weapons, did they remain intact as you continue

1        to chase Mr. Brown?

2  A.    I can't say for sure, I don't know.

3  Q.    Did you deploy your taser more than once in prong

4        mode?

5  A.    No.

6  Q.    How many cartridges did you have that night?

7  A.    I had two in my bag.  I didn't carry them on my

8        person.

9  Q.    And did anybody, during the course of the

10       investigation of the use of force on Mr. Brown,

11       ever ask you to verify that those two remained

12       undischarged?

13  A.   Honestly, I can't remember if somebody actually

14       asked me or checked them.  I couldn't remember

15       for sure.

16  Q.   When you discharged your taser, were there any

17       small pieces of paper that discharged at the same

18       time?

19  A.   Yes, but I forget what you call them.

20  Q.   Aphids or --

21  A.   Yeah, I think that's -- they come out of -- out

22       of the blast doors.  I remember seeing a few when

23       we walked back to the car.

24  Q.   Do you know if those were ever collected?

25  A.   I don't know.  I don't know.

1    Q.    So you're chasing Mr. Brown, you're not sure

2          whether the wire has really been disconnected or

3          not, you tackle Mr. Brown and you're then trying

4          to cuff him; right?

5    A.    Well, I tackle him, we roll and he hits me in the

6          head with something.  Then we -- I'm just trying

7          to get his arms, trying to do whatever I can to

8          just get his arms behind his back or just keep

9          him on the ground.

10              And, you know, I notice, you know, after I

11         tried to grab his arm a couple times, then I

12         notice there's something in his hand.  And at

13         some point I just I remember Mike saying, I'm

14         going to shoot him, I'm going to shoot him.  I

15         don't know if he saw the knife, if he saw

16         something else.  I just grabbed -- I didn't know

17         it was a knife at the time, but when I grabbed it

18         I could just feel it still a knife in the sheath,

19         in the black little cloth thing and I just tossed

20         it with my left hand, it was in his left hand, I

21         tossed it over to the left.  It was somewhere in

22         this driveway where we were at.

23              And we just keep trying to get him cuffed.  I

24         only had one hand on him for a while, I'm still

25         trying to broadcast because I only have one hand

1      on him because I'm trying to broadcast.  Mike

2      finally gets in so I let him broadcast for a

3      while, and eventually we just come to a stale

4      mate.

5  Q.  How long did this last where you were wrestling

6      with Mr. Brown?

7  A.  It seemed about a few minutes.  It was -- for a

8      fight, it was long.  I can't tell you exact time.

9  Q.  Are you sure that he was holding this object in

10      his left hand?

11  A.  Yeah.  Yes.  I was on his left side, his arm was

12      right here on the grass.  He was still kind of up

13      like this (indicating).  He wasn't all the way

14      down.  He was holding himself up.  I just grabbed

15      it out of his hand and threw it.

16  Q.  How far away did this object land?

17  A.  I remember kind of picking it up from the

18      driveway we were in.  It would be like right here

19      and then it was in the lawn right next to the

20      driveway, so a little bit north of our location.

21      I couldn't tell you exactly how far.  I mean,

22      from the middle of that lawn to the other side of

23      that driveway.

24          I ended up actually having to throw my taser,

25      too, because when I tried to drive stun him a

```
 1              couple times, he was just pushing it off and it
 2              was ineffective.  And, again, at some point I
 3              just had to get two hands on him just to keep him
 4              down.  And I threw my taser, also, in the yard, I
 5              believe with my hand on the other side just to
 6              keep it away from him.
 7    Q.       When you attempted to drive stun him with the
 8              taser, was the cartridge still in the taser?
 9    A.       I don't know for sure.  I don't know if it came
10              out at some point.  I really don't remember
11              exactly.
12    Q.       Did you pull the cartridge out?
13    A.       I don't know if I actually did or not.
14    Q.       Do you know where on his body you drive stunned
15              him?
16    A.       No.  It was -- it was just somewhere in the upper
17              region.  Maybe his arm.
18    Q.       On his front or his back?
19    A.       It was his front.  I was just trying -- I
20              remember just one time I remember specifically in
21              his arm to try to get his arm to just fall out
22              from him, but I don't know where I hit him the
23              other time.
24    Q.       Which arm was that?
25    A.       It was the left arm.
```

Page 34

1    Q.    When you drive stun a person, would you expect

2          that to produce a puncture in his skin?

3    A.    A puncture?

4                MR. KAISER:                        Objection.

5    BY MR. GERHARDSTEIN:

6    Q.    Yes.

7    A.    I'm not an expert on that.  I don't think so.  I

8          don't think so.

9    Q.    Do you have a taser with you?

10   A.    No.

11   Q.    Let's take a look at a taser.

12               (Thereupon, there was a discussion off the

13               record.)

14   Q.    Is this an X26?

15   A.    Yes.

16   Q.    All right.  So is this comparable to the one you

17         had?

18   A.    Yeah.  Yes.

19   Q.    So where do you attach the cartridge?

20   A.    You attach it on the front.

21   Q.    Is this a taser cartridge?

22   A.    That's a taser cartridge.  It looks like one,

23         yes.

24   Q.    So when you apply the drive stun with the

25         cartridge in, the cartridge with the wires

```
 1              extended from it doesn't have any pointy barbs on
 2              the end of it at that point; right?
 3    A.        The -- can you repeat that?
 4    Q.        When you do a drive stun --
 5    A.        Yeah.
 6    Q.        -- and the discharge cartridge is still attached
 7              to the taser, the wires are coming out of the
 8              discharge cartridge; right?
 9    A.        Yes.
10    Q.        And the prongs are over in the person, hopefully?
11    A.        Yes.
12    Q.        And that means that there aren't any prongs
13              attached to the discharge cartridge?
14    A.        No.
15    Q.        At the weapon site?
16    A.        No, not in this model.
17    Q.        So there's nothing on the cartridge that would
18              puncture the skin; right?
19    A.        I don't think I've ever seen it with the doors
20              open.  I don't know what's -- I've never taken a
21              good look on the inside.
22    Q.        So you would want to examine a discharge
23              cartridge in order to be satisfied with your
24              answer?
25    A.        Yeah.
```

1    Q.    But clearly the prongs aren't there anymore;

2          right?

3    A.    No, there's only one set of prongs on there.

4    Q.    If you were to drive stun the suspect without the

5          cartridge on it at all, would there be anything

6          different about the taser than it looks right

7          now?

8    A.    I mean, I would have to take it out.

9              You want me to take it out?

10   Q.    Yes.

11   A.    This is it without the cartridge right here

12         (indicating).

13   Q.    Right.  So as you look at it, now that you've

14         taken it from the holster, you don't see any

15         devices on the end of it that would puncture the

16         skin; right?

17   A.    No.

18   Q.    And if you were to just do a drive stun, those

19         two little metal pieces are sort of rounded and

20         blunt; right?

21   A.    That's correct, yes.

22   Q.    So you wouldn't expect those two blunt metal

23         pieces to puncture the skin?

24   A.    No.

25              (Thereupon, Plaintiff's Exhibit 18 to the

Page 37

```
 1                    videotaped deposition of Officer Michael

 2                    Chapman was marked for purposes of

 3                    identification).

 4    BY MR. GERHARDSTEIN:

 5    Q.    Showing you Exhibit 18, can you tell me what that

 6          is?

 7    A.    It looks like a taser download.

 8    Q.    Have you ever seen a taser download before?

 9    A.    I've seen it before, yeah, just maybe once.

10    Q.    Have you seen the taser download from December

11          31st, 2010 before?

12    A.    Yeah, I believe I was in the room when they did

13          it.

14    Q.    Oh, so you saw them do --

15    A.    They took it from us and I just stood by there.

16    Q.    And what you see is that they connect some

17          hardware to your taser handle and then they

18          download a record of the activity of your use of

19          the taser from the dataport on the taser handle;

20          right?

21    A.    Yes.

22    Q.    Do you have any reason to disagree with the data

23          that was downloaded from the handle of your taser

24          as it's indicated on Exhibit 18?

25    A.    I mean, I don't remember tasering this many
```

1          times, but it may be accidentally.  I mean, if

2          this is what it says --

3     Q.   How many taser deployments do you see recorded on

4          this download, Exhibit 18?

