GPO Number: 2.1.01
Effective Date: March 1, 2002
Revised Date: May 7, 2007
Associated Manual: Inspections, Internal Affairs, Employee Assistance Units
Related Orders: 1.1.22, 2.1.02, 2.1.03, 2.1.06 and 4.1.10
Subject: USE OF FORCE

Changes to this order are printed in Italic. The order now contains Appendices A and B.

| | |
|---|---|
| **PURPOSE:** | To establish guidelines for members of the Cleveland Division of Police for the use of non–deadly and deadly force.  To create clarity in a member's mind when action is critical and subject actions warrant escalation through the Action-Response Continuum. |
| **POLICY:** | A reverence for human life shall guide members in the use of force. Division members shall use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the life of the member or others. **Excessive force shall not be tolerated.** |

A member's responsibility is the protection of the public.  Standards for the use of force are the same on and off duty.  Members shall not use deadly force that may injure or kill bystanders or hostages, except to preserve life or prevent serious bodily injury.  **Deadly force is never justified solely to protect property.**  It must be stressed that the use of force is not left to the unregulated discretion of the involved member.  This is not a subjective determination.  The use of force must be objectively reasonable.  Justification for the use of force is limited to the facts actually known or reasonably perceived by the member at the moment that force is used.  Deadly force shall not be used to effect an arrest or prevent the escape of a person **UNLESS** that individual presents an imminent threat of death or serious bodily injury to members or others.

**At the scene of a police incident, many officers of the Division may be present and some officers may not be directly involved in taking police actions.  However, this does not relieve any officer present of the obligation to ensure that the requirements of the law and Divisional regulations are complied with.  Officers of the Division of Police are required to maintain control if the use of force against a subject clearly becomes excessive.**

Officers shall be trained and tested yearly on the law and Division policy regarding the use of force, appropriate methods to effect arrests, and the apprehension of fleeing subjects.  The Division mandates strict knowledge and compliance with this order.  Immediate supervisors are responsible for clarifying misunderstandings associated with this order.

**DEFINITIONS:**

**Actively resisting** means the subject is making physically evasive movements to defeat the member's attempt at control. This includes bracing, tensing, pushing, or verbally signaling an intention to avoid or prevent being taken into or retained in custody.

**Deadly force** is an action likely to cause death or serious physical harm.  It may involve firearms, but it also includes any force that falls within this definition. Deadly force includes firing at or in the direction of a person, head strikes with an ASP baton or any hard object, or using a sleeper hold.

**Force** means the following actions by a member:  any physical strike or instrumental contact with a person, or any significant physical contact that restricts movement of a person.  The term includes, but is not limited to, the use of firearms, chemical spray, electrical devices, sleeper hold or hard empty hands, the taking of a subject to the ground, or the deployment of a canine.  The term does not include escorting or handcuffing a person, with no or minimal resistance.

**Non-deadly force** is any use of force other than that which is considered deadly force.  Non-deadly force includes any affirmative action taken by a member to control a subject.  While members of the Division associate non-deadly force with the use of pepper spray, Taser and the ASP baton, non-deadly force **includes** the following:

1.  Use of a member's body part(s) to strike an individual;

2.  Use of Division issued intermediate weapons (See Section II) and equipment that may be used as a



PLAINTIFF'S
EXHIBIT 44

19      6-12-12

001328
1/1/2011

weapon (i.e. portable radio or flashlight) deployed on approved body target areas (i.e. no head strikes);

3.   Use of joint manipulation and/or pressure point techniques;

4.   Striking an individual with an object other than a firearm on approved body target areas (i.e. large muscle groups);

5.   Wrestling with an individual;

6.   Actively holding/pinning an individual against the ground or other fixed object;

7.   Any deliberate force which causes injury to another or causes another to fall, or collide with any object;

8.   Use of a canine that results in a dog bite;

9.   Any other physical action required to control a resistant, combative, or violent individual.

**Objectively reasonable force** is that level of force that is appropriate when analyzed from the perspective of a reasonable officer possessing the same information and faced with the same circumstances as the officer who actually used force. Objective reasonableness is not analyzed with hindsight, but will take into account, where appropriate, the fact that officers must make rapid decisions regarding the amount of force to use in tense, uncertain, and rapidly evolving situations. This policy guideline applies to all uses of force, not only the use of deadly force.

