Criminal Investigation



The following is the statement of: **P.O. Erik Melendez 1748** Date: January 11, 2011
Time: 1120 hours

AGE: 30 SEX: M RACE: H DOB: [redacted]80

Address: 9333 Kinsman Road City: Cleveland State: Ohio Zip: 44104 Phone: 216-623-5400

Employed at: Cleveland Division of Police – Fourth District Address: 9333 Kinsman Rd.

City: Cleveland State: Ohio Phone: 216-623-5400 Appointment Date: 10/23/06

Regarding the investigation of: **U.D.F.I.T. 10-23 (R.M.S. #2011-410077)**

I am making this statement pursuant to the orders of a lawful supervisory officer. I make this statement pursuant to the established principals of Garrity V. New Jersey 385 S. CT. 493 (1967). I do not waive my legal rights, nor do I consent to the audio or video taping of my statement.

Q: What can you about an incident that occurred on Friday, December 31, 2010 at approximately 2048 hours at 3589 East 114th Street involving the arrest of Rodney S. Brown?
A: I reported for duty at 1430 hours. I was assigned to Zone Car 4A28 with P.O. Pedro Vargas 1795. I was driving this night.

We responded to a call for an officer that broadcasted that he was fighting with a male that was resisting. He stated that multiple tasings had no effect on him. This was around 2045 hours. We were in the area of East 143rd and Kinsman. We responded from this location and arrived at East 114th and Benham. I believe it was approximately 2049 hours.

I parked the zone car at East 114th and Benham. I overheard Officer Chapman broadcast, "I'm right behind you zone cars. I'm right behind you." I ran to that location. I observed P.O. Chapman and P.O. Ilain attempting to handcuff a male who was actively resisting. They were on the front lawn at 3589 East 114th. The male was laying on his stomach. Each officer had one arm and were trying to handcuff him behind his back. My partner pulled his Taser and said "Let him go. I'm gonna taze him." Officer Chapman said a Taser doesn't work. I assisted in attempting to handcuff the male. I grabbed him by both biceps and attempted to pull his arms behind his back so he could be handcuffed. The male continued to keep resisting. He was pushing and pulling and kicking. He was pushing towards and away from the officers and pulling away from officers. He was screaming. No words, just sounds.

After a few minutes the male was handcuffed behind his back. Both arms were behind his back. The male was rolled into a seated position. He continued kicking and growling. Officer Merritt attempted to check him for weapons. The male continued kicking. I took my left arm, reached behind his handcuffed arm across his back and over his left shoulder to pick him up. The male was picked up and continued resisting. He was pulling away from officers. Officer Merritt also assisted in picking the male up off the ground.

The male was walked to a wheelchair ramp on the law at this address. The male refused to stand. We leaned him up against the wheelchair ramp. We attempted to search the male for weapons. The male started kicking back, like a donkey kick. The male kicked with his right leg. I was directly behind him on his right hand side. The male almost kicked me. At that time I disengaged from the male. I had no further physical contact with the male. I took a few steps back to catch my breath. By then several other officers were on scene.

PLAINTIFF'S EXHIBIT LM
22 6-13-12

EM 1748

I did not observe who placed the male into the zone car. I then observed Officers Rusnak and Merritt standing on the rear passenger side of the zone car. The rear passenger door was open. E.M.S. responded approximately two or three minutes later. I'm not sure.

The male was removed from the zone car through the rear driver's side door. He was brought out feet first. I observed the male. His eyes were wide open and glassy. He had a blank stare. The male refused to stand. He was placed on his knees. E.M.S. went to the ambulance and retrieved the gurney. Prior to being put on the gurney E.M.S. checked the male's pulse. One of the E.M.S. medics said that he had a weak pulse. The male refused to stand again. I believe Officers Rusnak and Merritt picked him up again and placed him on the gurney. I and several officers assisted in uncuffing the male and then handcuffing him to the gurney. The medics placed the male into the E.M.S. wagon. At that time my partner and I received a radio broadcast to break from the scene. I believed it was a Code 2 assignment for an open door at a vacant house. We left the scene at that time.

