IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
-------------------------------------------------   :
                                                    :   CASE NO.  1:11 CV 01370
   SHIRLEY BROWN,                                   :
                                                    :
                                      Plaintiff,    :   MEMORANDUM OF OPINION AND
                                                    :   ORDER
                         -vs-                        :
                                                    :
                                                    :
   MICHAEL CHAPMAN, et al.,                          :
                                                    :
                                     Defendants.    :
-------------------------------------------------   :
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS

　　　　　Before the Court is a motion for summary judgment filed by defendants City of

Cleveland, Michael Chapman, Belal Ilain, Erik Melendez, Pedro Vargas, David Skrletts,

Kevin Kincaid, James Merritt, Richard Rusnak, Mark Blaine, Dominik Pendelton,

Gregory Jones, Kevin Walker, and John Sattler (collectively "defendants"). The

defendants maintain they are entitled to qualified immunity from the plaintiff's

constitutional claims, and they assert state law immunity from the plaintiff's state law

claims pursuant to R.C. § 2744. The plaintiff has filed an opposition brief. (Doc. 33). The

defendants have filed a reply. (Doc. 35). The plaintiff filed two notices of supplemental

authority. (Doc. 36, 37). For the reasons that follow, the defendants' motion is granted in part and denied in part.

## I.

Following a traffic stop by Cleveland Police, Rodney Brown died while in custody. Mr. Brown's mother, Shirley Brown, brought this lawsuit on the decedent's behalf against the City of Cleveland ("Cleveland") and the numerous police officers named above, alleging claims of excessive force and deliberate indifference pursuant to 42 U.S.C. § 1983, state law assault and battery, and state law wrongful death.

At 8:45 P.M. on December 31, 2010, defendant Officers Michael Chapman and Belal Ilain initiated a traffic stop of Mr. Brown at the intersection of E. 113th and Benham Ave in Cleveland, Ohio. (Doc. 25-1; Doc. 25-2, p. 13; Doc. 25-3, p. 7).  According to the police, the reason for the stop was that Mr. Brown was operating a vehicle after dark without headlight illumination. (Doc. 25-2, p. 13; Doc. 25-3, p. 7). The plaintiff disputes this claim, asserting that Mr. Brown's headlights were lit at the time of the stop. (Doc. 33-8, ¶4).

It is undisputed that during the stop, Officers Chapman and Ilain approached the vehicle and asked Mr. Brown for his license and registration. (Doc. 25-2, p. 13). After repeated requests, Mr. Brown did not produce his license and registration. (Doc. 25-2, p. 26). Suspecting that Mr. Brown was intoxicated, the officers ordered him out of the vehicle. (Doc. 25-2, p. 24; Doc. 33-8, ¶6). Mr. Brown stepped out of the car. (Doc. 33-8,

2

¶6). The officers assert that he did so in an aggressive and threatening manner. (Doc. 25-2, p. 14; Doc. 25-3, p. 14).

The officers ordered Mr. Brown to place his hands on the hood of the car. (Doc. 33-8, ¶7). Mr. Brown complied, and the officers initiated a pat down. (Doc. 33-8, ¶7). At this point the parties' respective stories diverge. According to the plaintiff, while patting down Mr. Brown, Officer Chapman elbowed Mr. Brown in the back of the neck, forcing his head down toward the car trunk. (Doc. 33-9, ¶7). Mr. Brown responded to the blow, the plaintiff contends, by breaking away from the officers, crossing the street, and turning to face them. (Doc. 33-9, ¶8). The plaintiff maintains that Officer Chapman responded, in turn, by firing his taser directly at Mr. Brown's chest without warning. (Doc. 33-9, ¶9). According to the plaintiff, Mr. Brown leaned forward and said "ow," but the taser had no other apparent effect on Mr. Brown. (Doc. 33-8, ¶10).

The officers, on the other hand, deny the plaintiff's claim that Officer Chapman elbowed Mr. Brown in the back of the neck. According to the officers, they began a pat down, and, after placing the decedent under arrest, they tried to handcuff Mr. Brown, but the decedent started to physically resist them. (Doc. 25-2, p. 15; Doc. 25-3, p. 18). The officers say that Mr. Brown pulled away from them, and Officer Chapman drew and pointed his taser at the decedent. (Doc. 25-3, p. 19). Officer Chapman claims that he told Mr. Brown to get down on the ground and warned him that he would be tased if he did not. (Doc. 25-3, p. 19). Instead of complying, Mr. Brown took a step toward the officers, and Officer Chapman fired the taser at Mr. Brown's chest. (Doc. 25-2, p.15).

3

While the parties dispute the facts leading up to the initial taser deployment, they are in agreement that the taser did not immobilize Mr. Brown. (Doc. 33-8, ¶10; Doc. 25-2, p. 15). The parties agree that after being struck with the taser barbs, Mr. Brown ran away from the officers down Benham Avenue and that the officers gave chase, while Officer Ilain called for back up. (Doc. 33-8, ¶10; Doc. 25-2, p. 15). The officers claim that, during the chase, they saw the decedent reaching into his pants or his pocket, possibly for a weapon, and the officers later learned that the decedent had a knife. (Doc. 25-2, pp. 15-16). The officers eventually caught up to Mr. Brown in front of a house on E. 114th street. (Doc. 25-2, p. 15-16). Both officers used their tasers in drive stun mode to induce the decedent's compliance, but the tasers still had no effect. (Doc. 25-2, p. 16). The defendants claim, and the plaintiff does not dispute, that Mr. Brown swatted the officers' tasers away; that he punched and kicked the officers; that he grabbed Officer Chapman's arm and twisted his wrist; and that he struck Officer Ilain with the flat side of his knife. (Doc. 25-2, pp. 15-16; Doc. 25-3, p. 31). It is further undisputed that Officer Chapman responded to the decedent's actions by drawing his gun and putting it to the decedent's back. (Doc. 25-2, p. 17). The officer never fired his weapon, however, since Officer Ilain was able to disarm the decedent before Chapman opted for lethal force. (Doc. 25-2, p. 17). Officer Ilain advised Officer Chapman not to shoot, and Chapman holstered his service weapon. (Doc. 25-2, p. 17; Doc. 25-3, p. 44).

