IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHIRLEY BROWN | ) | CASE NO. 1:11-CV-1370 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| v. | ) | **DEFENDANTS' TRIAL BRIEF** |
| | ) | |
| MICHAEL CHAPMAN, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Defendants Michael Chapman, Belal Ilain, Erik Melendez, Richard Rusnak, James Merritt, John Sattler, and the City of Cleveland file their trial brief in compliance with the Court's Civil Trial order.

## I.    STATEMENT OF FACTS

On December 31, 2010 at approximately 8:45 PM EST Officers Michael Chapman and Belal Ilain initiated a lawful traffic stop of a vehicle travelling at night without its headlights on at East 113th Street and Benham Avenue in Cleveland.  Officers Chapman and Ilain initiated lights-and-sirens and stopped the vehicle.  Officers Chapman and Ilain approached the vehicle and asked the driver, Decedent, for his license and registration. Decedent replied to Officer Chapman's request that he produce his license and registration by asking "Do you know who I am?"  Decedent failed to produce identification despite repeated requests from the Officers over a period of a few minutes – more than enough time to produce a driver's license.  Decedent, in addition to driving at night without his headlights turned on and failing to produce his license and registration, exhibited behavior that lead Officers Chapman and Ilain to suspect that Decedent was driving under the influence of alcohol and/or other drugs.

Following Decedent's failure to produce a valid driver's license or other form of identification as well as Decedent's behavior that lead Officers Chapman and Ilain to believe Decedent was operating a motor vehicle while under the influence, Officer Chapman ordered Decedent out of the vehicle and informed Decedent he was under arrest.  Decedent exited his vehicle in an aggressive and threatening manner.  Officers Chapman and Ilain instruct Decedent around to the hood of the car and order him to place his hands against the car to allow the officers to search him for both contraband and officer safety. After patting down Decedent, Officer Chapman and Officer Ilain attempted to put Decedent in handcuffs.  Decedent began physically resisting the officers first by throwing his arms up to thrown the Officers off of him.

After Decedent pulled away from the Officers, Officer Chapman drew his taser and pointed it at Decedent commanding Decedent to get on the ground while officer Ilain also instructed Decedent and warned him he would be tased.  Instead of complying with Officer Chapman's command Decedent took two aggressive steps toward Officer Chapman and Officer Chapman fired his taser in probe mode.  Not only did the taser have no effect on Decedent, but Decedent began to flee Officers Chapman and Ilain, running away from them down Benham Avenue.  One of the Officers radioed dispatch asking for backup due to a resisting and fleeing male suspect, which was dispatched by radio operators at approximately 8:48:20 PM.  As Decedent is fleeing the Officers, Officer Ilain fires his taser at Decedent in probe mode, but the taser again has no effect.

Decedent then led Officers Chapman and Ilain on a chase down Benahm Avenue and East 114th Street.  During the chase, Officer Chapman saw Decent reaching into his pants or his pocket, and the Officers were concerned Decedent would produce a weapon.  Officer Ilain

2

finally caught Decedent in front of a house on East 114th and Office Chapman immediately enters into the fray.

During the fracas Officers Chapman and Ilain both used their tasers in drive stun mode in order to induce pain compliance by the Decedent.  The tasers had no effect.  In fact in his continued resistance, Decedent was able to swat the tasers away.  Decedent also hit Officer Ilain on the head with an object that was later learned to be a knife.  Decedent's unlawful resistance had devolved into an all-out brawl with Decedent punching and kicking the Officers as they simply try to gain control of the powerful criminal.  Decedent grabbed Officer Chapman's arm and twisted his wrist.  Decedent then hit Officer Ilain with the flat side of his knife.  This threat to the Officers' lives caused Officer Chapman to draw his service weapon and put it in Decedent's back in the hopes Decedent would stop resisting.  Before Officer Chapman was forced to fire his weapon, Officer Ilain is able to get the knife away from Decedent and throw it away from their scuffle and out of Decedent's reach; Officer Ilain then told Officer Chapman to holster his service weapon.  Officer Ilain believed that, although Decedent was still very much a threat and could have another weapon on him, at that time the two Officers had him in a good enough position that deadly force was not necessary.