5     A.   I see five.

6     Q.   And what we don't see on the taser download is a

7          spark test; right?

8     A.   Seems to be, yeah.

9     Q.   So you did not spark test your taser that day;

10         right?

11    A.   Not according to this.  I mean, I couldn't tell

12         you for sure if I did or not, but if you want to

13         look at this.  It seems like no.

14    Q.   You're supposed to spark test your taser at the

15         beginning of your shift; right?

16    A.   I don't know if that's required, but we are

17         supposed to check our equipment.

18    Q.   And spark testing a taser helps ensure that the

19         electricity that is emitted from the taser is

20         more likely to stay within manufacturer's

21         specifications; right?

22    A.   I have no idea.

23    Q.   Are you aware of any testing that's been done

24         over the years on tasers, especially X26s, and

25         whether unsparked tested tasers produce a higher

1          amount of electricity than tasers that are

2          regularly spark tested?

3    A.    I don't know anything about that.

4    Q.    After the incident on that night, what happened

5          to your actual taser?

6    A.    The homicide unit eventually just took it.

7    Q.    Did you ever get it back?

8    A.    No.  I got another one.

9    Q.    So do you know whether your taser was tested as

10         to the amount of electricity it emitted and

11         whether that was consistent with manufacturer's

12         specifications?

13   A.    No, I wouldn't know.

14   Q.    Now, you've indicated that you attempted to drive

15         stun Mr. Brown while you and Mr. Brown and

16         Officer Chapman were in the yard on 114th; right?

17   A.    That is correct.

18   Q.    And this indicates that it looks like there were

19         five -- four drive stuns, because the first one

20         would have been your deployment to his back;

21         right?

22   A.    Yeah, yeah.

23   Q.    And you said that you were sure that one of them

24         was in his arm, I think you said; right?

25   A.    Yeah.

1   Q.   And do you know what parts of the body the other

2        drive stuns would have been?

3   A.   No.  I couldn't remember exactly.

4   Q.   They could be on his front or on his back?

5   A.   It's possible.  I mean, I don't know for sure.

6        It's definitely a possibility.

7   Q.   Did all of your taser deployments occur before

8        any other officer arrived at the scene?

9   A.   Yes.

10          MR. KAISER:            Do you

11          mean other than Chapman?

12          MR. GERHARDSTEIN:       Yes.

13   A.   Yes, yeah.

14   Q.   And as far as you know, is that true of Officer

15        Chapman as well?

16   A.   Yeah, we were both just waiting for other

17        officers.  We just had him pinned down at that

18        point.  That was it.

19   Q.   Did you or Officer Chapman deploy your taser,

20        with respect to Mr. Brown, after any other

21        officers joined you at the scene?

22   A.   No.

23   Q.   When you compare your taser record to Officer

24        Chapman's taser record, it suggests that you

25        deployed yours first and you've testified that he

Page 41

1        deployed his first.  Do you have any explanation
2        for that?
3   A.   No.
4   Q.   Is that the first you've heard of that?
5   A.   Yeah, that is actually the first time I've heard
6        that.
7   Q.   Do you know whether your taser is synchronized to
8        a standard or to his taser, at all?
9   A.   No.  I mean, I know they've downloaded times and
10       haven't been accurate, you know.
11  Q.   Tell me about that.
12  A.   I just, you know, sometimes the times have to be
13       updated on there, I suppose.
14  Q.   What other experience do you have with the city
15       learning that their taser records are inaccurate?
16  A.   Well, in our last in-service they just said, make
17       sure you update it.  When the sergeants tell you
18       you have to update your software, just update it
19       or else they will not be an accurate time.
20       That's what they said in our in-service.  I mean,
21       I don't know if that's actually happened before.
22       But they just said, make sure you do the taser
23       updates when your sergeants tell you to do the
24       taser updates.
25  Q.   So what does that involve?

Page 42

1    A.    They hook it up to a computer and they do

2          something.  That's all I know.

3    Q.    Were you advised to update your taser prior to

4          December 31, 2010?

5    A.    I've updated before.  I have updated it.  I just

6          don't know the exact time.  I couldn't tell you.

7    Q.    Do you know whether you updated it before

8          December 31, 2010?

9    A.    I couldn't tell you.  I mean, they might keep

10         track of that, I'm not sure.  I can't really

11         remember.

12   Q.    So there would be probably be some sort of record

13         on the dataport of efforts to update the taser?

14   A.    Maybe, I don't know.

15   Q.    Do you know how long you had that particular

16         taser?

17   A.    This one I had from when I came out of the

18         academy until that day.

19   Q.    Well, I'm going to ask your attorney to get the

20         download for the whole time you had the taser in

21         service, and maybe we'll be able to see for yours

22         and for Officer Chapman when they were updated.

23             Prior to the arrival of any other officers and

24         while you and Officer Chapman were struggling

25         with Mr. Brown, did Mr. Brown say anything to

1      you?

2  A.   At what point are you asking?

3  Q.   You're in the struggle on 114th and no other

4       officers have arrived yet.

5  A.   I don't remember him, specifically, saying -- I

6       just remember him yelling to those people down

7       the street, get my people, get my people.  And

8       that's just the biggest thing I remember him

9       saying.  And I remember just telling him, relax,

10      put your hands behind your back or something like

11      that.  I think he responded, but I can't remember

12      what he said.  He obviously didn't comply.

13 Q.   Now, did he actually look at people down the

14      street and call to them?

15 A.   Yeah, I mean, he saw people down there.  They

16      were standing around at the 114th and Benham

17      area.  He said, hey, get my people, get my

18      people.

19 Q.   Did any of them respond to him?

20 A.   No, not that I could remember.

21 Q.   And this was said before any other officers

22      arrived?

23 A.   That's correct.

24 Q.   Did there come a time -- now, you've told us that

25      you grabbed the object, did you hear Officer

1          Chapman say that he was going to shoot --

2    A.    Yes.

3    Q.    -- Mr. Brown?

4    A.    Yes.

5    Q.    And did you think that was necessary?

6    A.    Once I grabbed it and I threw it, I threw that

7          knife.  I mean, I told him, don't shoot him,

8          don't shoot him.  I mean, I didn't --

9    Q.    And that was because at that point you had taken

10         the weapon away?

11   A.    I had taken one weapon away, but in our line of

12         work you always got to think where there's one

13         gun, they always say there's a second gun.  I

14         mean, we're not sure that the threat's completely

15         gone.  We had him in a good position, I didn't

16         think we needed to shoot him, at least.  That's

17         all.

18   Q.    Did he, at any point, say that he was having

19         trouble breathing?

20   A.    Just what I heard on the radio broadcast, that's

21         what I can really remember.

22   Q.    Did you listen to the radio broadcast before you

23         filled out your Garrity statement?

24   A.    No.

25   Q.    Is it your understanding that -- well, what was

1    it that you heard on the radio broadcast or what

2    is your recollection of his statement that he had

3    trouble breathing?

4  A.   I just -- on the radio broadcast he said, I can't

5       breathe.

6  Q.   And do you have a present recollection of that

7       night and him actually saying it?