**Serious use of force** is striking a suspect with a firearm, head strikes with an ASP baton or hard object, use of the Beanbag Shotgun when a beanbag round has caused death or serious physical harm, use of the sleeper hold or any use of force that causes serious physical harm.

**Intermediate weapons** are authorized, less lethal devices, approved and issued by the Division. Devices include, but are not limited to, the following: OC pepper-spray; the ASP baton; the Taser; and the Beanbag Shotgun.

**PROCEDURES:**

**I.**    Force Level

A.    Members shall determine the level of force necessary to protect themselves or others, or gain compliance from combative, resistant or violent individuals. Members shall consider alternative tactics to the use of force, which include, but are not limited to:

1.   Concealment and/or cover

2.   Voice commands

3.   Show of force (i.e. multiple officers, alternative weapons)

B.    Action-Response Continuum

Members are prepared with knowledge of laws, proper training in non-deadly force, proper training in use of force decision-making, proper training and accountability to high ethical standards and an understanding of Division directives. The Action-Response Continuum suggests a member's response to a suspect's action. It does not require proceeding in a certain order.

| SUSPECT ACTIONS | MEMBER RESPONSES |
|---|---|
| **RED** | **RED** |
| Weapon used against member | Deadly force |
| Attempting to disarm member | Sleeper hold |
| Life threatening weaponless assault | Beanbag Shotgun |
| Suicide Attempt | |
| **ORANGE** | **ORANGE** |
| Striking or kicking member | Baton / ASP techniques |

USE OF FORCE                                                                 Page 3 of 9

| YELLOW<br>Wrestling or pushing member<br>Active physical resistance | YELLOW<br>Striking, punching, kicking, tear gas,<br>OC pepper-spray, electrical devices/Taser,<br>restraints/restraint techniques |
|---|---|
| GREEN<br>Pulling away from member<br>Refusing to move (dead weight)<br>Escape | GREEN<br>Striking muscle groups or muscle masses, take downs, joint manipulations, pressure point control |
| BLUE<br>Not responding to commands<br>Verbal or physical danger cues | BLUE<br>Balance displacement, escort position, other member assistance, member presence, verbal/physical commands. |

C.      Consider the following member/suspect factors when choosing a response within the continuum:

1.      Age

2.      Gender

3.      Body size

4.      Skill level

5.      Number of suspects and number of members

6.      Relative strength of suspect and member

7.      Known or apparent medical condition

8.      Known or apparent drug/alcohol usage

D.      Special circumstances unique to each situation involving non-deadly force:

1.      Weapon proximity

2.      Injury or exhaustion

3.      Position (i.e., being on the ground)

4.      Distance from the suspect

5.      Special knowledge or training

6.      Availability of other options

7.      Environmental conditions

8.      Subject handcuffed

## II.      Intermediate Weapons

A.      Members who meet the Division's physical and mental requirements, successfully complete training and meet proficiency standards, are issued and required to carry intermediate weapons on duty and while engaged in secondary employment.

B.      Members shall not use intermediate weapons on individuals passively resisting.

C.      Members shall carry and use intermediate weapon holsters/carriers furnished by the Division or specifically authorized by the Chief of Police.

D.    Members may draw, display, point or threaten to use intermediate weapons if they fear for their safety or the safety of others, or to gain compliance from a resistant, combative, or violent individual.

E.    Batons/Hard Objects Used as a Weapon

    1.    The Division authorizes a member to use an expandable baton while on duty or working secondary employment. Absent exigent circumstances, the Division prohibits the use of non-traditional weapons/hard objects to gain compliance from resistant, combative, or violent individual(s).

    2.    The "Riot Baton" is authorized only during field force deployment.

    3.    When a member uses the ASP baton, Riot Baton, or any hard object/non-traditional weapon, medical personnel shall examine the subject (i.e. EMS, Emergency Room).