Q: How were you dressed during your tour of duty?
A: I was wearing the full Cleveland Police uniform. I was wearing my body armor in an external vest. I was carrying my ASP baton, OC pepper spray, and city-issued Taser.

Q: Were you carrying Taser Model X26, serial number X00-344053, during your tour of duty this day?
A: Yes.

Q: What service weapon were you carrying during your tour of duty?
A: My Glock Model 17 9mm pistol, serial number GCH041.

Q: Were you carrying a secondary weapon?
A: No.

Q: Did you fire your Taser at all during this incident?
A: I did not.

Q: Did you turn your Taser over to a superior officer so he could download its recorded firing data?
A: I did. I turned it over to Sergeant Sain, the Fourth District third shift O.I.C.

Q: Did you observe any of the other officers on scene use his Taser during this incident?
A: I did not.

Q: When you first observed Officers Chapman and Ilain attempting to handcuff the male, did he say anything?
A: He was just making grunting and roaring sounds.

Q: Did you hear Officers Chapman and Ilain saying anything to the male?
A: Several officers told him to stop resisting and to put his hands behind his back, but he never complied.

Q: After the male was handcuffed and rolled to a seated position, did he say anything?
A: Not that I recall.

Q: After the male was picked up and walked over to the wheelchair ramp, did he say anything?
A: In the process of picking the male up from the ground, he stated he couldn't breathe. I don't recall my exact statement, but it was something to the nature of, "So. I don't give a fuck. We all can't breathe right now." Then the male was walked to the wheelchair ramp. The male continued to pull away, attempting to break my grasp. The male was leaned against the wheelchair ramp, at which time he kicked in my direction, nearly striking me. I disengaged the male at that time. Other officers took control of the male. He continued to resist the other officers who were attempting to control the male. He was still pulling away from officers and pushing into other officers with his shoulders and body. He was lifting his leg and refusing to stand. He was kicking his legs.

EM1748

Q: Did you hear the male say anything while he was in the backseat of the zone car?
A: I did not.

Q: Do you know if radio was notified to have E.M.S. and a supervisor respond to the scene?
A: They both responded to the scene. I believe it was Officer Merritt who requested E.M.S.

Q: Did you see the male doing anything while he was in the backseat of the zone car?
A: I did not see the male. I was located behind the vehicle on the rear passenger side.

Q: Did the male say anything after he was removed from the backseat of the zone car when E.M.S. arrived on scene?
A: No. He made no statement.

Q: How did you feel physically after you struggled with the male?
A: I was tired. I had trouble breathing. It was cold outside. I felt winded.

Q: Did you recognize this male from any prior incidents?
A: No. I never had any encounter with this male prior to this incident.

Q: Were you injured during this incident?
A: I was not.

Q: Did you fire your service weapon during this incident?
A: I did not.

Q: What was the suspect wearing during this incident?
A: I recall that he was wearing a black leather jacket. I saw a Taser barb attached to it. I don't recall what area.

Q: Do you recall when radio was notified to request E.M.S. respond to the scene?
A: I don't recall. I heard it over the radio.

Q: Do you know how the male was positioned in the backseat of the zone car?
A: I don't know.

Q: Is there anything you wish to add to your statement?
A: I know that E.M.S. was requested at some time after this male was placed into the back of the zone car and was under complete control. I believe it was the second request. Also, during the entire incident that was automatic gunfire all around us from all directions. This was New Year's Eve.

Q. Having read your statement do you find it to be true? A. Yes

Signature: [signature] #1748

Witness: [signature] Relationship/ID# 2541/2
Det. Steve Loomis 2416 (C.P.P.A. Union Representative)

Witness: [signature] Relationship/ID#
Attorney Pat D'Angelo (C.P.P.A. Union Representative)

Witness: [signature] #9963 Sgt
Sergeant Charles DePenti 9963 (Internal Affairs Unit)

Taken by: Det. [signature] 365 ID#
Det. Tim Entenok 369

Statement taken at: the Homicide Unit Date: January 11, 2011 Time: 1205 hours
C OF C 71-2169