At this point, the decedent was disarmed, but still uncuffed, and still resisting. Realizing that his taser was having no effect on Mr. Brown and concerned that the device might be used against him and his fellow officer, Officer Ilain threw it out of the

4

decedent's reach. (Doc. 25-3, p. 33). The altercation had reached, as the defendants characterize it, a "stalemate." The decedent began shouting to whomever would listen to "go get my people," and the officers observed that a crowd was gathering around them. (Doc. 25-2, pp. 17-18; Doc. 25-3, p. 43). According to the defendants, the crowd remained under control, once it was apparent that the decedent was fighting police officers.

As the struggle continued, a number of other officers began to arrive. Officers Vargas and Melendez came first. (Doc. 25-4, p. 8; Doc. 25-5, p. 23). Vargas drew his taser, but Officer Ilain told him not to use it because it was having no effect on the decedent. (Doc. 25-2, p. 18). Officers Melendez and Vargas joined in the attempt to restrain the still resisting decedent. Officers Merritt and Rusnak came next. Officers Chapman and Ilain, at this point exhausted from the struggle, disengaged from the decedent. (Doc. 25-2, pp. 18-19; Doc. 25-4, pp. 12-13; Doc. 25-5, pp. 30-31; Doc. 25-7, p. 11; Doc. 25-8, p. 6). Officer Mark Blaine arrived and joined in the attempt to arrest the decedent, but the decedent continued to resist. (Doc. 25-6, p. 7). Officer David Skrletts arrived next and observed that the decedent was kicking the officers who were trying to effectuate the arrest. (Doc. 25-9, p. 17) Officer Skrlett took hold of the decedent's legs, crossed them, and applied pressure in an effort to gain compliance. (Doc. 25-9, p. 17). With a total of eight officers on the scene, they finally managed to handcuff the decedent using Officer Rusnak's handcuffs. (Doc. 25-5, p. 35).

After the decedent was handcuffed, Officer Rusnak learned that the decedent had been tased during the struggle and he called for EMS. (Doc. 25-8, p. 5). The

defendants state that Cleveland Police policy requires a call for a supervisor and EMS for any subject who has been tased. (Doc. 25-8, pp. 24, 32, 35).

The officers contend, and the plaintiff does not dispute, that Mr. Brown continued to resist, kicking his legs, even after the handcuffs were applied. (Doc. 25-5, p. 35). When the officers stood the decedent up, he complained to Officer Melendez that he could not breathe, to which Officer Melendez responded, "Who gives a fuck?" (Doc. 25-5, p. 37). The decedent continued to resist, however. Before placing the decedent in a police car, Officer Melendez decided to search him, but, before he could do so, the decedent attempted to kick Officer Melendez. (Doc. 25-5, p. 41). Officer Melendez disengaged from the decedent, and Officers Blaine and Vargas took over. (Doc. 25-4, pp. 24-25; Doc 25-6, pp.11-14). Blaine braced the decedent against a nearby handicap ramp and searched him for weapons. (Doc. 25-6, p.11). According to the defendants, several officers were needed to move the decedent from the ramp to the patrol car, as he continued to resist by alternatively jerking his body and going limp, requiring officers to carry him to the car. (Doc. 25-7, pp. 12-13; Doc. 25-8, pp. 16, 20-21; Doc. 25-10, pp. 12-13).

At the car, the decedent continued to resist, "kicking, and fighting, and snarling," requiring multiple officers to move him inside. (Doc. 25-6, p. 15; Doc. 25-7, p. 13; Doc. 25-8, pp. 25-26; Doc. 25-10, pp. 12-13). Once inside, Mr. Brown remained agitated, screaming and kicking the door. (Doc. 25-4, p. 37; Doc. 25-7, p. 37).  Officer Rusnak monitored Mr. Brown and told him to calm down. (Doc. 25-8, pp. 29-38). Mr. Brown complained to Officer Rusnak that he was having trouble breathing, and Officer Merritt

6

opened the windows of the police car to give him more air. (Doc. 25-7, p. 14).

Eventually, the decedent became quiet and subdued. (Doc. 25-7, p. 17; Doc. 25-8, p.

29). Rusnak noted that the decedent became unresponsive; the officer shone a

flashlight in the decedent's eyes, but his pupils did not constrict. (Doc. 25-8, p. 29). At

some point, Sgt. Sattler arrived, finding Mr. Brown slumped in the back seat of the car.

As EMS sirens were heard approaching, either Sgt. Sattler or Officer Rusnak decided to

move the decedent, still quiet and subdued, from inside the car to the curb, where,

according to the defendants, he remained sitting up under his own power until EMS

arrived. (Doc. 25-7, p. 17). However, when EMS did arrive, paramedics found the

decedent "propped up" on the curb leaning against one of the officer's legs. (Doc. 25-

12, pp. 19-20). The paramedics observed that the decedent was unresponsive and had

gone into cardiac arrest. (Doc. 25-12, pp. 13,19; Doc. 25-11, pp. 7, 9). Paramedics

administered CPR but they were unable to resuscitate him. Mr. Brown was pronounced

dead at 10:25 p.m.

The coroner determined that Mr. Brown's death was a homicide caused by a

"cardiopulmonary arrest following physical exertion during law enforcement activity."