While Officers Chapman and Ilain had managed to get the knife away from Decedent, Decedent was not yet cuffed and was still resisting the Officers.  Officer Ilain was concerned, after the drive stun applications to Decedent showed no effect, that Decedent would get ahold of Officer Ilain's taser and use it against either himself or Officer Chapman, causing Ilain threw his taser out of Decedent's reach.  As the struggle continued to a stalemate, Decedent began to shout at people in the distance to "go get my people," which led Officers Chapman and Ilain to observe

a crowd gathering, however the crowd did not advance once it appeared Decedent was fighting police officers.

The violent fracas, both started and perpetuated by Decedent, continued as Officers Chapman and Ilain struggled against both Decedent's continued blows and their own fatigue from exertion during the extended physical altercation. Eventually backup Officers began to arrive as Decedent continued to struggle and fight with Officers Ilain and Chapman. Officer Vargas, who along with Officer Melendez was in the first backup car to arrive, pointed his taser at Decedent but Officer Ilain told Officer Vargas the taser had no effect on Decedent and not to use his taser.  As Officers Vargas and Melendez continued to try to arrest the still resisting Decedent and Officers Merritt and Rusnak arrived and assisted with the still resisting Decedent, Officers Chapman and Ilain, exhausted, disengaged from Decedent.

Officer Melendez attempted to pull Decedent's arm behind his back in order to handcuff the still resisting suspect.  Officer Vargas was also struggling with the resisting suspect in order to attempt to handcuff him.  Other officers were still arriving on scene and attempting to get the resisting suspect into custody.

Officer Mark Blaine arrived and saw officers struggling with the suspect and immediately ran to the fray and joined the attempt to effectuate an arrest.  The officers were still trying to get the Decedent's hands behind his back, but he was ignoring the officers' commands and attempts to pull his hands from under his body.  Officer Blaine attempted to hold the suspect down as the suspect in addition to refusing to give up his arms for handcuffing, was trying to get up as he continued in his active resistance of a number of officers.

Officer David Skrletts arrived and saw the continued struggle between the Decedent and a number of officers.  Officer Skrletts observed Decedent's legs were free and he was trying to

get up and was kicking at the officers who were attempting to effectuate an arrest.  Officer Skrletts then applied weight to Decedentøs legs and crossed them using a tactic in an attempt to get Decedent to comply with the officers attempting to handcuff him.  After Decedent was handcuffed Officer Skrletts disengaged and had no further contact with Decedent.

Once the Officers were able to handcuff Decedent with Officer Rusnakøs handcuffs they rolled him over and sat him up, with Decedent still resisting the Officers even after being handcuffed, now by kicking his legs.  Officers then stood Decedent up and Decedent said he could not breathe.  Decedentøs actions belied his claim, as he continued to struggle and resist Officers after claiming he could not breathe.  Officer Melendez walked Decedent over to a wheelchair ramp in the front of the home on East 114th Street outside of which the struggle with Decedent occurred.  Officer Melendez wanted to search Decedentøs person before putting him a zone car, a search police had not been able to accomplish to this point due to Decedentøs flight and continued violent resisting.  Before Officer Melendez could search Decedent, despite his alleged inability to breathe Decedent mustered the strength to forcefully kick backwards and strike Officer Melendez in the groin.  Officer Melendez then disengaged from Decedent.

Officer Blaine braced Decedent against the ramp and searched him for weapons, as Decedent still continued to resist Officers.  Immediately after Officer Rusnak helped to get Decedent handcuffed, Rusnak learned Decedent had been tased during his flight and resistance and immediately called for EMS and a supervisor.  Officer Rusnak called, not because Decedent was showing any signs of physical distress ó Decedent was in fact still violently resisting ó but because Cleveland Police Policy requires a call for a supervisor and EMS for any subject who is tased and Officer Rusnak had concern about Officer Chapman and Officer Ilain after their prolonged struggle with Decedent.