8  A.   No.  I mean, at that point I think he was with

9       Officer Melendez and those guys and we were away

10      a little bit from all of them.  I can't --

11 Q.   Did you hear the response to Mr. Brown?

12 A.   On the radio broadcast, yeah.

13 Q.   What did you hear on the radio broadcast?

14 A.   I don't give a fuck, that's what I heard.

15 Q.   And who said that?

16 A.   This is just from what I'm understanding, it's

17      Officer Melendez.  I can't say that for sure, but

18      that's -- that's from his voice.

19 Q.   When you listened to the radio broadcast did it

20      sound like Officer Melendez?

21 A.   It sounds like him, yeah.

22 Q.   Did you ever ask Officer Melendez why he

23      said that?

24 A.   I don't think I actually ever asked him.  I mean,

25      he was in a fight and he was still fighting with

```
1           him.  I mean, if you're telling me you can't

2           breathe, I'm not exactly going to be nice to you

3           when you're still fighting with me.  I mean, I

4           can only imagine.

5    Q.     So is it your understanding that Mr. Brown said,

6           I can't breathe, while he was still in the

7           altercation with the officers?

8    A.     I mean, it sounds like they're still struggling

9           with him.  That's my belief.

10   Q.     Did Officer Melendez tell you one way or the

11          other whether the statement being unable to

12          breathe was while they were still fighting?

13   A.     He never, specifically, told me.

14   Q.     Did Mr. Brown say more than once that he was

15          having trouble breathing?

16   A.     Not to my knowledge, I don't know.

17   Q.     When you use a taser, you have to comply both

18          with the taser policy and the use of force

19          policy; right?

20   A.     That's correct.

21                   (Thereupon, Plaintiff's Exhibit 19 to the

22                   videotaped deposition of Officer Belal

23                   Ilain was marked for purposes of

24                   identification).

25
```

 1   / / /

 2   BY MR. GERHARDSTEIN:

 3   Q.    I'm showing you what's been marked as Exhibit 19.

 4         Is that the general order on the use of force in

 5         effect on December 31st, 2010?

 6              MR. KAISER:                    Show an

 7              objection to relevance to the GPO on

 8              relevance grounds, but go ahead and answer

 9              his questions.

10   A.    I believe so.

11   Q.    Did there come a time when you gave a statement

12         regarding the events of that night?

13   A.    Yes.

14              (Thereupon, Plaintiff's Exhibit 20 to the

15              videotaped deposition of Officer Belal

16              Ilain was marked for purposes of

17              identification).

18   Q.    I'm going to show you what's been marked as

19         Exhibit 20.  You recognize that?

20   A.    Yeah, yeah.  This is the statement I gave to

21         homicide.

22   Q.    And was this statement given on January 7th,

23         2011?

24   A.    Yes, according to this paper.  I can't remember

25         exactly, but if that's what this --

Page 48

```
 1   Q.    Describe the circumstances under which this
 2         statement was created.
 3   A.    We were sitting in the -- on the homicide unit
 4         and I was with one of the detectives and,
 5         essentially, I was sitting next to him and he
 6         asked me to go through what happened and he would
 7         just type out -- he was typing my statement out.
 8         Then he actually had questions for me and he
 9         typed out my responses.
10   Q.    And did you have an opportunity, then, to read
11         what he typed and determine whether it was
12         accurate?
13   A.    Yes.
14   Q.    Did you make any corrections in anything he
15         typed?
16   A.    I don't recall.  I don't think so.
17   Q.    Did you see it on the computer before he printed
18         it out?
19   A.    He was sitting right next to me.  I mean, I don't
20         know if I read it on the computer and then he
21         printed it out and if he printed it out and then
22         I read it.
23   Q.    Who was present when you gave the statement?
24   A.    In my immediate vicinity there was a detective,
25         there was an IA, internal affairs officer, and
```

1          might have been a union rep with me.  The union

2          lawyer was somewhere there, too, I don't know if

3          he was with me or Mike.  I can't remember who was

4          behind me.  Somebody was.

5     Q.   So looking at Bates Page 1486, the last page of

6          the exhibit, is that your signature?

7     A.   Yes, that's correct.

8     Q.   And then Follmer, he's the union rep?

9     A.   That's correct.

10    Q.   And Pat D'Angelo was your union attorney?

11    A.   M-hm.

12    Q.   Did Mr. Follmer make any additions or corrections

13         to the statement?

14    A.   No.

15    Q.   Did he say anything while you were being

16         interrogated?

17    A.   No.

18    Q.   Did Mr. D'Angelo make any additions or

19         corrections to the statement?

20    A.   Nobody did, no.

21    Q.   This Timothy Stacko, that's from internal

22         affairs?

23    A.   That's correct.

24    Q.   But the statement was taken by this Detective Tim

25         Entenok?

1   A.   Yes, I believe, that was the detective.

2   Q.   So he's the one that was doing the typing?

3   A.   Yes, I believe so.

4   Q.   So all those people were present?

5   A.   Yes.

6   Q.   Prior to giving the statement, did you have an

7        opportunity to talk to Officer Chapman about his

8        recollection of the events of that night?

9   A.   Honestly, I don't actually, think we talked about

10       the events.  We talked about how we were stunned

11       that the taser didn't actually work.  That's

12       probably the only thing we were talking about.

13  Q.   And did you have occasion, though, prior to

14       giving this statement to actually review the

15       facts with Officer Chapman about what happened?

16  A.   Did we have the opportunity?

17  Q.   Did you do it?

18  A.   No.

19  Q.   Were you instructed, one way or the other,

20       whether it's okay to talk about the facts with

21       other officers before the statement was given?

22  A.   I don't -- I don't remember anybody actually

23       telling me one way or another, so I can't really

24       remember.

25  Q.   How close to you was Officer Chapman while he was

Page 51

```
 1        giving his statement?

 2   A.   He wasn't -- he was, essentially, a few desks

 3        away on the other side in the homicide.  It's one

 4        big open room with a lot of desks.  I can't tell

 5        you.  It was a few desks on another computer in

 6        the back.

 7   Q.   Could you hear what he was saying?

 8   A.   I -- no.  I mean, you could probably hear some

 9        mumbling or something like that.  I probably

10        didn't hear a single word he said.

11   Q.   Prior to giving this statement, did you review

12        the facts of the incident with your union rep?

13   A.   I don't -- as I recall, I did explain to them

14        what happened and they just said, that's fine,

15        okay, just --

16   Q.   When did you make your statement about the facts

17        of the incident to Jeff Follmer?

18   A.   Probably on scene -- or, no, I don't even know if

19        he was on scene that day.

20        I don't know if I actually -- I believe I

21        talked more with Officer Kindness because I think

22        -- I can't remember if Follmer was actually there

23        on scene.  We just saw him that day -- the day of

24        the statement.

25   Q.   So Officer Kindness was the union rep who came to
```

1       the scene?

2   A.  Yeah, Kindness was there, and I believe the

3       president, Steve Loomis was there.  I can't

4       recall exactly.  I remember Steve Kindness was

5       there for sure, so I won't be able to tell you

6       for sure.

7   Q.  What was the president's name?

8   A.  Steve Loomis at the time.

9   Q.  Is he still the president?

10  A.  No, Jeff Follmer is now.

11  Q.  Did you meet with Pat D'Angelo prior to the time

12      you actually gave the statement?

13  A.  Yes, I spoke with him briefly, yes.

14  Q.  Was anyone else present when you spoke with Pat

15      D'Angelo?

16  A.  That day, I do remember specifically Follmer and

17      Loomis and Kindness.  I just remember Follmer was

18      there that day, specifically, because he was the

19      one sitting next to me most of the time.

20  Q.  And by that day, do you mean the day you met

21      with --

22  A.  January 7th.

23  Q.  -- D'Angelo?

24  A.  That was all January 7th.

25  Q.  Did you meet with Pat D'Angelo before January

Page 53

1      7th?