    4.    Photographs of the area struck by an ASP baton, Riot Baton, or any hard object/non-traditional weapon shall be taken and be made part of the investigative package (i.e. Polaroid, Crime Scene and Records).

F.    Oleoresin Capsicum "OC" (Pepper) Spray

    1.    If feasible, members shall provide a loud verbal warning before OC spray is used.

    2.    Members shall not use OC spray on women known or believed to be pregnant.

    3.    Unless a member is being assaulted or believes an assault is imminent and there are no other alternatives, members shall not use OC spray on persons with a known respiratory condition.

    4.    If OC is sprayed on a juvenile, elderly, pregnant or physically disabled person, they shall be transported to the nearest hospital for treatment.

    5.    Members shall assist bystanders who come into contact with OC discharges. If an injury occurs or medical attention is required, the member shall complete an Injury to Person/Accidental/Pepper Spray Record Management System (RMS) report and forward it through the chain of command to the Inspection Unit.

    6.    If a suspect does not comply after two, one-second bursts of OC, members shall discontinue use and select an alternative response.

    7.    When control is established at the scene, the member shall make a reasonable effort to relieve the suspect's OC discomfort. Members shall wash OC from the suspect's eyes as soon as possible at a district jail or hospital.

    8.    Immediately transport suspects for emergency medical care if:

        a)    Symptoms, other than mild, last beyond 45 minutes.

        b)    They experience difficulty breathing or lose consciousness.

        c)    The member believes, requested or not, that the suspect needs medical attention.

        d)    The member becomes aware of a medical condition (bronchitis, heart ailment, emphysema, etc.) that OC spray may aggravate.

    9.    Members shall carefully handle the suspect's clothing to avoid OC contact.

    10.    If it will not endanger innocent bystanders, OC may be released in enclosed areas to move suspects who refuse to exit when a forced exit is required. OC shall not be used on

persons passively resisting.

11.     The use of OC on an individual attempting to swallow evidence or contraband is permitted when:

  a)     There is a clear indication that the object or substance in the subject's mouth is contraband.

  b)     There are exigent circumstances such as the imminent destruction of evidence or medical emergency.

  c)     The officer has issued, and the subject refused to comply with a verbal command to spit out any contraband.

  d)     The use of OC is not otherwise prohibited by another section of this order.

G.     Electrical Devices/Tasers **(also refer to GPO 2.1.06)**

  1.     If feasible, members shall provide a loud verbal warning before deploying the Taser.

  2.     The Taser shall not be used:

  a)     On women known or believed to be pregnant unless deadly force is the only other option.

  b)     If the subject has knowingly come in contact with flammable liquids or is in a flammable atmosphere.

  c)     If the subject is in a position where falling could cause substantial injury or death.

  d)     If the subject is operating a motor vehicle, unless no alternative is available and the suspect directs force at the officer, or the officer believes an assault is imminent.

  e)     If the subject appears to be under the age of 10 or over 70, due to the potential of falling when incapacitated, unless the encounter rises to a deadly force situation.

  f)     If the suspect is holding a firearm, unless no alternative is available and the suspect directs force at the officer or the officer believes an assault is imminent.

  g)     In a situation where deadly force is clearly justifiable unless another officer is present and capable of providing deadly force to protect the officer and/or civilians as necessary.

  h)     If the subject is physically disabled, unless no other alternative is available and the subject directs force at the officer or the officer believes an assault is imminent.

  3.     Officers shall have EMS respond to the scene to evaluate a subject who has been exposed to a Taser shock.  If a Taser is deployed on a juvenile, elderly, pregnant or physically disabled person, they shall be transported to the nearest hospital for treatment.

  4.     If a first shot does not make contact or is ineffective, *the same or another officer may attempt additional shots as needed or practical in order to make successful contact on a subject.*  Officers shall not exceed three 5 second cycles *unless circumstances exist that can be clearly articulated in a required Form-1.*

  5.     Center mass of the body is the primary target area, particularly the center mass of the back, because clothing is usually tighter in this area.  If a suspect is wearing loose or heavy clothing on the upper body, the legs may be considered a target.