(Doc. 25-19). The plaintiff's expert pathologist concluded "that Mr. Rodney Brown died

as a result of the direct effects of tasering on an enlarged hypertensive heart. The

strenuous physical struggle contributed to the increased physiological demands upon

the heart of this emotionally disturbed individual, leading to a fatal arrhythmia." (Doc. 33-

6, p. 8).

7

The decedent's mother Shirley Brown filed this lawsuit on July 6, 2011 against the City of Cleveland and Cleveland Police Officers Michael Chapman, Belal Ilain, Erik Melendez, Pedro Vargas, David Skrletts, Kevin Kincaid, James Merritt, Richard Rusnak, Mark Blaine, Dominik Pendelton, Gregory Jones, Kevin Walker, and John Sattler. The plaintiff alleges claims of excessive force and deliberate indifference to a serious medical condition under 42 U.S.C. § 1983, along with state law claims of assault and battery and wrongful death. The defendants move for summary judgment.

## II.

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000) (citing Northland Ins. Co. v. Guardsman Prods., Inc., 141 F.3d 612, 616 (6th Cir. 1998)). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." Scott v. Harris, 550 U.S. 372, 378 (2007).

To prevail on a section 1983 claim, a plaintiff "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." Smoak v. Hall, 460 F.3d 768, 777 (6th Cir. 2006) (citing Waters v. City of Morristown, 242 F.3d 353, 358-59 (6th Cir. 2001)). A defendant may assert "the defense of qualified immunity, which shields government officials from 'liability for civil

8

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "In qualified immunity cases, the plaintiff bears this burden; he must show that the defendant is not entitled to qualified immunity." Wysong v. City of Heath, 260 Fed.Appx. 848, 852 (6th Cir. 2008) (citing Wegener v. City of Covington, 933 F.2d 390, 392 (6th Cir. 1991)).

When determining whether the allegedly injured party has met this burden, the Court "typically employs a two-step analysis," asking: "'(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established.'" Smoak, 460 F.3d at 777 (quoting Estate of Carter v. City of Detroit, 408 F.3d 305, 310-11 (6th Cir. 2005)).

### III.

### A. Probable Cause to Stop

The parties first disagree as to whether Officers Chapman and Ilain lawfully traffic stopped the decedent. The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop is considered a Fourth Amendment "seizure." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A traffic stop does not violate the Fourth Amendment when the officer has probable cause to believe that a traffic violation occurred. U.S. v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993). In the present case, the defendants maintain that the stop was lawful because Mr. Brown was operating his vehicle after dark without headlight illumination in violation of § 437.02 Cleveland Municipal Code. (See Doc. 27-15). The

9

plaintiff contends his headlamps were lit, and she provides the declarations of two witnesses, Priscilla Ellston and William Vaughn, both of whom claim that "[t]he lights on the young man's car were on when I observed the police talking to him." (Doc. 33-8, ¶4; Doc. 33-9, ¶4).

Upon review of the plaintiff's declarations, the Court concludes that she fails to meet her summary judgment burden. The trouble is that Ms. Ellston and Mr. Vaughn only observed Mr. Brown's car after the traffic stop had been effected. When the police intiated the stop of the decedent, Ellston and Vaughn were inside their home on E. 113th Street. As such, neither Ms. Ellston nor her husband observed whether Mr. Brown's headlights were on when the police made the stop. As stated in their declarations, they observed the lights from a police car outside the window of their home, which drew them outside. They saw Mr. Brown's car, already stopped in front of their home, with its headlights illuminated. In the Court's view, a jury could not reasonably make the inference that Mr. Brown's headlamps were illuminated while he was traveling based simply on the observation that his headlamps were illuminated after his car had been stopped. While this *may* have been the case, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) (the plaintiff must present "more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). In this instance, the plaintiff has failed to bring forth evidence that would lead a reasonable jury

to conclude that Mr. Brown's headlamps were lit at the time of the stop and that the officers stopped Mr. Brown without probable cause.

### B. Excessive Force

The plaintiff's claims of excessive force are limited to two particular instances: whether Officer Chapman used excessive force (1) when he allegedly struck Mr. Brown with an elbow in the back of the neck; and (2) when he initially tased Mr. Brown in the chest.[1]  To support the claims against Officer Chapman, the plaintiff submits the declarations of Ms. Ellston and Mr. Vaughn, who state the following:

> 6. The officers told Mr. Brown to exit his car. Mr. Brown cooperated. He kept asking the officers what he had done.
>
> 7 The officers had Mr. Brown stand behind his car and told him to get on the car. As Mr. Brown was complying, [Officer Chapman] elbowed Mr. Brown in the back of the neck.
>
> 8. Mr. Brown pushed the officer off of him, ran across the street, and faced the officers.
>
> 9. Then [Officer Chapman] pointed his taser at Mr. Brown and tased him in the chest. I did not hear the officer give any warning to Mr. Brown before he was tased.

(Doc. 8).

While the defendants dispute these allegations, for the purposes of qualified immunity, the Court must accept the plaintiff's version of the facts as true.

---

[1]     As stated by the plaintiff, she "makes no claims that any of the Defendants' actions following Chapman's initial tasing of Mr. Brown constitute excessive force nor does the plaintiff make any excessive force claims against any other officer." (Doc. 33, p. 13).

11

To determine whether force is excessive, the Court considers whether the use of force was "objectively reasonable." Scott v. Harris, 550 U.S. 372, 381 (2007). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)). The test is fact specific, not mechanical, and the three most important factors for each case are: (1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempts to resist arrest or flee. Id.