After Officer Blaine found no weapons on Decedent, Officers moved the still resisting Decedent into a zone car.  It again took a number of officers to move Decedent from the wheelchair ramp to the zone car as Decedent continued to resist by alternatively attempting to kick and jerk his body around while snarling and growling while other times going limp as dead weight forcing the officers to essentially carry him, a rather large man, to the zone car.

Once Officers brought the resisting Decedent to the zone car, he continued to violently fight getting into the vehicle.  Multiple Officers has to get the resisting Decedent into the back of the zone car.  Once in the car, he continues to kick at the seats and windows, head butt the seats and windows, and scream.  Officers told him to calm down and wait for EMS.  Eventually Decedent became quiet and subdued.  Shortly thereafter, as EMS sirens were heard approaching, Officers took the now calm Decedent out of the car and sat him on the curb in order to give EMS quicker and easier access to the Decedent.

Once EMS arrived on scene, police involvement essentially ended, with the exception of the most basic forms of assistance to EMS as well as escorting the ambulance.  Paramedics Anthony McGhaw, Sergio Fletcher, and Mark Barrett arrived and began assisting Decedent.

While EMS received the call reporting a male tasered, even though the call as reported was not considered life threatening EMS treats all calls as emergency runs.  EMS travelled as quickly as possible to the East 114th location.  EMS administered emergency medical treatment as quickly as possible and could not have expedited medical intervention for Decedent beyond what they actually did do.

Upon EMS arrival, Paramedics believed Decedent exhibited symptoms of being high on õWET,ö a PCP type drug.  Decedent had either a faint pulse or no pulse.  Paramedics administered life saving measures.  While the exact moment is in question, sometime between

when Decedent was brought out of the zone car and before he arrived at the hospital Decedent passed away.

## II.    APPLICABLE LAW

### A.  Officer Chapman's use of force was reasonable.

As a preliminary matter the majority of the force used by Cleveland Police, specifically everything following the initial taser deployment by Officer Chapman, is not at issue in this case as Plaintiff has agreed that force was reasonable.  The two uses of force in question at trial are 1) the alleged elbow to the back of Brown's head while Chapman was attempting to arrest Brown outside of Brown's vehicle and 2) Chapman's initial attempt to taser Brown in the chest in probe mode.  Plaintiff has claimed Officer Ilain is liable for failure to intervene in these instances.

When assessing an excessive force claim the court must consider "whether the officers' actions are —objectively reasonable∅ in light of the facts and circumstances confronting them, without regard to their underlying motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). While a number of factors go into the analysis, such as "the severity of the crime at issue [and] whether the suspect poses an immediate threat to the safety of the officer or others," *Id* at 396, "the ultimate question is whether the totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006).  The standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

The Supreme Court has instructed that the "calculus of reasonableness must embody allowance for the fact that police officers are forced to make split-second judgments –  in

circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham, supra* at 396-397.

Law enforcement officers are permitted to use the amount of force that is reasonably necessary to affect an arrest. The Sixth Circuit has confirmed that "an officer making an arrest has ¬the right to use some degree of physical coercion or threat to affect it." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007), quoting *Graham*, 409 U.S. at 395-396. *Fox* held an officer did not use excessive force even when his takedown maneuver to gain control of an uncooperative suspect resulted in a facial cut and bruising. *Fox*, 489 F.3d at 236-237.

Regarding the alleged elbow, both Officer Chapman and Officer Ilain deny that Chapman struck Brown prior to Brown breaking free from the Officers' attempt to effectuate a lawful arrest.

As to Chapman's initial use of his taser in probe mode, Chapman's use of force was objectively reasonable. Officer Chapman pointed his taser at Decedent, ordered Decedent who had already resisted arrest to the ground, and upon Decedent's non-compliance and continued advance on Officer Chapman, Officer Chapman justifiably fired his taser in probe mode at Decedent. The taser had no effect. An Officer is justified in tasing a suspect resisting arrest. *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505 at 509 (6th Cir. 2012) citing *Williams v. Sandel,* 433 Fed.Appx. 353 (6th Cir. 2011); *Caie v. W. Bloomfield Twp.,* 485Fed.Appx. 92 (6th Cir. 2012); and *Williams v. Ingham,* 373 Fed.Appx. 542, 548 (6th Cir. 2010).