2   A.   No.

3   Q.   Well, if other people were present, not for any

4        meetings -- did you have any meetings alone with

5        Pat D'Angelo?

6   A.   Alone, no.

7   Q.   If other people were present, go ahead and tell

8        me what you said to Pat D'Angelo and what he said

9        to you.

10  A.   I remember he just wanted to hear the story.  I

11       gave him the story.  He's like, okay, that's

12       fine, I don't think you guys have anything to

13       worry about.  It was very brief.  It was

14       literally I told him the story and it was like we

15       were out of there.  That was it.  It was very

16       brief.

17  Q.   Did he suggest any additions or corrections to

18       what you were to say?

19  A.   Not at all.

20  Q.   Directing your attention to Exhibit 20, Bates

21       numbered Page 1484, first full paragraph says, we

22       were holding the male and waiting for assistance;

23       did I read that correctly?

24  A.   That's correct.

25  Q.   We were still on our knees and trying to hold the

1      male down.  Now, at this point is it just you and

2      Officer Chapman that you're talking about?

3          If you need to get the context, look at it  a

4      little more broadly.

5              THE VIDEOGRAPHER:              Off the

6              record.  Change tapes real quick.

7              MR. GERHARDSTEIN:              Okay,

8              let's go off the record for a second.

9              (Thereupon, there was a brief recess.)

10             MR. GERHARDSTEIN:              Back on

11             the record.

12     BY MR. GERHARDSTEIN:

13     Q.   And looking, again, at Exhibit 20, Bates No.

14          1484, the question is, you've got an entry here

15          about the male said that he couldn't breathe,

16          even though he was fighting and trying to get up

17          off the ground; did you see that?

18     A.   Yeah.

19     Q.   And my question is, having reviewed this, was

20          this statement made when you were alone with

21          Chapman and Mr. Brown or were other officers

22          present?

23     A.   At this point it would had to have been just me

24          and Chapman.

25     Q.   And how do you know that?

1  A.    Because we're waiting for assistance, I mean.

2  Q.    That means you're waiting for assistance from

3        other officers?

4  A.    Yeah.

5  Q.    And it's also in sequence before the male began

6        to yell at the group, hey, go get my people?

7  A.    Yeah.

8  Q.    And that was said, if I understand your testimony

9        correctly, before other officers arrived?

10 A.    That's correct, yes.

11 Q.    So how long before other officers arrived did Mr.

12       Brown say, hey, go get my people?

13 A.    I really couldn't tell you that.  I mean, it

14       could have been two minutes, it could have been

15       five minutes.  I don't know, somewhere --

16 Q.    Would you agree, then, that based on a review of

17       your Garrity statement and your listening to the

18       tape, that it appears that Mr. Brown said, at

19       least twice, once to you and Chapman and once to

20       Melendez, that he was having trouble breathing?

21 A.    Yes.

22 Q.    Did you respond to Mr. Brown when he said that he

23       was having trouble breathing?

24 A.    I think my response must have been -- I can't

25       remember, specifically, what I said right after

Page 56

 1          he said that.  But at some point I just told him,

 2          relax, relax, just put your hands behind your

 3          back, we're all tired at this point, I'm spent.

 4          So I can't exactly say what I said immediately

 5          after, but at some point I just told him, put

 6          your hands behind your back, relax.  I don't know

 7          if I even responded to that actual statement.

 8     Q.   So tell me what happened.  Take it from this

 9          point on, from the point he said he was having

10          trouble breathing, then when he said, hey, go get

11          my people.  Tell me what happened.

12     A.   At that point I believe we were just at a stale

13          mate.  We're both almost trying to negotiate with

14          him just to give up and relax.  I don't think --

15          we're not -- we're trying to get his -- we're

16          still trying to get his arm behind his back but

17          he's still trying to push off the ground, he's

18          not complying.

19              And eventually other cars come.  Vargas is the

20          first one there and I see him pull out his taser.

21          He's like telling us, watch out, watch us.  I

22          told him, no no, it's not working, get down here

23          and grab him.

24              It seemed like other officers came right

25          around the same time, more and more just came.

1    And, finally, me and my partner we just left off

2    of him and let them handle it because we were

3    spent.  I mean, we were trying to catch our

4    breath and we were just sitting there.

5         Eventually they started -- they kept wrestling

6    with him a little bit, but after I took a few

7    seconds to catch my breath, I went to look for

8    the object I threw from his hand and I went to

9    look for my taser, too.

10   Q.   So did you go look for the object that you threw

11        from your hand and your taser before Mr. Brown

12        was secured?

13   A.   I don't know if they had secured him for sure or

14        not.  They were still wrestling with him.

15        Whether or not -- I mean, he could still be

16        handcuffed and still fighting.  I don't know if

17        he was handcuffed.  Secured is kind of a broad

18        word.

19   Q.   Take a look at Exhibit 12.  This is what purports

20        to be a diagram showing Mr. Brown's car back at

21        113th and Benham.

22        Have you ever seen this before?

23   A.   I have not seen this, no.

24   Q.   Do you have any idea why they'd be measuring off

25        the 6 feet from the vehicle back to Benham and 14

1        feet --

2    A.    No, I wouldn't know.

3    Q.    Was the back of the car toward Benham?

4    A.    No, the back of the car was -- the front of the

5        car was towards Benham.  The car was facing

6        southbound.

7    Q.    Okay.  All right.  Take a look at Exhibit 13.

8        This is a diagram of what I think is intended to

9        be the scene where you ultimately, or Mr. Brown

10       was ultimately restrained; would you agree?

11    A.    Yes.

12    Q.    So they've indicated, and when we get the

13       photographs I'm sure we'll see these numbers

14       probably relate to those little yellow tents that

15       have numbers on them and there was probably

16       photographs that will show us those items, which

17       we'll get, but where, using this diagram if it's

18       helpful to you, would the altercation with Mr.

19       Brown have occurred?

20          Where were you wrestling?

21    A.    In this grass area right here (indicating).

22    Q.    Between No. 1 and No. 9?

23    A.    Yeah, yeah.

24    Q.    And do you have a recollection of this wheelchair

25       ramp?

Page 59

1    A.    Yeah, I remember there being like a wooden

2          wheelchair ramp in the yard.

3                MR. KAISER:                Al, what

4                you see is a No. 9.  I can't tell, I think

5                it's a No. 8.  It just might be my

6                glasses.

7                MR. BACEVICE:              Eight, 9

8                right here, I believe.

9                MR. KAISER:                Oh, I got

10               you.

11   BY MR. GERHARDSTEIN:

12   Q.    What was the weather like that night?

13   A.    I couldn't tell you the temperature.  It was dry.

14   Q.    It wasn't snowing?

15   A.    I don't think.  I can't remember if there was

16         flurries or something like that, but there wasn't

17         much snow on the grouped, that's for sure.

18   Q.    And the item that you threw, what I don't see on

19         here is either a number that reflects the knife

20         or a number that reflects your taser.  Maybe I'm

21         missing it.

22               Have you seen this before?

23               Do you know where those items would have been?

24   A.    No.  I mean -- no.

25   Q.    Positioning ourselves on the grassy area, which

1        way were your heads?

2   A.   Towards the house.  Towards the wheelchair ramp.

3   Q.   So that would be east?

4   A.   Yes.

5   Q.   And where did the item you've described as the

6        knife, where did that go?

7   A.   Somewhere near No. 6 here, but it was further

8        even north there.  That's somewhere there.

9   Q.   And when you -- do you have any understanding as

10       to why that alleged knife wouldn't be indicated

11       on this diagram that has all the other items that

12       the police found that night?

13  A.   The only reason I would believe is because these

14       were left there.  I went and secured the weapons

15       immediately.  I don't want two weapons just

16       laying on the grouped.  None of these are

17       dangerous items.  I could just -- you know, I'm

18       not concerned.  I'm concerned about the weapons

19       that are still lying around.