6.  Avoid hitting the subject in sensitive tissue areas, such as the head, face, neck, groin, or breast area. If available, EMS personnel or medical personnel at a medical facility shall remove probes penetrating these areas. A Taser certified officer, or EMS personnel if available, shall remove probes penetrating other areas.

7.  Probes shall be treated the same as contaminated needles and disposed of by placing them in a "sharps" container.

8.  At the time of booking, members shall notify detention personnel that the subject was struck with Taser probes or received a drive stun.

9.  Transport suspects for emergency medical care immediately if:

    a)  The suspect experiences difficulty breathing, chest pains or loses consciousness.

    b)  The officer believes the suspect requires medical attention (whether or not the suspect requests attention).

    c)  The officer becomes aware of a medical condition (i.e. multiple sclerosis, muscular dystrophy, epilepsy, or a heart ailment), that a Taser may aggravate.

10. **When a Taser incident occurs, members shall present the Taser to their superior for data download prior to their tour's end. A copy of the downloaded data shall be attached to the Use of Non-Deadly Force Report. If the download is not available, a notation shall be made on the Use of Non-Deadly Force Report and the member shall forward the download when it is available.**

## III. Investigation of Non-Deadly Force

A.  If non-deadly force is used, whether or not an injury occurs, members shall promptly request a supervisor to respond to the scene. Members shall obtain necessary medical assistance for subjects appearing to be injured or complaining of injury. An on-duty superior officer from the district in which the incident occurs shall investigate off-duty officers' use of non-deadly force. Supervisors who observe, participate in, authorize, or are otherwise involved in the use of force shall not assume investigative responsibilities of the incident.

B.  *In cases where members assigned to multi-agency, multi jurisdictional units or task forces are involved in use of force incidents, the supervisor who is next in the chain of command who did **not** observe, participate in, authorize, or otherwise was involved in the use of force shall assume investigative responsibilities of the incident.*

C.  *Members shall complete the Use of Non-Deadly Force Report (see attached Appendix A) before reporting off-duty. If more than two officers are involved, the other involved officers shall use an Additional Officer Information Sheet of the UNDF Report (Appendix B) and forward it to the investigating supervisor.*

D.  *If non-deadly force is used, members shall complete an RMS report titled "Police Intervention".*

    1.  *The member completing the narrative section shall include the notation "Use of Non-Deadly Force Report completed" in that narrative.*

    2.  *The member completing the RMS Report shall identify within it all members who used non-deadly force during the incident.*

E.  *Before reporting off duty the member completing the RMS Report shall:*

    1.  *Submit the original Use of Non-Deadly Force (UNDF) Report and the RMS Report to the investigating supervisor. The supervisor shall sign the reports after having checked them for accuracy and completeness.*

2.   Fax the supervisor-signed UNDF Report (*Appendices A* and *B*) *and the Police Intervention Report (RMS) to the Record File Section.*

3.   *Fax the supervisor-signed UNDF Report to the Inspection Unit.*

4.   *Forward copies of the same reports to the district/bureau Administrative Supervisor/Executive Assistant.*

5.   *The officer shall return all the original documents to the supervisor for final forwarding through the chain of command.*

F.   Supervisors notified of the use of non-deadly force shall immediately respond to the scene and conduct an objective, impartial, complete investigation, preparing an investigative packet to include:

1.   A supervisor's Form-1 with a synopsis of the incident and evaluation of the non-deadly force. Address whether or not use was appropriate and in compliance with Division rules and procedures.

2.   Copies of associated RMS and accident reports.

3.   *The member's original* UNDF Report.

4.   Interviews of the subject and all witnesses.

5.   Photos of any injuries to members, witnesses, and/or subjects.

6.   Copies of any records of medical treatment.

7.   If the Taser is used, a copy of the downloaded data.

G.   Within seven days of the incident, the investigating supervisor shall forward the packet through their chain of command. Each supervisor in the chain of command shall review the investigation and assess the force to determine if it was appropriate and in compliance with Division rules and procedures.