Based on the plaintiff's version of the facts, a reasonable jury could find that Officer Chapman used excessive force when he elbowed Mr. Brown in the back of the neck. Although the officers allege that Mr. Brown exited the vehicle in "an aggressive and threatening manner," Mr. Brown, by the plaintiff's account, initially offered no resistance and he complied with the officer's order to submit to a pat down. Further, Mr. Brown did not present an immediate risk to officer safety, and the crimes of which he was suspected at that time were relatively minor. The officers had observed Mr. Brown operating a motor vehicle without headlights after dark; they suspected that he was intoxicated; and he had failed to produce identification when asked. Under these particular circumstances, a reasonable jury could find that an unprovoked blow to the back of the neck was excessive and unreasonable. As such, sufficient evidence exists to show that Mr. Brown's constitutional rights were violated.

12

Furthermore, it was clearly established at the time of the incident that Mr. Brown had the right to be free from such use of force. The Sixth Circuit has consistently held that the right to be free from physical force when one is not resisting the police is a clearly established right. See Shreve v. Jessamine Cty. Fiscal Court, 453 F.3d 681, 687 (6th Cir.2006) (holding that strikes to plaintiff's back and knee are unreasonable where plaintiff was already incapacitated, despite plaintiff's prior attempt to avoid detection by police). As such, Officer Chapman was on notice that such use of force was unconstitutional. Officer Chapman is accordingly not entitled to qualified immunity with respect to the blow allegedly administered to the back of Mr. Brown's neck.

Next comes the question whether Officer Chapman used excessive force when he first tased Mr. Brown in the chest. It is undisputed that Mr. Brown broke away from the officers and ran across the street after Officer Chapman allegedly struck him in the back of the neck. As the defendants see it, by taking this action, Mr. Brown was resisting arrest and committing a felony. Further, given Mr. Brown's aggressive posture on exiting his car, the officer's suspicion that Mr. Brown was intoxicated, and Brown's failure to produce identification, the defendants argue, it was reasonable under the circumstances for Officer Chapman to deploy his taser in order to effectuate Mr. Brown's arrest.

The plaintiff disagrees, arguing that Mr. Brown was not so much resisting as he was reacting to an allegedly unnecessary traffic stop and Officer Chapman's allegedly unconstitutional use of force. The plaintiff argues that after the decedent broke away from them, the officers should have employed other less intrusive means of resolving

13

the situation. As the plaintiff sees it, by deploying the taser aimed at Mr. Brown's chest, Officer Chapman was in effect using deadly force to effect Mr. Brown's arrest.

Having considered the facts and circumstances of this particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight, the Court concludes that it was not objectively unreasonable for Officer Chapman to make use of his taser in the way he did. In the Sixth Circuit, "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012).  While the facts leading up to the taser deployment are in question, it is undisputed that Mr. Brown broke away from the officers and ran across the street in the middle of his arrest. By taking this action, Mr. Brown resisted arrest. In addition, this resistance along with his aggressive posture, his refusal to provide identification, and the officers' suspicion that Mr. Brown was intoxicated reasonably support Officer Chapman's belief that the decedent posed a safety threat--a belief that, incidentally, turned out to be correct. This Court must give great weight to officer's on-the-spot judgment when events happen very quickly. Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992). In this instance, Officer Chapman did not act unreasonably when he tased a resisting suspect. See Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012) (resistance, including fleeing, marks the line between reasonable and unreasonable tasing).

14

The Court disagrees with the plaintiff's contention that Officer Chapman's initial use of the taser amounted to deadly and, therefore, excessive force under the circumstances. First of all, it appears that the first taser deployment had little, if any, effect on the decedent. According to the plaintiff's declarations, the decedent leaned forward, said "ow," and ran away. Further, while the plaintiff cites a number of cases which purportedly support the idea that use of taser may amount to deadly force, none of them stand for a per se rule that a chest shot with a taser automatically amounts to deadly force. And in any event, the cases cited by the plaintiff are inapposite. The plaintiff first relies on Landis v. Baker, 297 Fed. App'x 453, 464 (6th Cir. 2008), in which a panel of the Sixth Circuit held that use of force was objectively unreasonable where the defendant officer used "a taser in stun mode, in rapid succession on a suspect who [was] surrounded by officers, in a prone position in a muddy swamp, who [had] only one arm beneath him, and who [had] just been struck several times with a baton."

Landis is distinct from the present case. There, unlike here, officers continued to use force even though the plaintiff suspect had been already subdued. Moreover, the potential for foreseeable injury to the Landis plaintiff existed to a degree not present here. In Landis, the plaintiff was held underwater in a muddy swamp for up to fifteen seconds while officers repeatedly tased him. Here, Officer Chapman applied his taser once, to no apparent effect, while Mr. Brown stood on the street after having resisted officers attempts to arrest him.

The plaintiff also cites two opinions from the Southern District of Ohio to support the idea that use of a taser may amount to deadly force. The plaintiff first cites Baker v.

15

Union Township, 2013 WL 4502736 (S.D. Ohio August 22, 2013). In Baker, the court

denied summary judgment where officers tased a plaintiff who was standing at the top

of a stairwell, causing the plaintiff to fall down the steps and break his neck. In the

Court's view, Baker is inapposite. The officer's alleged use of force in that case was

found to be objectively unreasonable based on circumstances that are not present here:

that plaintiff was not fleeing at the time; he posed no safety threat; and he was

positioned at the top of a stairwell when the officer tased him.

The Court concludes that Peabody v. Perry Township, No. 2:10-cv-1078, 2013

WL 1327026 (S.D. Ohio March 29, 2013) is similarly inapposite. In that case, the court

determined that a jury question existed as to whether force was reasonable because the

defendant officer tased a fleeing suspect while the suspect was climbing over an eight

foot fence. Again, as with Landis and Baker, it was not merely the use of a taser that

raised the question of whether force was reasonable; instead, it was the use of a taser

in circumstances where the risk of serious bodily harm or death was substantial. In

Landis, it was where the plaintiff was submerged in a foot of water; In Baker, it was

standing at the top of a flight of stairs; and in Peabody, it was where the plaintiff was

scaling an eight foot fence. No such circumstance existed in the present case.