The Sixth Circuit, in *Williams v. Sandel*, held that a tasering a suspect thirty-seven times, while also subjecting him to baton strikes and pepper spray, while suspect resisted arrest did not violate suspect's constitutional rights. *Williams v. Sandel,* at 362-63. In *Caie v. W. Bloomfield Twp.* the Sixth Circuit held the use of a taser on a suspect resisting arrest by laying on his hands

8

to prevent handcuffing did not violate the arrestee's right.  *Caie* at 95-97.  After the single use of a taser in drive stun mode, the Plaintiff in *Caie* complied with the officers and allowed himself to be handcuffed.  *Id* at 94-95.  In this case, Decedent continued to resist despite multiple tasings.  *Caie* explained that the standard to apply to an excessive force inquiry is whether the force is "objectively reasonable" in light of the facts.  *Id* at 95-96 citing citing *Scott v. United States,* 436 U.S. 128 at 137-39, (1978); *Terry v. Ohio,* 392 U.S. 1, at 21 (1968) .  In this matter the continued resistance of Decedent rendered all force used by the Officers, all non-lethal force, "objectively reasonable."

In *Hagans* the decedent suspect was tased 4-6 times in drive stun mode and once in probe mode while resisting arrest.  *Hagans* at 507.  The repeated taserings had no effect and the decedent suspect was subdued by three officers and handcuffed.  *Id* .  Medical personnel arrived and shortly thereafter the decedent lost consciousness and never regained it dying three days later.  *Id.*  The Sixth Circuit reversed the District Court and found the use of a taser on the decedent suspect objectively reasonable because the suspect was actively resisting.  *Id* t 509-511.  In terms of force, *Hagans* is most similar to this case.  In this matter Decedent was tasered repeatedly because he resisted arrest and continued to resist.  After the taserings were ineffective Decedent was eventually subdued by multiple Officers.  In this matter, as in *Hagans*, the force used was objectively reasonable.

**B.  The initial stop of Brown's vehicle was lawful.**

Rodney Brown was driving with his headlights off at night when Officers Chapman and Ilain initiated their traffic stop on the vehicle he was driving.[1]  Officer Chapman, along with Officer Ilain, made the initial lawful traffic stop of Decedent's vehicle that began this

---

[1] Brown's driver's license was also suspended.  He was driving the vehicle illegally.

unfortunate encounter.  It is undisputed in the record that Decedent was travelling after dark without his headlights on, giving probable cause for Officers Chapman and Ilain to make the traffic stop.[2]  See Ohio Revised Code § 4513.03(A)(1); Cleveland Codified Ordinance 437.02(a)(1).  Decedent did in fact initially comply with the Officers lights-and-sirens stop and pulled his car to the side of the road.  Defendant Officers admit that they chose to stop the vehicle also because it was coming from an area where gun shots had been reported and they wanted to check the sobriety of the driver; however as a matter of law any probable cause to stop a vehicle renders the stop lawful.  *U.S. v. Burton*, 334 F.3d 514 at 516 (6th Cir. 2003) citing *Whren v. United States*, 517 U.S. 806 at 812-13 (1996).  As Brown was driving after dark without his headlights on, the stop of Brown was lawful.

### C.  The initial attempt to arrest Brown was lawful.

After interacting with Brown at his vehicle, Officers Chapman and Ilain decided to arrest Rodney Brown.  Upon speaking to the Decedent, he repeatedly refused to produce a valid driver's license or otherwise identify himself.  Decedent's failure gave Officers Chapman and Ilain probable cause to arrest Decedent.  See Ohio Revised Code § 4507.35; see also *United States v. Smith*, Case No.: 1:06CR00565, 2007 WL 2046806 (N.D. Ohio July 12, 2007) at p. 5: õAs such, the defendant was in prima-facie violation of O.R.C. § 4507.35, requiring the operator's license be on or about the driver's person, producible upon the request of a police officer. As the Sixth Circuit has recently observed, that prima-facie violation of O.R.C. § 4507.35 furnished the officers with probable cause to effect Mr. Thompson's arrest upon the