20  Q.   So you went and picked them up?

21  A.   I went and picked them up before homicide even

22       got there.

23  Q.   And where was the taser?  Again, trying to orient

24       it with respect to those.

25  A.   I believe I threw the taser with my right hand,

1          somewhere in between where it says ear warmer and

2          sidewalk over here.  Somewhere over there.

3     Q.   All right.

4     A.   I remember -- as I recall, somewhere near the

5          sidewalk.

6     Q.   Okay.  One of the items on the ground was a

7          glove, was Mr. Brown wearing gloves?

8     A.   Oh, I don't remember.  I don't remember that.

9     Q.   Well, as you reflect back on your interaction

10         with him both at the car at 113th and later at

11         114th where you wrestled, does that help you

12         recall whether he was wearing gloves or not?

13    A.   There was no -- I can't remember 100 percent

14         honestly, no.

15                   (Thereupon, Plaintiff's Exhibit 21 to the

16                   videotaped deposition of Officer Belal

17                   Ilain was marked for purposes of

18                   identification).

19    BY MR. GERHARDSTEIN:

20    Q.   Exhibit 21 is part of your training file that was

21         produced in discovery in this case dated

22         September 16th, 2010.  It indicates that you had

23         received a taser recertification; is that

24         accurate?

25    A.   Yes.

Page 62

1    Q.    And I see that you have some sort of heart saver
2          first aid module completed as of May 14th, 2009.
3          What did that involve?
4    A.    I believe at that time we did a CPR and ADT -- or
5          the AED.  We practiced on that in our training.
6    Q.    Did you carry an AED in your zone car?
7    A.    No.
8    Q.    Do any Cleveland Police supervisors carry AEDs?
9    A.    I don't know.  I couldn't tell you.
10   Q.    At anytime on the night of December 31, 2010 did
11         anyone take the vitals of Mr. Brown?
12   A.    You mean officers?
13   Q.    Yes.
14   A.    I didn't.  I don't know if anybody else did.
15   Q.    After you stepped away and got the weapons
16         secured, what happened next with respect to Mr.
17         Brown?
18   A.    The last thing I remember is him being in the
19         backseat of one of the zone cars.
20   Q.    How did he get to the backseat of the zone car?
21   A.    The other officers that showed up put him in
22         there.  I wasn't involved in that process.
23   Q.    Did you observe it, at all?
24   A.    No.  I just remember them struggling with him a
25         little bit more.  I remember them struggling with

```
 1          him a little bit on the wheelchair ramp.
 2              And I think at that point I'm looking around
 3          for the taser and whatnot and the knife, so I
 4          don't know.
 5   Q.     Whose zone car was he placed in?
 6   A.     It was Officer Rusnak and Officer Merritt's zone
 7          car.
 8   Q.     When you observed him in the zone car, what did
 9          you observe?
10   A.     I never actually took a peek in the zone car.  I
11          think after that I might have walked back to our
12          zone car.  At some point I walked -- but I don't
13          remember really -- I don't remember even taking a
14          peek in there.  I don't remember.  I'm just
15          waiting -- just waiting for a supervisor to come
16          down and that's it.  I thought it was okay.
17          let's go get our car and let's get that area
18          secured.
19   Q.     Who asked for the supervisor to come to the
20          scene?
21   A.     I don't remember exactly.
22   Q.     Why was a supervisor called for?
23   A.     Anytime you have a -- some kind of taser
24          deployment or use of non-deadly force or deadly
25          force, you need a supervisor down there.
```

Page 64

1    Q.    Who first called for EMS?

2    A.    I recall it was Rich Rusnak.  Officer Rusnak.

3    Q.    Did you hear him do that?

4    A.    I remember his voice over the air calling for

5          EMS.  I do remember that.

6    Q.    You didn't call for EMS?

7    A.    No.

8    Q.    And was it your understanding that he was calling

9          for EMS because policy requires that when you

10         have a taser deployment you're supposed to call

11         EMS?

12   A.    Yes.

13   Q.    So when you witnessed that call for EMS, was

14         there any indication that the request for EMS was

15         tied to any medical problem that Mr. Brown was

16         actually having?

17   A.    No, not that I know of, no.  I mean, I thought it

18         was just because of the taser deployment.

19   Q.    You may have said this, but I'm not clear.  Did

20         you actually see Mr. Brown in the zone car?

21   A.    No, I can't -- I can't remember at this point.  I

22         mean, there was -- I couldn't tell you -- I

23         remember him going into the zone car.  I know he

24         was in there because I could hear something, some

25         kind of pounding or heard him yelling or

1          something.  It was muffled, but I just knew he

2          was in there.  He wasn't outside anymore.

3     Q.   Were the windows down?

4     A.   I can't remember that.

5     Q.   Were the doors open or closed?

6     A.   I don't know.

7     Q.   How long was he in the zone car before somebody

8          arrived?

9     A.   I don't know.  I don't know.

10    Q.   What happened next?

11    A.   Eventually once EMS actually arrived we took him

12         out of the zone car.

13    Q.   Did you participate in that?

14    A.   I remember I did participate in that once EMS

15         showed up.  And I think I helped uncuff him and I

16         believe I helped him cuff him.  And actually I

17         was in the EMS wagon with him.  They actually

18         asked for me to call -- I called over the air for

19         -- I think they needed fire because they had a

20         male in full arrest, I guess cardiac arrest, so

21         they asked me to call the dispatchers for that.

22    Q.   Now, going back to Exhibit 20 at Page 1485 --

23         that's your Garrity statement.

24              Here you go.

25              About a third of the way down the page the

1          question is, did you hear the male say anything

2          while he was in the back seat of the zone car; do

3          you see where I'm at?

4                    MR. KAISER:                    He's on

5                    the next ahead, Page 1485.

6     BY MR. GERHARDSTEIN:

7     Q.    Question was did you hear the male say anything

8          while he was in the backseat of the zone car; do

9          you see that?

10    A.    Yeah.

11    Q.    And the answer is, I heard him say something, but

12         nothing that I could clearly understand.  There

13         was some kind of movement in the car, I could

14         hear movement; did I read that correctly?

15    A.    That's correct, yeah.

16    Q.    And is that your recollection as we sit here

17         today?

18    A.    Yes.  I just remember some kind of muffled noises

19         and somebody -- I don't know if it was kicking or

20         something like that, but just --

21    Q.    I think earlier you testified you didn't recall

22         him in the zone car at all?  I mean, it's

23         possible to have a recollection --

24    A.    I mean, I didn't see him.  That's different.  No,

25         because I could hear him, though.

1  Q.   So now you're saying you do have a recollection

2       of actually hearing him in the zone car?

3  A.   Yes.  I thought you were asking if I actually saw

4       him, if I'm looking at him.

5          No, I mean I just heard noises and my back is

6       turned, but I know he's not around there anymore.

7       He's obviously in the zone car.

8  Q.   And what efforts, if any, did any of your

9       colleagues make to check on the well being of Mr.

10      Brown while he was in the zone car?

11 A.   I can't tell you what anybody else was honestly

12      doing.  I can't tell you.

13 Q.   So do you have any recollection, at all, one way

14      or the other, as to whether any of your

15      colleagues checked on his condition while he was

16      in the zone car?

17 A.   I don't remember, honestly.

18 Q.   In your statement, couple lines down, the

19      question was, did you see any police officer

20      check on the male while he was in the backseat of

21      the zone car; do you see that?

22 A.   Yes.

23 Q.   And at least when you gave your Garrity statement

24      you said, yes, I saw P.O. Rusnak?

25 A.   M-hm.

1   Q.   Did I read that correctly?

2   A.   That's correct.

3   Q.   So you remembered that at that time, but you

4        don't remember that today?