H.   *The commander's office shall ensure that all RMS reports and appendices are complete and accurate and they are placed in a separate envelope marked UNDF and forwarded to the Report Center. The complete investigative packet shall continue through the chain of the command to the appropriate Deputy Chief.*

I.   After review and endorsement, the Deputy Chief shall forward the investigative packet to the Chief of Police with their recommendation.

IV.   Use of Deadly Force/Firearms

A.   Officers who meet the Division's physical and mental requirements and demonstrate proficiency shall be allowed to carry firearms.

B.   Officers shall carry and use only weapons, holsters and ammunition furnished by the City of Cleveland or authorized by the Chief of Police.

C.   Officers may draw, display or point a weapon if they fear for their own safety or the safety of others.

D.   Use of safe tactics:

1.   Vehicle stops (felony, misdemeanor, or suspicious circumstances) present tactical dilemmas for officers. **Officers shall not unreasonably place themselves in a position where a threat of imminent danger of death or serious physical injury is created when attempting to stop a motor vehicle or apprehend a felony suspect.** While

conducting a felony stop or stop for suspicious circumstances, the officer shall employ tactics that promote safety for the officer and the public. **Officers should avoid standing directly in front of, behind, or beside a suspect vehicle and should not intentionally use their body to block the suspect vehicle**. The likelihood of injury to the officer substantially increases when using these dangerous and rarely effective tactics. **Officers will follow all training protocols/guidelines which are taught in the Police Academy relative to 'felony stops' involving vehicles and armed suspects.**

2.    **The Division recognizes that the mobility of vehicles present heightened risks for officers and discourages officers from reaching into vehicles. This tactic is extremely dangerous and rarely effective.**

E.    Firing at or from a moving vehicle is rarely effective and presents extreme danger to innocent persons, particularly if the officer driving the vehicle is attempting to fire a weapon. Many vehicles involved in violations are driven by persons whose age or reasons for fleeing do not justify the use of firearms as a means of apprehension. **Intentionally firing at a moving vehicle is prohibited unless there is imminent danger of death or serious injury to officers and/or other persons, where other means are not available to avert or eliminate the threat, and, where feasible, some warning has been given. Officers shall NOT fire at a vehicle that is no longer an imminent threat.**

F.    Officers shall not fire warning shots.

## V.    Investigation of Deadly Force

The Use of Deadly Force Investigation Team (UDFIT) shall investigate all forms of deadly force except firearm discharges involving animals and accidental discharges that do not result in injury or death or do not involve a citizen or suspect. The UDFIT shall also investigate the use of a Division canine that results in **death or serious physical harm.**

A.    Officers shall:

1.    Immediately notify their superior.

2.    Obtain necessary medical assistance for subjects who appear to be injured or complain of injury.

3.    If their firearm was used to cause death or injury, immediately surrender the weapon and any other weapon carried, to their superior or to a superior officer from the UDFIT.

4.    Be immediately removed from street duty, and assigned temporarily to non-sensitive work, if they cause death or injury.

5.    Complete a posttraumatic stress incident debriefing program if they cause death or injury, and do not return to street duty until so ordered by the Chief.

B.    Supervisors shall:

1.    Immediately respond to the scene and take control.

2.    Advise the Communications Control Section (CCS) to notify the UDFIT *immediately upon learning* there has been a use of deadly force incident. *The supervisor shall direct CCS to first notify UDFIT before any other notifications are made* (i.e. Internal Affairs, Unions, Employee Assistance Unit, and Office of Professional Standards). These units perform a support function to the UDFIT.

3.    Ensure that medical care has been provided for as needed.

4.    Ensure that witnesses have been identified and separated.

5.    Ensure that involved officers have been identified and separated. Due care shall be

        taken that each separated officer is NOT isolated and is in the company of a non-involved person at all times.

6.      Ensure that involved officers' weapons and ammunition have been inspected and secured as necessary.

7.      Ensure that the crime scene is secure, and that an officer is assigned responsibility for maintaining a Crime Scene Entry Log.

8.      Confer with the OIC of UDFIT and ensure that all related RMS reports are generated as required.

C.      A Crime Scene detective is assigned as a member of the UDFIT.  Their responsibility is to identify, photograph, collect, log and secure all evidence from the scene of a use of deadly force incident.