Finally, Mercado v. City of Orlando, a case from the Eleventh Circuit, is also

inapposite. There, a defendant police officer employed a "Sage Launcher"[2] in an

---

[2]     A "Sage Launcher," is "a 'less lethal' munition that fires a polyurethane
        baton that is 1.5 inches wide, travels approximately 240 feet per second,
        and delivers a force of 154 foot/pounds of energy-approximately the
        energy of a professionally-thrown baseball." Mercado v. City of Orlando,
        407 F.3d 1152, 1155 (11th Cir. 2005).

16

attempt to subdue a suicidal plaintiff. <u>Mercado v. City of Orlando</u>, 407 F.3d 1152, 1155 (11th Cir. 2005). The officer fired two rounds from six feet away, and one of them struck the plaintiff in the head, causing him serious, debilitating injury. A panel of the Eleventh Circuit concluded that the officer's actions violated the plaintiff's clearly established constitutional rights. Noting the existence of evidence that the officer intentionally shot the plaintiff in the head, the court concluded that the officer's use of the Sage Launcher amounted to deadly and excessive force. The court observed that at the time the plaintiff was not committing a crime, resisting arrest, or posing an immediate threat to the officers. <u>Mercado</u>, in addition to not being binding on this Court, is distinguishable from the present case on a number of counts, most noticeably with respect to the type of force used. Here it is a taser; there it was a Sage Launcher. The two are not equivilent. Moreover, in <u>Mercado</u>, unlike in the present case, the plaintiff neither resisted arrest nor posed a safety threat.

In sum, with respect to Officer Chapman's initial use of the taser, the plaintiff has failed to raise any material fact issues requiring submission to a jury. And the plaintiff has failed to demonstrate that the initial use of the taser was unreasonable under the circumstances. Therefore, summary judgment will be granted as to this claim.

*C. Failure to protect*

Next comes the question whether Officer Ilain is entitled to qualified immunity with respect to the plaintiff's claim that he failed to protect Mr. Brown from Officer Chapman's use of excessive force. First, with respect to Officer Chapman's use of the taser, Mr. Brown's failure to protect claim against Officer Ilain is not viable. As just

17

discussed, Officer Chapman is entitled to qualified immunity with respect to his use of the taser. As such, no claim lies against Officer Ilain with respect to Chapman's use of the taser.

The remaining question is whether Officer Ilain may be held liable for failing to protect the decedent, when Officer Chapman allegedly elbowed Mr. Brown in the back of the neck. It is well-settled that officers have a duty to protect a suspect from the excessive force of other officers. See Durham v. Nu'Man, 97 F.3d 862, 866-67 (6th Cir. 1996). Implicit in this proposition is that the officer actually had an opportunity to protect the suspect being subjected to excessive force. Based on the facts of the present case as they have been presented to the Court, it is not apparent that Officer Ilain would have had any opportunity to protect the decedent from the single blow allegedly delivered to the back of Mr. Brown's neck. Nevertheless, because the defendants have not sought summary judgment on this point, the Court will allow this claim to go forward against Officer Ilain.

### D. Deliberate Indifference to a Serious Medical Need[3]

---

[3]    The defendants argue that summary judgment is warranted on the deliberate indifference claim, because the plaintiff did not include this claim in either the initial complaint or the amended complaint. While the defendants are correct that the plaintiff did not assert a deliberate indifference claim in her pleadings, the Court disagrees that summary judgment is proper on this ground. Even though the plaintiff did not file a formal motion for leave to amend the complaint to include a deliberate indifference claim, the Court has the discretion to allow the plaintiff to proceed with the claim "when justice so requires." Fed.R.Civ.P. 15(a)(2). Here, the defendants, fully anticipating that the plaintiff was seeking relief on this ground despite the absence of a formal claim, filed a motion for summary judgment that included arguments as to why qualified immunity protected them from a deliberate indiffference claim. The defendants took

18

Next comes the question whether the defendant officers were deliberately indifferent to Mr. Brown's medical needs. "[D]eliberate indifference" to the serious medical needs of pretrial detainees normally constitutes a substantive due process violation. Estate of Owensby v. City of Cincinnati, 414 F.3d 596, 602 (6th Cir.2005). In support of her claim, the plaintiff indicates that Officer Melendez said "So, who gives a fuck?" when Mr. Brown complained twice that he could not breathe. The plaintiff further maintains that the defendants were deliberately indifferent after the decedent was placed in the back seat of the police car, when he again complained that he could not breathe, failed to respond to a light being shone in his eyes, failed to respond to officer's questions, and showed signs that he was unable to sit under his own power. On these basic facts, the plaintiff maintains that the defendants were aware of a substantial risk of serious harm to Mr. Brown and that the defendant's disregarded the risk.

### 1. The level of culpability required

The first issue for the Court to determine is the level of culpability required to establish a violation of the decedent's constitutional right to adequate medical care. The plaintiff maintains that the traditional deliberate indifference standard applies, while defendants argue for a heightened standard of malice with intent to harm. The

---

a second opportunity to address these arguments in their reply brief. Therefore, the defendants would not be prejudiced by allowing the deliberate indifference claim to proceed to trial. Further, given, as described below, that the plaintiff presents a potentially meritorious claim of deliberate indifference, the Court concludes that "justice so requires" that the Court allow the amendment. Therefore, the Court deems the complaint amended to include claims of deliberate indifference against the defendants.

deliberate indifference standard normally applies in cases, like this one, where a pretrial detainee is alleged to have been denied adequate medical care. See, e.g., Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004). However, depending on the circumstances, a heightened standard requiring malice and intent to harm may apply "when unforeseen circumstances demand an officer's instant judgment," such as in a "high speed vehicle chase." Ewolski v. City of Brunswick, 287 F.3d 492, 511 (6th Cir. 2002). When deciding whether the traditional standard or the heightened malice standard applies, the Court looks to "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." Id. at 510.