---

[2] While the Sixth Circuit surprisingly held that the fact two witness claimed they saw Brown's lights on *after* the traffic stop combined with Chapman's testimony that he never ordered Brown to turn his headlights on constituted enough circumstantial evidence to overcome summary judgment, the reality of the record is that no fact witness can dispute Chapman's and Ilain's testimony that Brown was initially driving with head headlights off after dark.

belief that he was committing a misdemeanor offense. *See United States v. Campbell,* 486 F.3d 949 (6th Cir.2007). In addition, Mr. Thompson's prima-facie violation provided a separate legal ground upon which to rest the defendant's continued detention during the investigative stop." Additionally, both Officer Chapman and Officer Ilain believed Decedent exhibited signs of being under the influence of drugs or alcohol while driving the automobile, also creating probable cause to investigate further and arrest Decedent. *State v. Jones*, Case No.: No. 2001-A-0041, 2002 -Ohio- 6569 at ¶ 19 (Ohio App. 11 Dist. 2002) citing *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142.  As a result, Officers ordered Decedent out of his vehicle in order to place him under arrest.

### D.  Melendez was not deliberately indifferent to Brown's medical needs.

Plaintiff alleges that Officer Erik Melendez was deliberately indifferent to Brown's serious medical needs when he said "Who gives a fuck?" in response to Brown stating he could not breathe while simultaneously fighting off many Cleveland police officers who were trying to effectuate a lawful arrest.  A denial of access to medical care is analyzed under one of two standards depending on the circumstances surrounding the alleged denial.  "In general, the level of culpability required to support section 1983 liability depends upon the circumstances of each case. The determining factor is –whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Owensby v. City of Cincinnati*, 414 F.3d 596, 602 (6th Cir. 2005) quoting *Ewolski v. City of Brunswick,* 287 F.3d 492, 510 (6th Cir.2002) (citation and internal quotation marks omitted).

The deliberate indifference standard is normally applied where a pretrial detainee has been denied access to medical care.  *Owesnby* at 602 citing *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir.2004).  In order to show deliberate indifference, Plaintiff must show

the officer 1) knew of the substantial risk of serious harm to the pretrial detainee and 2) disregarded that risk. *Owensby* at 603 quoting *Watkins v. City of Battle Creek,* 273 F.3d 682, 686 (6th Cir.2001).

Defendant Officer Melendez argues that the standard that should apply to a denial of access to medical care against him is he heightened standard requiring malice and intent to harm. However, Officer Melendez also argues that regardless of the standard applied as a matter of law he cannot be held liable for denial of access to medical care.

The heightened standard applies õøwhen unforeseen circumstances demand an officer's instant judgment,ø such as in a ̶high speed vehicle chase.ö  *Owensby* at 603 quoting *Ewolski,* 287 F.3d at 511.  The unforeseen circumstances in this matter are the violent and continued acts of resistance by the Decedent.

Decedent resisted handcuffing; once handcuffed he continued to kick at officers.  Officer Melendez replied õWho gives a fuck?ö to Decedentøs complaint that he could not breathe as he moved the handcuffed Decedent over against the wheelchair ramp to brace him and allow for a pat down for weapons.  Before Officer Melendez was able to pat the victim down, the victim kicked backwards striking Officer Melendez in the groin.  Officer Melendez disengaged.

The actions of the Decedent showed he could breathe.  A person who cannot breathe is unable to violently struggle and hurt a large number of police officers for an extended period of time.  People who cannot breathe pass out and die.  However, he was violently struggling for the entire time, even after he was put into the back of a zone car.  The Paramedics testified that they could and would not have done anything differently in terms of getting to the Decedent.

12

The record shows Officer Melendez never denied Decedent access to medical care or had, considering the totality of the circumstances, reason to believe Decedent was at substantial risk of serious harm.