5   A.   No.  I mean, something like that.  I don't know

6        if he opened the door or what he did.  I had a

7        better memory three days afterwards not --

8   Q.   So you go on in the statement to say, I saw P.O.

9        Rusnak with the rear passenger door open.  He was

10       checking on him.  I believe Police Officer Rusnak

11       called for EMS after the male was in the

12       backseat.  I know he notified radio a second time

13       and for their ETA; did I read that correctly?

14  A.   That's correct, yeah.

15  Q.   And as we sit here today, you just don't have any

16       present recollection of any of that?

17  A.   I told you I remember hearing Officer Rusnak

18       calling for EMS.  I mean, is there something --

19  Q.   And do you now have a present recollection of him

20       with the passenger door open?

21  A.   At this point, I mean, I really can't tell you I

22       remember, no, I don't really remember,

23       specifically.  It's his car, he would probably be

24       trying to check on him.  It is the backseat of

25       his car so -- but I can't specifically remember.

1   Q.   Now, prior to the time EMS arrived, do you have

2        any knowledge, one way or the other, as to

3        whether Mr. Brown was still breathing?

4   A.   Me actual knowledge, no.

5   Q.   Prior to the time that EMS arrived, do you know

6        one way or the other whether Mr. Brown's heart

7        was still beating, whether he had any cardiac

8        activity?

9   A.   I mean, I know -- I mean, you got to ask me more

10       specific about the time.  I mean, obviously he

11       was breathing at some point before EMS arrived.

12  Q.   Right.

13  A.   But once EMS actually arrived was he still

14       breathing at that point?

15  Q.   Yes.

16  A.   I would not know.  I do not know that.

17  Q.   Did you observe Mr. Brown at the time EMS

18       arrived?

19  A.   Yes, I did.

20  Q.   Tell me -- did you say you helped them take him

21       from the car?

22  A.   I remember him just being on the stretcher, at

23       least, and uncuffing him.  I believe I'm the one

24       that actually uncuffed him just to give him some

25       more movement because he was much more -- he

Page 70

1       wasn't wrestling anymore.  Obviously, they're not

2       going to -- it's going to be easier for them to

3       work on him without --

4   Q.  Prior to his uncuffing, he was taken out of the

5       zone car?

6   A.  Yes.

7   Q.  Did you observe him being taken out of the zone

8       car?

9   A.  Did I actually observe him?

10  Q.  Yes.

11  A.  I don't know if I walked over after he was

12      actually on the stretcher or I actually walked

13      over as they were taking him out.  I can't

14      remember exactly.

15  Q.  Prior to being put on the cot, did you observe

16      Mr. Brown either kneeling or seated?

17          Did you see him in some position outside the

18      zone car, but before he was lifted onto a cot?

19  A.  No, I really -- I can't say that I did.  I don't

20      really remember.  I can't really say.

21  Q.  So he was still cuffed?

22  A.  Yes.

23  Q.  And describe for me EMS arriving and what your

24      role was.

25  A.  I -- I mean, like I said, the one part I do

```
 1              remember is him being on the actual stretcher and
 2              they're just placing him on the stretcher.
 3     Q.       Was he cuffed behind or in front?
 4     A.       I believe he was cuffed behind.
 5     Q.       And he was laying on his cuffs?
 6     A.       Yes, we had to uncuff him and just cuff him right
 7              here (indicating).
 8     Q.       So you uncuffed one hand from the other and
 9              recuffed each hand to the sides of the stretcher?
10     A.       You know, I can't remember if I cuffed both hands
11              or one hand.  In those kinds of situations, we've
12              had those before, I ask EMS what do you feel?  Do
13              you want me to cuff him with one hand, or you
14              want me to keep -- how do you guys feel?
15                 I can't remember how I recuffed him exactly --
16     Q.       So at that point --
17     A.       -- but I uncuffed him for sure.
18     Q.       -- you were close to Mr. Brown, you touched him,
19              you maneuvered his arm?
20     A.       Yeah.  Yes.
21     Q.       Was he still resisting?
22     A.       No, not when he was on the stretcher, no.
23     Q.       Was he breathing?
24     A.       I don't know.  I mean, I would have to probably
25              checked a little closer, but I don't know.
```

1    Q.    Were his eyes open?

2    A.    I don't remember that, specifically --

3    Q.    Have you ever --

4    A.    -- at this point.

5    Q.    -- been around somebody that had expired?

6    A.    Yes, I have been.

7    Q.    Did you look at Mr. Brown and think that he was

8          dead?

9    A.    No, honestly, no.  I mean, I'm not a medical

10         professional.

11   Q.    Have you ever had any opinion as to whether Mr.

12         Brown was breathing at the time EMS arrived?

13   A.    Have I ever -- I don't -- I don't remember.  I

14         mean, I don't remember.  My opinion changes,

15         obviously, after certain things happened.

16   Q.    Like what?

17   A.    Like he ended up dying.  You would think -- you

18         thought he was just -- I didn't know if he was

19         breathing or not.  People just get tired after

20         they've been running and fighting.  I just didn't

21         think of it.  But now that you know he died,

22         maybe he wasn't breathing, you don't know.

23   Q.    So you know that when EMS assessed him he was not

24         breathing and there was no cardiac --

25   A.    Once he got into the EMS wagon, he was going into

1    full cardiac arrest because they told me because

2    they wanted me to call for -- hey, call fire, let

3    them know we have a male in full arrest.  So I

4    knew once he was in the wagon, not while he was

5    on the stretcher.  I didn't know it right away.

6  Q.  While he was on the stretcher, did EMS tell you

7    one way or the other, anybody from EMS, that he

8    was breathing or that he had a weak pulse or

9    anything else?

10 A.  Stretcher outside?

11 Q.  Yes.

12 A.  I don't remember that.

13 Q.  So did you hear anything from EMS about his

14    condition prior to him going into the wagon?

15 A.  Not that I can remember.  No, I don't remember.

16 Q.  And he was put in the wagon immediately; right?

17 A.  Essentially once -- yeah.

18 Q.  So it was like a fluid motion?

19 A.  They put him in there, yeah, I remember uncuffing

20    him and he was put him in the wagon.

21 Q.  You uncuffed him?

22 A.  Yes.  I don't know if I uncuffed him all the way

23    because his arms were behind his back, so I

24    uncuffed him and --

25 Q.  Did you cuff him to the gurney or not?

Page 74

```
 1   A.   Like I said, I don't remember that.  I don't know
 2        if EMS -- what they wanted me to do.  They
 3        probably might remember better.  But usually in
 4        that case I would ask them, what do you guys feel
 5        comfortable with?  Do you want me to -- I did
 6        whatever they did.  I can't tell you exactly if I
 7        cuffed him.  There again, I might have --
 8        especially after he was going into full cardiac
 9        arrest, I probably -- I don't know.  I would
10        definitely ask them again, do you want me to
11        uncuff him?  Because I want them to be able to do
12        what they need to do without --
13   Q.   When you cuffed him or uncuffed him, could you
14        feel any tension in his arms?
15   A.   Again, it wasn't -- I couldn't -- he wasn't
16        resisting, that's for sure.  I can't tell you if
17        there was tension, tension.  He wasn't like
18        pulling away or anything like that, no.  But
19        tension, I couldn't really tell you if there was
20        a lot of tension or not.  But he wasn't --
21   Q.   As we sit here today, do you have an opinion, one
22        way or the other, as to whether he was alive when
23        EMS arrived?
24             MR. KAISER:                    Show an
25             objection.
```

Page 75

1    A.    I have no opinion, honestly.

2    Q.    Would you agree that when you gave your Garrity

3          statement you contended that he was breathing and

4          alive when EMS arrived?