In the present case, the defendants argue for the heightened standard because the decedent's behavior so quickly transitioned from wildly aggressive resistance to a state of passivity. The defendants indicate EMS had already been summoned even while the decedent was resisting and that by the time the decedent was showing any sign of distress, officers had removed him from the car in order to provide easy access to medical personnel. The defendants state that after being removed from the police car, EMS arrived within a minute or two.

The deliberate indifference standard will be "sensibly employed only when actual deliberation is practical." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 851 (1998). For instance, the Sixth Circuit found application of the deliberate indifference standard proper when six minutes passed between the time the plaintiff was taken into custody and the time he was given medical care. Estate of Owensby v. City of Cincinnati, 414 F.3d 596, 603 (6th Cir. 2005). During that time, "the officers had time to do such things

as greet each other, prepare for the arrival of their superiors, pick up dropped items and straighten their uniforms; some officers even had time to observe and discuss the apparent severity of [the plaintiff's] injuries. Id. On the other hand, the Supreme Court has applied the actual malice standard where the event under scrutiny lasted only seventy-five seconds. Lewis, 523 U.S. at 845–46. In that case, officers observed the victim's motorcycle approaching at high speed, and they were forced to make an instantaneous decision to give chase. Id. at 853.

In the present case, it is undisputed that approximately fifteen minutes passed between the time Mr. Brown was taken into custody and the time that EMS arrived. The officers spent part of that time attempting to move the decedent, who was still resisting, into the patrol car. According to Officer Rusnak, Mr. Brown spent "several minutes" in the back of the police car, after EMS had already been summoned. (Doc. 25-8, p. 28). For a portion of his time in the car, Mr. Brown remained agitated, kicking at the seats and screaming. After a "few minutes," he stopped kicking and screaming, and he became quiet and subdued. However, Officer Rusnak monitored Mr. Brown's condition during that entire time.  Mr. Brown complained that he was having trouble breathing and Officer Merritt opened the windows of the car to give him air. Officer Rusnak opened the door of the car and asked Mr. Brown some questions, to which he received "gibberish" answers. Officer Rusnak then shone a light in Mr. Brown's eyes which produced no pupillary response. An unspecified amount of time passed, and Sgt. Sattler arrived, who observed the decedent "slumped" in the back seat. Sgt. Sattler ordered the officers to

21

remove the decedent from the car. They set Mr. Brown on the curb, where he remained for up to two minutes when EMS arrived.

In the Court's view, the situation here is not analogous to that described in Lewis, where officers were called upon to make an instantaneous decision. More like Owensby, the officers had the opportunity to focus their attention on Mr. Brown's condition for several minutes. The Court acknowledges that officers spent a portion of their time attempting to place Mr. Brown, who was still resisting, in the back seat of the police car. The Court further acknowledges that Mr. Brown's transition from a resisting suspect to a quiet and subdued one was fairly quick. However, after becoming quiet and subdued in the car, the officers had several minutes to deliberate on Mr. Brown's condition. Under these facts, the Court concludes that the traditional deliberate indifference standard applies.

*2. Whether there is sufficient evidence of deliberate indifference*

To prove the defendants were deliberately indifferent, the plaintiff must satisfy two requirements: one objective and one subjective. Comstock v. McCrary, 273 F. 3d 693, 702 (6th Cir. 2001). To satisfy the objective component, the plaintiff must establish the medical need was sufficiently serious. Id. at 702. To satisfy the subjective component, the plaintiff must show the officer to "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). As such, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the

existence of such needs, is essential to a finding of deliberate indifference." Horn by Parks v. Madison Cnty. Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994).

In the present case, the plaintiff has plainly satisfied the objective component, as she provides evidence that Mr. Brown was objectively suffering from a serious medical need. Mr. Brown died while in custody and the coroner concluded that his death occurred as a result of "cardiopulmonary arrest following physical exertion during law enforcement activity." (Doc. 25-19).

Next, the Court considers whether the plaintiff has provided sufficient evidence of the subjective component. The plaintiff begins by arguing that the decedent's initial breathing complaint put Officer Melendez on notice that there was a substantial risk of serious harm to Mr. Brown, and the plaintiff argues that Officer Melendez's response, "who gives a fuck?" establishes a disregard for that risk. The Court disagrees. Even though the decedent told Officer Melendez he could not breathe, the circumstances were such that Officer Melendez could not have reasonably inferred that the decedent was suffering from a serious medical condition at that time. It is undisputed that after his initial breathing complaint to Officer Melendez, Mr. Brown continued to actively resist the officer's efforts to restrain him up until they placed him in the back of the police car. Officer Melendez attempted to lean him over a nearby wheelchair ramp for a search, and the decedent attempted to kick the officer. (Doc. 25-5, p. 41). Officers Blaine and Rusnak then attempted to take control of the decedent, but he continued to resist. (Doc. 25-4, p. 25; Doc. 25-6, p. 13). They placed the still resisting decedent in the patrol car, where he was shouting and kicking at the door. (Doc. 25-7 at 15). Any risk of serious

harm to Mr. Brown, at least in relation to his ability to breathe, would not have been evident while the decedent was still shouting and actively resisting. Therefore, Officer Melendez's statement and his failure to provide medical care do not amount to an actionable offense under the circumstances.