### E. Meritt, Rusnak, and Sattler were not indifferent to Brown's medical needs.

Despite a failure to plead the claim, Judge Wells held Plaintiff has a claim against Officers James Meritt and Richard Rusnak and Sergeant Sattler of deliberate indifference to a serious medical need that should be heard by a jury. As noted above, a denial of access to medical care is analyzed under one of two standards depending on the circumstances surrounding the alleged denial. "In general, the level of culpability required to support section 1983 liability depends upon the circumstances of each case. The determining factor is –whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Owensby v. City of Cincinnati*, 414 F.3d 596, 602 (6th Cir. 2005) quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir.2002) (citation and internal quotation marks omitted).

The deliberate indifference standard is normally applied where a pretrial detainee has been denied access to medical care. *Owesnby* at 602 citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir.2004). In order to show deliberate indifference, Plaintiff must show the officer 1) knew of the substantial risk of serious harm to the pretrial detainee and 2) disregarded that risk. *Owensby* at 603 quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir.2001).

EMS was called to the scene while Brown was still aggressive and agitated in the back seat of the zone car. Only after EMS was already in route to Brown did Brown begin to show signs of potential distress. When Brown did show potential distress, these Defendants tried to

aid Brown by 1) engaging Brown by questioning him, 2) checking for pupil dilation, 3) opening the windows in order to get Brown more air, 4) removing Brown from the zone car as EMS approached in order to give the trained medical personnel easier access to Brown so he could be treated, and 5) removing Brown's handcuffs again in order to allow the trained medical personnel to treat Brown. While these efforts did not ultimately save Brown's life these Defendants, none of whom are trained medical professionals, performed to the best of their abilities in try to help out Rodney Brown. They were not indifferent, deliberately or accidentally, to Brown's medical needs.

**F. The Defendants are protected by qualified immunity.**

In evaluating whether an officer's conduct is reasonable, the court must pay "careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. at 399. Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from suit unless the plaintiff shows the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The central purpose of affording public officials qualified immunity from suit is to protect them ―from undue interference with their duties and from potentially disabling threats of liability." *Id.* 457 U.S. at 806.

Qualified immunity operates in excessive-force cases "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier, supra* 534 U.S. at 207 (*quoting Priester v. Riviera Beach,* 208 F.3d 919, 926-927 (11th Cir. 2000)). The evidence establishes that all Defendants at all times acted reasonably and at no time violated and right of or duty owed to Rodney Brown.

14

When a police officer invokes qualified immunity, the Sixth Circuit has repeatedly stressed that the ultimate burden of proof is on the plaintiff to show that an officer is not entitled to qualified immunity. *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991); *Scott v. Clay County*, 205 F.3d 867, 874 n. 9 (6th Cir. 2000); See also *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004); *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992); *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999).  Plaintiff cannot meet his requisite evidentiary burden and the evidence placed before the Court at trial will well establish the Defendants are well deserving of the protections of qualified immunity.

**G.  The Defendants are protected by immunity under Ohio law.**

The individual Defendants are also immune from all state law claims under Ohio Revised Code Chapter 2744.  Ohio Revised Code Chapter 2744 specifically grants immunity to employees of political subdivisions for negligence claims arising out of the course and scope of the person's employment with the political subdivision. *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 357.  Specifically, R.C. § 2744.03(A)(6) provides that an employee of a political subdivision is immune from liability unless one of the following exceptions applies:

> i.   The employee's acts or omissions were manifestly outside the scope of his employment;
>
> ii.  The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or
>
> iii. Civil liability is expressly imposed by a section of the Revised Code.

Ohio Rev. Code § 2744.03(A)(6)(a)-(c).

At all times the individual Defendants were acting within the scope of their employment and none of their actions or omissions õwere with malicious purpose, in bad faith, or in a wanton or reckless mannerö as a review of the facts regarding each individual Defendant will show.  In this case, none of the alleged actions or omissions by any individual Defendant violated any rights of or duties owed to Decedent.