5    A.    When EMS arrived?

6    Q.    Yes.

7    A.    I have no opinion.  I can't tell you for sure.

8    Q.    So take a look at Exhibit 20, Page 1486, about

9          two thirds of the way down the typed it says, was

10         the male conscious when you uncuffed him; do you

11         see where I am?

12   A.    Yes.

13   Q.    Was the male conscious when you uncuffed him

14         after he was placed on the stretcher.  Answer, he

15         was breathing, but his eyes were closed; did I

16         read that correctly?

17   A.    Yes.

18   Q.    I could feel tension in his arms when I uncuffed

19         him; did I read that correctly?

20   A.    That's correct.

21   Q.    So that was your understanding back on January

22         7th, 2011; right?

23   A.    Yes.

24   Q.    But as we sit here today, you no longer know that

25         for sure?

Page 76

1   A.   No, I can't -- I mean, I can't tell you that for

2       sure.

3   Q.   It's a pretty big deal; right?

4        I mean, it's pretty important, don't you

5       think?

6          MR. KAISER:            Objection.

7          Argumentative.

8   A.   I'm not a medical professional.  I don't know.

9       It just seemed like -- I mean, I couldn't -- when

10      you're there you just thought, he's breathing,

11      he's just real tired.  That's all that was in my

12      mind.

13  Q.   If he wasn't breathing when EMS arrived, he could

14      have died in the car; right?

15  A.   I suppose it's possible.

16         MR. GERHARDSTEIN:       Let's take

17         a short break.

18         THE VIDEOGRAPHER:       Off the

19         record.

20         (Thereupon, there was a brief recess.)

21         THE VIDEOGRAPHER:        On the

22         record.

23  BY MR. GERHARDSTEIN:

24  Q.   Take a look at Exhibit 14.  This is the EMS

25      report from their interaction with Mr. Brown,

1        okay?

2            And do you see where it says that they arrived

3        at the patient at 21:10 on the upper right-hand

4        corner or right inside there?

5    A.  At patient 21:10, okay, yeah.

6    Q.  And that's 9:10; correct?

7    A.  That's correct.

8    Q.  And then do you see at 21:10 down under

9        assessments where they list their assessment at

10       the time they arrived at the patient?

11   A.  Yes, I see assessments.

12   Q.  And it says, no spontaneous respiration; right?

13   A.  Yes.

14   Q.  So he's not breathing; right?

15   A.  Right.

16   Q.  No pulse; right?

17   A.  That's correct.

18   Q.  Fixed gaze; right?

19   A.  Right.

20   Q.  You don't have any reason to disagree with that

21       assessment at 21:10 as soon as EMS arrived at the

22       scene, right, or at the patient, right?

23   A.  No, they know better than me.

24   Q.  You testified earlier that you did discover on

25       December 31, 2010 that the person we keep

1          describing in these reports as the male subject

2          was Rodney Brown?

3     A.   That's correct, yes.

4     Q.   What time was that that you made that discovery?

5     A.   It was -- I believe it was after EMS left, that's

6          all.  I can't even tell you -- I really couldn't

7          tell you for sure because I was still helping

8          them out, so I mean -- it was still while we were

9          on scene, though.  I couldn't tell you exactly

10         when.  And I had to use my MDT, my computer.

11    Q.   Did you say you traveled with EMS?

12    A.   No, I was just in the wagon with them while they

13         were working on him for a few minutes there.

14    Q.   So then you exited the wagon and went back to

15         your vehicle and then ran additional information?

16    A.   At some point, yeah, I went accessed MDT, I

17         clicked on the address listed to that vehicle --

18         and this is the old system, I don't think you can

19         did this with the new system, but when you click

20         on that address other names will come up from

21         that address.  And I saw his name, I saw a few

22         other names, but obviously I wanted the male's

23         name.  I don't know if I had to run one or two,

24         but after that I typed in his Social and his name

25         came up and, okay, I'm pretty sure that's him.

1    Q.    And you also got a picture?

2    A.    Yes, yeah.

3    Q.    So on December 3st, shortly after EMS left the

4          scene, you knew that the person you had been

5          interacting with was Rodney Brown?

6    A.    I mean, we weren't 100 percent, but it was very

7          likely, yes.  That's who I thought it was and

8          obviously it was, yes.

9    Q.    Did you share that information with any other

10         person connected with the Cleveland Police

11         Department?

12   A.    I know I did.  I couldn't tell you who I

13         specifically told.  If it was sergeant, if it was

14         homicide.  I couldn't tell you exactly,

15         specifically, who I told.

16   Q.    When did you share that information?

17   A.    Pretty much after I saw that information.  I'm

18         sure I went to somebody.

19   Q.    So any idea, at all, as to why he would be listed

20         as John Doe in the morgue for so many hours?

21               MR. KAISER:                    Show an

22               objection.

23                     Foundation.

24   A.    I wouldn't know.

25   Q.    But as far as you're concerned, you revealed his

```
 1              identity to a superior officer shortly after he

 2              left --

 3    A.        I don't know that.  I said I could have.  I don't

 4              know.  I talked to somebody else, I don't know,

 5              specifically.  It could have been the homicide

 6              unit.  It could have been a supervisor, but I did

 7              tell somebody there, yes.

 8    Q.        Well, did you tell somebody with the intent that

 9              this would become part of the case investigation?

10    A.        Yes, obviously, yes.  We needed to know who it

11              was.  I needed to tell somebody that was going to

12              handle this, this might be the person.

13    Q.        Did you carry a cell phone on that night?

14    A.        I had a -- I believe, yes, I had a cell phone.  I

15              don't carry it on my person.  I usually leave it

16              in the car.

17    Q.        Did you make any cell phone calls related to your

18              interaction with Mr. Brown?

19    A.        I don't know that.  I don't remember -- not at

20              that time, no.

21    Q.        What was your cell phone number?

22    A.        It's 330, 330 is the area code, 701-7894.

23    Q.        And is that your cell phone or a city cell phone?

24    A.        That's mine.

25    Q.        Are there any rules within the City of Cleveland
```

1          about whether you can make personal cell phone

2          calls while you're at work?

3     A.   I don't know, specifically.

4     Q.   So you don't know of any prohibition?

5     A.   No.

6     Q.   And have you made calls from time to time on your

7          cell phone while you're at work?

8     A.   Oh, yes, yes.

9     Q.   What service did you have?

10    A.   Sprint.

11    Q.   And do you still have that same service?

12    A.   Yes.

13    Q.   Do you still have that same number?

14    A.   Yeah.

15    Q.   Has anybody in connection with the investigation

16         into the events surrounding Rodney Brown ever had

17         you produce your cell phone record for that

18         night?

19    A.   No, no.

20    Q.   At the time you went back to your zone car and

21         you looked at your computer and you pressed on

22         the address and saw the address, then you saw the

23         name, then you saw the picture, you knew at that

24         point that Mr. Brown was deceased; right?

25    A.   No, I don't believe I did, no.  I can't remember

1          for sure, but --

2     Q.   You had been present in the EMS wagon; right?

3     A.   Yeah.

4     Q.   And you had witnessed them intubate him; right?

5     A.   Yeah.

6     Q.   And you had witnessed them make an assessment

7          where he was no longer breathing and he had no

8          cardiac activity; right?

9     A.   I didn't -- I mean, they -- all's they told me it

10         looked like he was in trouble, we need fire

11         because he's in full arrest.  I mean, I don't

12         know.  I don't know If that means they weren't

13         going to be able to save him or -- because they

14         went to the hospital.  They didn't just stick

15         around and say, okay, that's it.  But, I mean,

16         they obviously went to the hospital very quickly

17         so I thought they could still save him.

18    Q.   When did you learn that he had died?

19    A.   I don't know if it was that night or the next

20         day.  I don't remember exactly.  I don't know

21         exactly.