The Court next addresses the plaintiff's claim that the defendants were deliberately indifferent to the decedent's serious medical needs *after* he was placed in the back of the police car. While it is a close question, having considered the evidence in a light most favorable to the plaintiff, the Court concludes that fact issues preclude summary judgment with respect to whether Officer Rusnak, Officer Merritt, and Sgt. Sattler were deliberately indifferent *after* Mr. Brown was placed in the cruiser. As described below, the plaintiff supplies evidence to show that these three defendants were aware that Mr. Brown was experiencing a serious medical condition at that time, and she provides evidence to show that these defendants failed to adequately respond to his condition.[4]

Officer Rusnak and Officer Merritt both testified to their belief that Mr. Brown was breathing normally up until the paramedics arrived. (Doc. 25-7, pp. 18-24). However, there is sufficient evidence on record for a reasonable jury to discredit this testimony

---

[4]     Although it is apparent that some of the other defendant officers were present while Mr. Brown was cuffed in the back of the car, the plaintiff fails to provide any evidence showing that any other officer, besides these three, were aware of Mr. Brown's condition after he had been placed in the back of the car. Therefore, summary judgment on the deliberate indifference claim will be granted as to Officers Michael Chapman, Belal Ilain, Erik Melendez, Pedro Vargas, David Skrletts, Kevin Kincaid, Mark Blaine, Dominik Pendelton, Gregory Jones, and Kevin Walker.

and conclude that Mr. Brown's condition had changed while cuffed in the back of the police car. A reasonable jury could further conclude that Officers Rusnak and Merritt, and Sgt. Sattler, being aware of Mr. Brown's changed condition, could have drawn the inference that a substantial risk of serious harm to Mr. Brown existed. First, Officer Rusnak testified that Mr. Brown had told him that was having trouble breathing while in the back of the police car. Officer Merritt testified that he was aware of Mr. Brown's breathing complaint. Both Rusnak and Merritt acknowledged that at some point while cuffed in the back of the police car, Mr. Brown became quiet and subdued, following a prolonged struggle and multiple taser applications. Although the officers claim that Mr. Brown never exhibited any signs that he was unable to breathe, the officers apparently found Mr. Brown's claim credible enough that Officer Merritt opened the windows of the cruiser in order to give him more air. Further, at some point Officer Rusnak opened the door of the police car, a fact by which a jury could reasonably infer Officer Rusnak's belief that Mr. Brown no longer presented a flight risk.

While Mr. Brown was in the back seat, Officer Rusnak asked him questions but he provided only "gibberish" responses. And while Mr. Brown was vocalizing incoherently in the back seat, he had become completely unresponsive: Rusnak shone a flashlight in the decedent's eyes which produced no pupillary response. Rusnak further testified that the decedent was not making eye contact or moving his head. Instead, the decedent was staring blankly into space. Sgt. Sattler testified that when he arrived he observed Mr. Brown "slumped over" and not responding, but, as he recalls, still breathing. He instructed the officers to remove the decedent from the car. (Doc. 25-

15, p. 14). According to Sgt. Sattler, Mr. Brown's condition did not improve when they removed him from the car.

The officers say that Mr. Brown remained seated on the curb until EMS arrived up to two minutes later. According to Officer Rusnak, Mr. Brown was kneeling on his own, staring at the sky. However, the testimony of the paramedics who treated Mr. Brown undermines this claim and further calls into question the defendants' version of events. Paramedics Fletcher, McGraw, and Barrett all testified that when they arrived, Mr. Brown was positioned on the ground leaning against an officer's leg. Paramedic Fletcher described Mr. Brown as "propped up." The paramedics placed Mr. Brown on a gurney, and they quickly determined that Mr. Brown was in cardiac arrest. This testimony is at odds with Rusnak's claim that up until the time paramedics arrived Mr. Brown was kneeling, under his own power, while staring up at the sky. While this difference in testimony may perhaps appear "miniscule," as the defendants claim, in the Court's view, it is important. Based on the paramedics' testimony, a reasonable jury could call into question the defendants' suggestion that Mr. Brown was breathing and sitting upright on his own up until the paramedics arrived.

Certainly, after considering all the evidence, a rational jury could find in the defendants' favor and conclude based on the defendants' testimony that Mr. Brown was not exhibiting signs by which the officers should have inferred the existence of a serious risk to Mr. Brown's health. And consistent with the officers' version of the events, a jury could find that Mr. Brown stopped breathing only when EMS arrived on the scene. However, the evidence in favor of this position is not so one-sided that the Court is left with no choice but to grant summary judgment. In particular, as noted above, both

Rusnak and Merritt knew of Mr. Brown's breathing complaint while in the back of the car, and they addressed his complaint by opening the windows to provide more air; the officers knew that Mr. Brown had become quiet and subdued and "lethargic"; Rusnak shone a light in Brown's eyes, which produced no response; Mr. Brown was not moving his head but was staring blankly into space, slumped over in the back of the car; and he was not responding to the defendants' questions. Officer Rusnak opened the car door without concern that Mr. Brown would attempt to escape, even though he was wildly resisting only minutes earlier. All this evidence viewed in the plaintiff's favor and considered in conjunction with the paramedics' testimony that Mr. Brown was "propped up" against an officer's leg when they arrived amount to "facts from which the inference could be drawn that a substantial risk of serious harm existed" when Mr. Brown was in the back of the police car.