**H.  The City of Cleveland is not liable.**

While a municipality is subject to suit under § 1983, *Monell v. Department of Social Services of New York City,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality does not incur § 1983 liability based solely on the unconstitutional acts of its employees. That is, a municipality cannot be held liable on a theory of respondeat superior.  *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell,* 436 U.S. at 694õ695, 98 S.Ct. 2018.   Rather, a plaintiff must show that the municipality's own policies or customs proximately caused the constitutional violation: õ[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.ö  *Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

A government entity incurs liability under § 1983 only when its failure to train served as the õmoving forceö behind an underlying constitutional violation. *Id.* at 658, 98 S.Ct. 2018; *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197 (stating that failure to train would not lead to municipal liability unless the plaintiff could prove that õdeficiency in training actually caused the police officers' indifference to her medical needsö). Furthermore a plaintiff must show that the municipality's failure to train its officers amounts to deliberate indifference to the rights of persons with whom the police came into contact. *Berry v. City of Detroit,* 25 F.3d 1342, 1345

(6th Cir.1994) (citing *City of Canton,* 489 U.S. at 388-689, 109 S.Ct. 1197). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton,* 489 U.S. at 390-691, 109 S.Ct. 1197.

In the context of alleged failure to provide medical care, the plaintiff must show that the municipality engaged in a custom or practice of deliberate indifference to a detainee's medical needs. *See Miller v. Calhoun County,* 408 F.3d 803, 815 (6th Cir.2005). This "typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Id.* (holding that a plaintiff who "failed to make the threshold showing of a clear and persistent pattern of mistreatment of detainees" could not establish a custom or policy of deliberate indifference).

As with the failure to train claim, Plaintiff presents almost no evidence that the City engages in a custom of deliberate indifference toward detainees' medical needs. Plaintiff also lacks evidence of police practice or an expert witness to address the City's alleged failure to train in this regard. Furthermore, there is no proof that the City was aware of any prior acts or pattern of mistreatment of detainees; the record contains no evidence that the City of Cleveland had knowledge of prior occasions where officers failed to properly respond to a detainee's medical needs. A single incident possibly amounting to a violation of a detainee's rights does not amount to a pattern of mistreatment. Nor does it evince acquiescence or implicit support of such behavior on the part of the City of Cleveland. Because the Plaintiff does not

17

come forward with sufficient evidence of a policy or custom of constitutional violation, Plaintiff

lacks sufficient evidence to make out a *Monell* claim.

### III.    WITNESS LIST

In addition to the anticipated cross examination of all witnesses called to testify for

Plaintiff's case in chief, Defendants reserve the right to call the following witnesses:

Michael Chapman – Defendant and eyewitness to the events in question in this litigation.

Belal Ilain – Defendant and eyewitness to the events in question in this litigation.

Erik Melendez – Defendant and eyewitness to the events in question in this litigation.

Richard Rusnak – Defendant and eyewitness to the events in question in this litigation.

James Merritt – Defendant and eyewitness to the events in question in this litigation.

John Sattler – Defendant and eyewitness to the events in question in this litigation.

Mark Blaine – Dismissed Defendant and eyewitness to the events in question in this litigation.

Dominic Pendleton – Dismissed Defendant and eyewitness to the events in question in this

litigation.

Pedro Vargas – Dismissed Defendant and eyewitness to the events in question in this litigation.

Kevin Kinkaid – Dismissed Defendant and eyewitness to the events in question in this litigation.

David Skrletts – Dismissed Defendant and eyewitness to the events in question in this litigation.

David Medina – Cleveland Police Department taser training officer.

Anthony McGhaw – Cleveland EMT responded to the scene.

Mark Barrett – Cleveland EMT responded to the scene.

Sergio Fletcher – Cleveland EMT responded to the events on the scene.

Dr. Joseph Felo – Cuyahoga County Medical Examiner's Office employee involved in the autopsy of Rodney Brown and able to testify about the reports from the Medical Examiner's Office.

Defendants reserve the right to recall any witness called in Plaintiff's case-in-chief.

## IV.     PROPOSED EXHIBITS

Defendants reserve the right to place the following exhibits into evidence:

A:  "Schrade" folding knife with 3.5 inch blade used by Rodney Brown and recovered at the scene.

B:  Overhead photograph showing the location of the initial stop and the arrest.

C:  Coroner's Report.