22    Q.   Were you put on administrative leave?

23    A.   Yes.

24    Q.   Were all the officers that interacted with Mr.

25         Brown put on administrative leave or just you and

Page 83

1          Officer Chapman?

2   A.   I know my partner and I, Officer Chapman, I know

3        we were.  I can't recall anybody else.

4   Q.   So at the time you were put on administrative

5        leave, you were aware that he had died?

6   A.   Yeah, at some point I was, definitely.

7   Q.   Take a look at Exhibit 15.  Do you recognize that

8        document?

9   A.   No, I don't think I've actually seen this.

10  Q.   On the first page of that exhibit, about a third

11       of the way up from the bottom, it states that

12       officers report Brown initially tensed up after

13       being shocked, but then suddenly shrugged it off

14       and began fleeing on foot, and that's in

15       reference to the initial tasing.  Do you see

16       that?  If you want to go up a couple lines --

17  A.   Yeah, I do see that.  Let's see.

18  Q.   Is that accurate that he tensed up?

19  A.   I honestly don't remember him tensing up at all

20       in my memory.  I don't remember seeing him

21       tensing up.

22  Q.   So the only officers who were present when Brown

23       was tased at 113th were you and Chapman; right?

24  A.   That's correct.

25  Q.   So if this investigation concluded in the plural

Page 84

1          that you report that Brown initially tensed up,

2          it's your testimony that this investigation

3          report is wrong; correct?

4    A.    I just -- I mean, I just don't remember that.  I

5          can't say if this is wrong or not, but --

6    Q.    This indicates that you deployed your taser by

7          firing a cartridge at the fleeing Brown, that's

8          correct; right?

9    A.    Yes.

10   Q.    And even though your taser download shows you

11         doing three activations of your taser before

12         Chapman tased Brown, it's still your testimony

13         that Chapman tased him first?

14   A.    Yes.

15   Q.    And did anybody ever explore with you why your

16         taser was -- makes that recollection -- oh, it's

17         four.  I'm sorry, let me restate that.

18            Your taser download reflects four taser

19         deployments before Chapman ever tases Mr. Brown,

20         okay?  Do you understand?

21   A.    Well, according to the documentation, yeah.

22   Q.    And has anybody ever explored with you why those

23         records indicate that?

24   A.    Today is the first I've even heard of that.

25   Q.    Did you ever talk to any of the EMS squad members

1          after this incident?

2    A.    No.

3    Q.    Is there any sort of practice or custom with

4          respect to removing an individual from the zone

5          car that you're expecting EMS to interact with?

6    A.    Can you repeat that?

7    Q.    Yeah, that's a bad question.

8             Mr. Brown was in the zone car; right?

9    A.    Yeah.

10   Q.    And everybody is waiting for EMS?

11   A.    Yeah.

12   Q.    Then he's removed by the police before EMS gets

13         there, rather than just letting EMS assess him in

14         the zone car.  Is that unusual, at all, or is

15         that standard practice?

16   A.    I mean, I don't -- to remove him before EMS gets

17         there?

18   Q.    Yeah.

19   A.    Unless there was some other reason to.  I don't

20         know what reason there would be to, but there's

21         no -- obviously, I mean, I really don't know.

22         You'd had to -- every situation would be

23         different.  Like maybe, you know, I've had people

24         throwing up in the back of my car, I'm like,

25         okay, why don't you just come out here and get

1        some air.  Every situation was going to be

2        different.

3   Q.   Right.  This involves a situation where you know

4        EMS is on the way, my question is based on your

5        training and experience as a Cleveland Police

6        Officer, is it your understanding that

7        appropriate police protocol requires that the

8        officers take the suspect out of the zone car

9        when they hear the EMS sirens arriving?

10            MR. KAISER:                    Show an

11            objection, but answer if you can.

12  A.   It's -- I mean, if he's fine sitting in the zone

13       car, you would just keep him in the zone car.  I

14       don't -- I couldn't -- if he's fine in the zone

15       car, just leave him in the zone car.  If you can

16       accommodate a person, if he said he wants to get

17       out and I want to get some air or something like

18       that, that happens, like, oh, it's a hot day, you

19       try to accommodate them.  It just depends.

20  Q.   All of the things being equal, you would normally

21       expect EMS to go ahead and assess him in the zone

22       car?

23  A.   Just come over, we'd open the door and maybe

24       they'd talk to him, yeah, yeah.

25  Q.   So you don't have an explanation as to why Mr.

Page 87

1           Brown was removed from the zone car before EMS

2           got there?

3                   MR. KAISER:                    Objection.

4    A.    I don't even -- I don't remember him being

5           removed from the zone car before they got there.

6           This is the first time I'm actually hearing that.

7           Because I just thought they brought the cot over

8           or whatever.  I didn't know he was actually

9           outside the car before they got there.

10   Q.    So that's what I want to clarify.

11          The other thing is you didn't get involved in

12          removing Brown from the zone car right?

13   A.    No.  Like I said --

14   Q.    You interacted with Brown after EMS was already

15          with him?

16   A.    Yeah.  I just remember him being on that cot and

17          trying to help them out at that point, that's --

18   Q.    And that was at the request of EMS?

19   A.    I don't think that was at the request of EMS.  I

20          was just trying to help.

21                  MR. GERHARDSTEIN:              I don't

22          have anymore questions.

23              Thank you, sir.

24              THE VIDEOGRAPHER:              End of the

25          record, the video record.

1            For the transcript, the witness has

2       the right to review the transcript and/or

3       video of his testimony or may waive that

4       right.

5       MR. KAISER:                      He'll

6       review.

7       THE VIDEOGRAPHER:             Thank you.

8       MR. GERHARDSTEIN:             Thank you,

9       sir.

10                     – – –

11          (DEPOSITION CONCLUDED.)

12                     – – –

13

14

15

16          _____

17          OFFICER BELAL ILAIN      (Date)

18

19                     – – –

20

21

22

23

24

25

Page 89

```
 1    I have read the foregoing transcript from Page 1

 2    through 88 and note the following corrections:

 3    PAGE      LINE                 REQUESTED CHANGE

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19
                         _____

20                       Officer Belal Ilain

21         Subscribed and sworn to before me this _____ day

22    of _____, 2012.

23                       _____

                         Notary Public

24

           My commission expires: _____.

25
```

Page 90

1                    C E R T I F I C A T E
2
3    STATE OF OHIO,                )
4                                  )  SS:
5    COUNTY OF CUYAHOGA.           )
6
7

          I, Lori A. Morris, a Notary Public within and for
8    the State of Ohio, authorized to administer oaths and
     to take and certify depositions, do hereby certify that
9    the within-named witness, OFFICER BELAL ILAIN, was by
     me, before the giving of his/her deposition, first duly
10   sworn to testify the truth, the whole truth and nothing
     but the truth, that the deposition as above-set forth
11   was reduced to writing by me by means of stenotypy, and
     was later transcribed into typewriting under my
12   direction; that this is a true record of the testimony
     given by the witness; that said deposition was taken at
13   the aforementioned time, date and place, pursuant to
     notice or stipulations of counsel, that I am not a
14   relative or employee or attorney of any of the parties,
     or a relative or employee of such attorney or
15   financially interested in this action.  I am not, nor
     is the court reporting firm with which I am affiliated,
16   under a contract as defined in Civil Rule 28(D).
17
18        IN WITNESS WHEREOF, I have hereunto set my hand
     and seal of office, at Cleveland, Ohio, this 27th day
19   of June, 2012.
20
21   _____
     Lori A. Morris, Notary Public, State of Ohio.
22   1360 West Ninth Street, Cleveland, Ohio 44113
     My Commission expires April 21, 2017.
23
24
25