Next is the question whether Officer Rusnak, Officer Merritt, and Sgt. Sattler disregarded the risk of serious harm to Mr. Brown. It is undisputed that Officer Rusnak summoned EMS soon after Mr. Brown was taken into custody. Merritt and Sattler were aware that EMS was on its way. Under Sixth Circuit case law, simply calling EMS may not have been enough. In Jones v. City of Cincinnati, 521 F.3d 555, 560 (6th Cir. 2008), defendant officers, who knew that their suspect had stopped breathing, were denied qualified immunity on a deliberate indifference claim even though they had summoned EMS. In the present case, Officer Rusnak, Officer Merritt, and Sgt. Sattler could likewise be held liable for showing a deliberate indifference to Mr. Brown's serious medical condition, if a jury were convinced that these defendants were aware of the existence of a substantial risk of serious harm to Mr. Brown.

27

The decedent had a clearly established right to adequate medical care at the time of the incident. See id. ("The right of a suspect in custody to receive adequate medical care, even if the suspect had been fleeing and resisting before the officers placed him in custody, was clearly established" as of December 31, 2010). Therefore, qualified immunity will be denied with respect to the claim of deliberate indifference against Officer Rusnak, Officer Merritt, and Sgt. Sattler.

*E. Whether Cleveland may be held liable for the plaintiff's claims of excessive force and deliberate indifference.*

Next comes the question whether the City of Cleveland may be held liable for the plaintiff's constitutional claims. A municipality is liable for a plaintiff's constitutional injury when the municipality's custom or policy caused the injury. Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690-91 (1978).

As described above, Mr Brown's constitutional rights were not violated when Officer Chapman intially deployed his taser. As such, there is nothing for which the City of Cleveland can be held liable in this respect. This leaves the issues of Cleveland's liability with respect to the blow delivered by Chapman to the back of Mr. Brown's neck and with respect to the claims of deliberate indifference against Officer Rusnak, Officer Merritt, and Sgt. Sattler. The plaintiff argues that under a theory of ratification, Cleveland is liable for these alleged injuries. A municipality ratifies – and therefore "causes"– the unconstitutional acts of its employees, when it fails to meaningfully investigate and punish allegations of unconstitutional conduct. See Leach v. Shelby County Sheriff, 891 F.2d 1241 (6th Cir.1990); Marchese v. Lucas, 758 F.2d 181 (6th Cir.1985). To prove liability by ratification, the plaintiffs must show that "(1) a final municipal policymaker

28

approved an investigation . . . (2) . . . so inadequate as to constitute a ratification of the[ ] alleged" constitutional violation. Wright v. City of Canton, Ohio, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001).

In the present case, the plaintiff indicates that the officers were not disciplined for their actions, and the plaintiff argues that Cleveland's investigation of the incident was inadequate because Cleveland failed to "discover the eyewitness testimony that contradicts the Defendants' version of events." According to the plaintiff, "[i]f the investigation had been designed to find out what actually happened, surely this information would have been discovered." Cleveland does not challenge this argument. In the Court's view, the plaintiff has supplied sufficient evidence for trial on the question of Cleveland's liability. Therefore, the Court will deny summary judgment on the claim that Cleveland is liable for the decedent's injury resulting from Officer Chapman having struck him in the back of the neck. Summary judgment is likewise denied with respect to the claim that Cleveland is liable for the plaintiff's claim of deliberate indifference to a serious medical condition. Summary judgment will be otherwise granted with respect to the plaintiff's constitutional claims against the City of Cleveland.

*F. State Law Claims*

Finally, the Court addresses whether the individual defendants are statutorily immune from the plaintiff's state law claims of wrongful death and assault and battery pursuant to R.C. 2744.03 . Under Ohio law it is presumed that a municipal employee is immune from liability. Cook v. Cincinnati, 103 Ohio App. 3d 80, 90, 658 N.E.2d 814, 821 (1995). However, a plaintiff can rebut that presumption by showing that any of the following exceptions apply:

29

>(a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

R.C. § 2744(A)(6). In this instance, the plaintiffs argue that the second exception applies, because the defendants acted "in a wanton or reckless manner." In Ohio, wanton or reckless conduct is "perversely disregarding a known risk, or acting or intentionally failing to act in contravention of a duty, knowing or having reason to know of facts which would lead a reasonable person to realize such conduct creates an unreasonable risk of harm substantially greater than the risk necessary to make the conduct negligent." Chesher v. Neyer, 477 F.3d 784, 797 (6th Cir.2007).

In the Court's view, the plaintiff has rebutted the presumption that Officer Chapman, Officer Rusnak, Officer Merritt, and Sgt. Sattler are entitled to statutory immunity, but she has failed to do so with respect to the remaining officers. There is evidence to show that Officer Chapman delivered a blow to the back of Mr. Brown's neck with little or no provocation. Further, there is evidence to show that Officer Rusnak, Officer Merritt, and Sgt. Sattler failed to act in spite of knowledge of the existence of a substantial risk of serious harm to Mr. Brown after he had been placed in the back of the police car. In the Court's view, a reasonable jury could conclude that these acts were committed in a wanton or reckless manner. As such, the plaintiff may proceed with her state law claims against Officer Chapman, Officer Rusnak, Officer Chapman, and Sgt. Sattler.

**IV.**

For the reasons stated above, the defendants' motion for summary judgment is denied in part and granted in part. The motion is denied with respect to the plaintiff's claim that Officer Chapman used excessive force when he elbowed Mr. Brown in the back of the neck; denied with respect to the plaintiff's claim that Officer Ilain failed to protect the decedent from Officer Chapman's use of excessive force; denied with respect to the deliberate indifference claims against Officer Rusnak and Officer Merritt and Sgt. Sattler; denied as to Cleveland's liability on the excessive force claim and the deliberate indifference claim; denied with respect to the state law claims against Officer Chapman, Officer Rusnak, Officer Merritt, and Sgt. Sattler. The motion is otherwise granted.


IT IS SO ORDERED.

                                        /s/ Lesley Wells
                                        UNITED STATES DISTRICT JUDGE

Date: 13 January 2015

31