D:  Trace Evidence Report.

E:  Toxicology Report.

F:  News Channel 5 Video showing Shirley Brown discussing her son.

G:  Rodney Brown's Croft & Barrow jacket.

H:  Rodney Brown's Anabil long sleeve shirt.

I:  Rodney Brown's Rahman t-shirt.

J:  Rodney Brown's Hanes tank top.

K:  Rodney Brown's Bklyn Express blue jeans.

L:  Rodney Brown's black belt.

M:  Rodney Brown's Merona shorts, blue with white trim.

N:  Rodney Brown's socks (3).

O:  Rodney Brown's shoes.

P:  Keys recovered from Rodney Brown.

Q:  Gray Kyocera S1000 cell phone recovered from Rodney Brown.

R:  Gray Kyocera Virgin Mobile Cell Phone with black cell phone case recovered from Rodney

Brown.

S:  Michael Chapman's taser cartridge.

T:  Belal Ilain's taser cartridge.

U:  Black Kyocera cell phone back cover.

V:  Silver Kyocera cell phone batter.

W:  Right black leather glove.

X:  One taser probe wire labeled "photo marker #5."

Y:  One taser probe wire labeled "photo marker #6."

Z:  White metal ring with nine clear stones labeled "photo marker #7, owner Rodney Brown."

AA:  Black lighter labeled "photo marker #8, owner Rodney Brown."

BB:  Black "Body Glove" cell phone belt clip labeled "photo marker #9, owner Rodney Brown."

Defendants reserve the right to use any exhibits Plaintiff submits into evidence.

## V.   EVIDENTIARY ISSUES.

Defendants are filing in conjunction with this trial brief seven motions in limine.

Defendants wish to admit the knife used by Rodney Brown as evidence in this matter.  While

Defendants do not believe there are any legal issues regarding the admission of the evidence,

there are certainly logistical issues to producing a weapon in the United States District Court and

Defendants wish to put all parties on notice and will work with the Court and Court

administration to properly address the logistics.

## VI.   ESTIMATED LENGTH OF TRIAL

Defendants estimate trial will last 1-2 weeks.

## VII.    PROPOSED VOIR DIRE

Defendantsø proposed voir dire questions and a copy of the proposed questions are attached to this filing.

## VIII.   PROPOSED JURY INSTRUCTIONS

Defendants have submitted proposed jury instructions attached to this filing.  Defendants object to Plaintifføs proposed jury instructions as said instructions include a section on ratification, which is not at issue in this matter and also was not pled by Plaintiff.

## IX.     SPECIAL INTERROGATORIES/VERDICT FORMS

Defendants respectfully request that these forms be reserved for the final pre-trial as the instructions were not admitted jointly and the final version[s] will determine the interrogatories and verdict forms to be tendered to the jury.

Respectfully submitted,

**BARBARA A. LANGHENRY (0038838)**
**Director of Law, City of Cleveland**

**By:**     s/ John P. Bacevice Jr.               Aikaterini Houston
**THOMAS J. KAISER (0014339)**          **AIKATERINI HOUSTON (0086262)**
Chief Trial Counsel                     Assistant Director of Law
**JOHN P. BACEVICE JR. (0087306)**      601 Lakeside Avenue
Assistant Director of Law               City Hall, Room 106
601 Lakeside Avenue                     Cleveland, Ohio 44114-1077
City Hall, Room 106                     ahouston@city.cleveland.oh.us
Cleveland, Ohio 44114-1077              ATTORNEY FOR DEFENDANT
Email: tkaiser@city.cleveland.oh.us     CITY OF CLEVELAND
jbacevice@city.cleveland.oh.us
ATTORNEYS FOR DEFENDANTS
MICHAEL CHAPMAN
BELAL ILAIN
ERIK MELENDEZ
JAMES MERRITT
RICHARD RUSNAK
JOHN SATTLER

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Trial Brief was filed electronically on

September 12, 2016. Notice of this filing will be sent to all parties by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.

        s/ John P. Bacevice Jr.
John P. Bacevice Jr. (0087306)
Attorney for Defendants